1              KANTILAL SHAH, M.D.
2          (interrupted).
3      Q   Okay.  Since 1980, more than 100?
4      A   Roughly I can say, but I cannot give the
5          exact figure.
6      Q   I'm sorry?
7      A   I say I cannot give the exact figure.  I
8          don't know.
9      Q   It's okay.  I'm not asking for an exact.
10         I'm asking for approximate.
11     A   Approximately maybe say 100.
12     Q   Since 1980?
13     A   Or maybe more.  I don't know.  I cannot
14         remember the exact number.
15     Q   Okay.  Again, I'm not asking ---
16         (interrupted).
17     A   I understand, but I don't know the exact
18         number.  I cannot say that.
19     Q   You said that.  How about the approximate
20         number?
21     BY MR. PEEPLES:
22              Objection to form; asked and answered.
23     BY THE WITNESS:
24     A   I don't know the number approximately.
25     BY MR. BROOKS:

MARY T. BABIARZ COURT REPORTING SERVICE, INC.
(845) 471-2511

15

```
 1                    KANTILAL SHAH, M.D.
 2               (Whereupon, there was a brief recess
 3          taken.)
 4
 5          BY MR. BROOKS:
 6     Q    Doctor, earlier on you agreed that
 7          assessment of danger is essentially a risk
 8          assessment, did you not?
 9     A    Can you repeat the question?
10     Q    Earlier on you acknowledged that an
11          assessment of danger is essentially an
12          assessment of risk.
13     A    That's correct.
14     Q    So, you would agree that you're looking at
15          how likely this person is to cause harm to
16          self or others when you are assessing for
17          dangerousness?
18     A    That's correct.
19     Q    Okay.  Now, when you're assessing a mentally
20          ill person to determine whether he meets the
21          criteria for involuntary hospitalization,
22          would you agree that if there is a small
23          chance that this person can cause harm to
24          self or others, then that makes him
25          dangerous?
```

KANTILAL SHAH, M.D.

1

2   A    I don't know.

3        BY MR. BROOKS:

4   Q    I tell you what, Doctor, from now on, and

5        maybe it's my fault that I wasn't clear, if

6        you don't understand the question, tell me

7        you don't understand and I'll rephrase it.

8        In fact, I'll say it's my fault for not

9        making it clear.  Okay?  I apologize.

10            Doctor, is it your practice to

11       carefully complete the two physician

12       certificates?

13  A    Yes.  We have to -- yeah, we clinically

14       interview the patient and we have to make a

15       decision at times.

16  Q    Are you diligent when you -- as a general

17       rule, are you diligent when you complete the

18       forms?

19  A    After talking to patient, after interviewing

20       the patient.

21  Q    Yes.

22  A    After collecting information from outside,

23       then we make a -- after we interview the

24       patient and before we reach the conclusion,

25       we have to -- we have to decide whether the

1          KANTILAL SHAH, M.D.

2       patient can be dangerous to self or others.

3    Q  I understand that.

4    A  Yeah.

5    Q  But then would you agree that you have to

6       write down why you believe the person is

7       dangerous?

8    A  We do not write down everything in the piece

9       of paper.

10   Q  Do you write down the most important stuff?

11   A  Usually we try to as much we can.

12   Q  Is it a general practice for you to try and

13      write down the most pertinent reasons why

14      you believe the person is dangerous?

15   A  Whatever information we got from other

16      places and whatever information we have from

17      the history, whatever was given to us, okay,

18      when we check the records, and we see the

19      admission screening note, and on that

20      conclusion and after talking to patient, we

21      correlate everything and then we make a

22      decision, though we do not document

23      everything on the piece of paper.

24   Q  Maybe you don't document everything, but is

25      it a general practice for you to document

```
1                    KANTILAL SHAH, M.D.
2           the most important material?
3      A    We try as much we can.
4      Q    I'm not asking about the other people.  I'm
5           asking about you.
6      A    I understand that.
7      Q    Do you try to document the most important
8           material relating to the assessment of
9           dangerousness?
10     A    We do not document everything on that piece
11          of paper.
12     Q    I'm not asking about everything.
13     A    Yeah.
14     Q    You told me that.
15     A    Yeah.
16     Q    I'm asking you as a general practice do you
17          try to document the most important material
18          relating to dangerousness?
19     A    Like -- we try.
20     Q    I'm not asking about others.  I'm asking
21          about you.
22     A    Yeah.
23     Q    Is it your general practice ---
24          (interrupted).
25     A    Yeah.
```

KANTILAL SHAH, M.D.

1

2  Q    -- to try to write down the most important

3       material relating to dangerousness; yes or

4       no?

5  A    Yes.

6  Q    And would you agree that it's important to

7       write down the most important material

8       relating to dangerousness?

9  A    Yes.

10 Q    And would you agree that one of the reasons

11      why it is important to do so is because

12      other clinicians are going to look at what

13      you write and base their own decisions upon

14      your clinical findings?

15 A    Can you rephrase the sentence?

16 Q    Would you agree that it's important to write

17      down the most important material about

18      dangerousness because other clinicians may

19      well look at the record and base their own

20      clinical decisions upon your clinical

21      findings?

22 A    That's right.

23 Q    I'm sorry?

24 A    That's correct.

25 Q    Doctor, since you've been evaluating

KANTILAL SHAH, M.D.

2      go.

3    Q   Well, what I'm asking you is can you recall,

4      do you have a specific recollection, where

5      you concluded the person was mentally ill,

6      needed hospitalization, but was not

7      dangerous, and you said, I want this person

8      in the hospital, but I have to let him go

9      and I will let him go?  Can you recall that

10      happening?

11   A   I cannot recall right now.  I don't know.

12   Q   I'm sorry?

13   A   I cannot recall.

14   Q   Now, Doctor, would you agree that a person

15      may pose a danger to others because he poses

16      a risk of assaulting a person or otherwise

17      causing intentional physical harm; agree or

18      disagree?

19   A   Agree.

20   Q   Would you agree that another way a person

21      poses a danger is that he poses a danger to

22      himself because of a risk that he may

23      attempt suicide or otherwise engage in self

24      injurious behavior?

25   A   Yes.

KANTILAL SHAH, M.D.

1

2    A    Yeah.

3    Q    Okay.  Any others?

4    A    I don't remember any more.  I don't know any

5         more.

6    Q    Now, Doctor, I'd like to focus on the third

7         category of danger; inability to meet needs,

8         okay?  When assessing whether or not someone

9         is a danger to himself because of an

10        inability to meet needs, is it important to

11        look at whether or not the person suffered

12        from malnutrition during the last period of

13        time that he was living on an unconfined

14        basis?

15   BY MR. PEEPLES:

16           Objection to form.

17   BY MR. BROOKS:

18           What's wrong with the form?

19   BY MR. PEEPLES:

20           What do you mean unconfined?

21   BY MR. BROOKS:

22           Not arrested, in jail, in a

23        psychiatric hospital, anyplace.

24   Q    Is it important to know whether or not the

25        person suffered from malnutrition?

1          KANTILAL SHAH, M.D.

2    A    It is important to know whether the patient

3         suffered from malnutrition.  That's part of

4         the examination though.

5    Q    Is it important to know whether or not the

6         patient suffered from dehydration?

7    A    That's very important, too.

8    Q    Is it important to know whether or not the

9         person suffered from any other physical

10        infirmities that went untreated?

11   A    Yes, it's important.

12   Q    Is it important to know whether or not the

13        person has a willingness to accept

14        treatment?

15   A    Yes.

16   Q    Is it important to know whether or not the

17        person has a willingness to accept treatment

18        on an outpatient basis?

19   A    Yes.

20   Q    Is it important to know whether or not the

21        patient has family members who are willing

22        and able to provide support?

23   A    Yes.

24   Q    Is it important to know whether or not the

25        person has an ability to listen to others

```
 1                        KANTILAL SHAH, M.D.

 2              history whether they got hurt by walking in

 3              traffic or not, whether they are using any

 4              substance, alcohol or not.

 5        Q     Anything else?

 6        A     Any information we collect from the

 7              community what happens.

 8        Q     Such as?

 9        A     Such as in the past, like whether there is a

10              similar episode in the past, what happened,

11              how that happens.

12        Q     Anything else?

13        A     That's all I remember.

14        Q     Fair enough.  Now let's look at whether or

15              not a person is a danger to others as a

16              result of assaultive behavior.  What factors

17              do you look at?

18        A     We look at the history first, what happens,

19              whether they had similar incidents before or

20              not.

21        Q     History of prior assaultive behavior?

22        A     Right, assaultive behavior.

23        Q     What else?

24        A     And whether this assaultive behavior was

25              related to the delusion, like paranoid
```

```
                         KANTILAL SHAH, M.D.
 1
 2          times.
 3     Q    And?
 4     A    And whether they are taking their medication
 5          or not, whether they are using a substance
 6          or alcohol or not, and whether they have a
 7          family history positive or not, and that's
 8          the only think I remember right now.
 9     Q    How about the role of stressors?
10     A    That's important, too.
11     Q    Community support?
12     A    It is also important, too.
13     Q    Would you agree that if a person -- question
14          withdrawn.
15               Would you agree that some
16          hallucination make a patient more dangerous
17          than other hallucinations?
18     A    That's correct.
19     Q    And wouldn't you agree that command
20          hallucinations render a person far more
21          dangerous than other hallucinations which
22          may not be harmful in nature at all?
23     A    Correct.
24     Q    And would you agree that when looking at a
25          person who suffers from delusions poses an
```

KANTILAL SHAH, M.D.

2      increased risk of harm, you have to know

3      whether or not the person has ever acted on

4      delusions in the past?

5   A   It's important.

6   Q   I'm sorry?

7   A   Yes, it's important.

8   Q   And would you also have to know the nature

9      of the particular delusions of which the

10     person suffers from?

11   A   Yes.

12   Q   Would you agree further that some delusions

13     are far more risk enhancing than other

14     delusions?

15   A   Yes.

16   Q   And would you degree whether or not a person

17     intends to act on the delusions is important

18     to know when assessing a person's

19     dangerousness?

20   A   Yes.

21   Q   Would you agree further that a person who

22     intends to act on delusions poses a far

23     greater risk of harm than a person who does

24     not intend to act on his delusions?

25   A   Yes.

MARY T. BABIARZ COURT REPORTING SERVICE, INC.
(845) 471-2511

1                    KANTILAL SHAH, M.D.

2      Q    Would you agree that because a person who

3            intends to act on his delusions poses a far

4            greater risk of harm than does a person who

5            does not intend to act on delusions, when

6            assessing whether or not a delusional person

7            is dangerous, a doctor should find out

8            whether or not the person intends to act on

9            the delusions?

10     A    Can you just rephrase it?  That's too long.

11           I lost some of it.

12     Q    Sure.  About two minutes ago ---

13           (interrupted).

14     A    Okay.

15     Q    -- you said a person who intends to act on

16           delusions --- (interrupted).

17     A    Yes.

18     Q    -- poses a far greater risk of causing harm

19           than does a person who does not intend to

20           act on the delusions, correct?

21     A    That's correct.

22     Q    Would you agree that because of that, a

23           clinician who attempts to determine whether

24           or not a delusional person is dangerous

25           should attempt to determine whether or not

KANTILAL SHAH, M.D.

1

2    A    Criminal history.

3    Q    Yes.  Is that correct?

4    A    Yes.

5    Q    Would you agree further that if you know the

6         person's involvement with criminal history,

7         that even if the person does not have a

8         history of assaultive behavior within the

9         criminal justice system, the person's

10        involvement or lack of involvement may

11        provide pertinent information regarding the

12        threat of harm he may pose?

13   A    All information would depends on how --

14        whether they are involved with substance

15        abuse, drug or alcohol involvement.

16   Q    Involved with the criminal justice system?

17   A    Right, yeah.

18   Q    Now, Doctor, is it true that as a physician

19        in an Office of Mental Health facility, you

20        have access to a person's involvement in the

21        criminal justice system?

22   A    Nowadays we do have.

23   Q    And when did you get this?

24   A    It doesn't come right away day of admission

25        but within two or three days we get a closer

KANTILAL SHAH, M.D.

1

2   Q   Well, do you make an attempt to get this

3       information --- (interrupted).

4   A   Yes, information.

5   Q   -- prior to completing the two PC

6       certificate?

7   A   That's correct.

8   Q   How do you go about gathering this

9       information?

10  A   On the emergency room, where patient was

11      brought, how was brought, from the family

12      which is involved and also by looking at all

13      the records.

14  Q   I'm talking about the history with the

15      criminal justice system that's on the

16      computer.  Is it your practice to attempt to

17      gather this information prior to completing

18      the two PC certificate?

19  A   We check the records, like criminal history,

20      if available.  Sometimes it's not available

21      at the time of conversion, but prior to that

22      we would have whatever information available

23      from the emergency room or whether patient

24      came from the jail, we have some

25      information, why he was committed in jail,

KANTILAL SHAH, M.D.

1

2          what crime he did.  So, we try to get

3          information as best we can.

4    Q     Now, a second ago you said the information

5          is not available prior to conversion.  Is

6          that what you said?

7    A     Some information --- (interrupted).

8    Q     But the word you said was conversion; is

9          that correct?

10   A     Yes, I did.

11   Q     When you say conversion, do you mean a

12         determination of whether or not the person

13         is going to be converted to two PC status?

14   A     That's correct.

15   Q     And by being converted to two PC status, do

16         you mean being certified for involuntary

17         hospitalization under the Mental Hygiene

18         Law?

19   A     Can you just reframe it for me?

20   Q     When you say converted to two PC status, do

21         you mean being civilly committed?

22   A     Yes.

23   Q     Under the Mental Hygiene Law?

24   A     Yes.

25   Q     Now, you said this -- this information is

```
1                    KANTILAL SHAH, M.D.

2           information yourself?

3    A      From the patient, yes.

4    Q      No, from the computer.

5    A      No.

6    Q      Why not?

7    A      We didn't do that.  That's usually -- I

8           don't know.  I didn't do it.

9    Q      Ever?

10   A      No.

11   Q      My question is why not.

12   A      That's a good question, but I didn't do it.

13   Q      Let's talk about being a danger to self

14          because of suicide and other self injurious

15          behavior.  What are the factors that relate

16          to this type of dangerousness?

17   A      What are the factors related to this ---

18          (interrupted).

19   Q      This type of danger.

20   A      We check the past history first.

21   Q      You're saying history of --- (interrupted).

22   A      Yeah.

23   Q      -- past suicide attempts?

24   A      Past suicide attempts, right.

25   Q      Okay.  What else?
```

73

KANTILAL SHAH, M.D.

1

2   A   We check the family history.  We check the

3       reason for why that happened, what was

4       stress, any stress factors was involved, and

5       whether this happened due to response to any

6       specific delusions.

7   Q   How about hallucinations, too?

8   A   Yes, and equally drug and alcohol.

9   Q   How about impulsivity?

10  A   Yes.

11  Q   How about the lack of future plans?

12  A   It's important.

13  Q   How about hopelessness?

14  A   It's very important.

15  Q   An intent to die or signals of intent to

16      die?

17  A   If somebody single, it's possibly they are

18      more dangerously.  Marital status, if

19      somebody single, they're not married.

20  Q   Oh, that's something else.

21  A   That's okay.

22  Q   No, because --- (interrupted).

23  A   I'm sorry.

24  Q   No, no.  That's fine, because you

25      misunderstood me, but we'll go to where

KANTILAL SHAH, M.D.

2        you're going, fine.

3    A   Okay.

4    Q   You're talking about single, separated, or

5        divorced status; is that important?

6    A   Yes.

7    Q   So a person's marital status is important?

8    A   That's correct.

9    Q   Now, I'm not talking about marital status

10       now, but whether or not the person has

11       presented with some sort of signal that they

12       intend to die.

13   A   Yeah, that's very important.

14   Q   Anything else?

15   A   Recently broke up with a relationship.

16   Q   Would you agree that having broken up in a

17       relationship is enough of an indicia of

18       danger as to warrant the finding of

19       involuntary hospitalization because of

20       dangerousness?

21       BY MR. PEEPLES:

22            Objection to the form.

23       BY THE WITNESS:

24   A   You're trying to say the question that if

25       somebody is dangerous because they broke off

MARY T. BABIARZ COURT REPORTING SERVICE, INC.
(845) 471-2511

```
                        KANTILAL SHAH, M.D.
 1
 2           a relationship --- (interrupted).
 3           BY MR. BROOKS:
 4      Q    Yes.
 5      A    And ask for involuntary admission?
 6      Q    Yes.
 7      A    We may assess the patient and at that time
 8           we decide whether he meets criteria for
 9           admission as a voluntary status or not.
10      Q    Involuntary you said, right?
11      A    Involuntary or voluntary status.
12      Q    Right.  Any other factors?
13      A    We have the support system, how many they
14           have.
15      Q    Anything else?
16      A    Employment, whether they work or not.
17      Q    I'm sorry?
18      A    Whether they are working or not working,
19           that's important.
20      Q    Anything else?
21      A    I don't remember anything right now.
22      Q    All right.  Now let's look at someone being
23           a danger because of the use of drugs?
24      A    Use of?
25      Q    Use of drugs and alcohol.
```

77

KANTILAL SHAH, M.D.

1

2  Q    In what way can someone pose a danger to

3       themselves through use of drugs and alcohol

4       that is different than what we've discussed

5       previously?

6  A    Then I don't know.

7  Q    I'm sorry?

8  A    I don't know.

9  Q    Okay.  Doctor, has anybody ever talked to

10      you about how you assess dangerousness?

11 A    We have lectures.  We have conferences.

12 Q    No, but has anybody evaluated the work

13      you've done?  And when I say the work you've

14      done, the commitment forms you've completed

15      and things of that nature.  Has anybody ever

16      evaluated the work you've done and spoken to

17      you about how you conduct dangerousness

18      assessments?

19 A    Except education lecture, nobody tell us how

20      to assess.  That we learn by seeing, being

21      at whatever lectures we have.

22 Q    Well, when you go to a lecture, you sit down

23      and you're provided information, correct?

24 A    Yes.

25 Q    And then you have to apply the information

78

                        KANTILAL SHAH, M.D.

1

2              that you've learned and gathered at these

3              lectures, correct?

4     A        Correct.

5     Q        Has anybody ever sat down with you and

6              evaluated your work and has spoken to you

7              about how you've applied the information

8              that you've learned?

9     A        Nobody tell us how to do that, but that's we

10             learn.

11    Q        Has anybody ever told you you must attend

12             particular lectures regarding dangerousness?

13    A        Yes.  We usually we -- they encourage us to

14             attend the lectures for like anything, like

15             how to assess suicidal behavior.

16    Q        I'm sorry?

17    A        They encourage you to attend the conferences

18             whenever you're able to.

19    Q        Is it mandatory?

20    A        It's similar to mandatory.  They ask you to

21             attend as much you can, unless something, an

22             emergency, comes up with a patient, then you

23             cannot, but usually everybody attend that

24             lecture, which is important to us.

25             BY MR. BROOKS:

          MARY T. BABIARZ COURT REPORTING SERVICE, INC.
                         (845) 471-2511

83

KANTILAL SHAH, M.D.

2      in the jail because they are -- there must

3      be -- there is the treatment for that if he

4      suffer from any malnutrition, but they also

5      have a medical department there, too.

6  Q   And so a patient is going to be provided for

7      in jail, correct?

8  A   Right.

9  Q   Would you agree it's important to know

10     whether or not the person suffered from

11     malnutrition or dehydration immediately

12     preceding his arrest?

13  A   Yes.

14  Q   Now, have you ever made an attempt to speak

15     to people from the jail to determine whether

16     or not a patient who you deemed a danger to

17     himself because of an inability to meet

18     needs was suffering from malnutrition or

19     dehydration at the time of arrest?

20  A   Yeah.  What's the process right now is that

21     when the patient come from the jail, usually

22     we have a medical report there and same time

23     we have two psychiatrists' report there.

24  Q   When you say two psychiatric reports, you're

25     talking about competence, right?

KANTILAL SHAH, M.D.

1

2  A    Except the clinical team.  We have team

3       members.  If anybody has information,

4       sometime I don't have, if they have some

5       information, then we talk about it.

6  Q    Would you agree, Doctor, that the

7       information the clinical team has is about a

8       patient's clinical condition?

9  A    Right.

10  Q    I'm not concerned about the patient's

11       clinical condition.  I'm concerned about ---

12       (interrupted).

13  A    Administration you're talking about?

14  Q    Yes, not relating to the clinical

15       presentation of a particular patient.

16  A    Okay.

17  Q    But what is required in terms of a level of

18       certainty prior to certifying the patient

19       for involuntary hospitalization.

20  A    We, again, I'm telling you what we do.  We

21       collect information from the clinical team

22       and information from the community,

23       information from the emergency room or from

24       the jail and on that ground and after

25       talking to the patient, we make a decision

KANTILAL SHAH, M.D.

2       whether the patient -- as a psychiatrist I

3       make a decision in the end whether patient

4       meets criteria to admit him as a voluntary

5       patient or commit on two PC.

6  Q   Right, whether or not a patient meets the

7       criteria, correct?

8  A   Patient should meet criteria.

9  Q   You have to determine whether or not the

10      patient meets the criteria?

11  A   Yes, in order make two PC or voluntary,

12      right.

13  Q   Right, and would you agree further that a

14      determination of whether or not a patient

15      meets the criteria requires a determination

16      of the likelihood of a person causing harm

17      to self or others?

18  A   Yes.

19  Q   And would you agree further that there may

20      be a 1 percent chance that the person will

21      cause harm and a 99 percent chance ---

22      (interrupted).

23  A   That's correct.

24  Q   Has anybody ever spoken to you ---

25      (interrupted).

KANTILAL SHAH, M.D.

1

2    A    We talk -- you are asking the same question

3         again and again.

4    Q    That's because you didn't answer the

5         question.

6    A    No, actually, with the clinical team, they

7         talk about it, but I'm not talking about --

8         beside clinical team, I don't know anything

9         about it.  Clinical team, I'm talking about

10        psychologist, social worker, and my team, we

11        work with the patient.

12   Q    Okay.  What do they say the level of

13        certainty must be?

14   A    No.  We collect the information and whatever

15        they have, they talk to me, and then I make

16        a decision at the end.

17   Q    And what is the level of certainty that must

18        exist in your mind?

19   A    At that time -- we make a decision at the

20        time.

21   Q    That's not my question.

22   A    Yeah.

23   Q    My question to you is you make a decision,

24        right?

25   A    Right, we make decision whether patient can

KANTILAL SHAH, M.D.

1

2      be admitted here as a voluntary status or

3      involuntary status.

4  Q   I'm only talking about involuntary now, all

5      right?

6  A   Okay.

7  Q   What is the level of certainty that must

8      exist in your mind for you to commit

9      someone?  Is it 1 percent, 99 percent

10     2 percent, 98 percent, 10 percent,

11     90 percent?  What's the level of certainty?

12     BY MR. PEEPLES:

13         Objection.

14     BY THE WITNESS:

15  A   I cannot answer that question.

16     BY MR. BROOKS:

17  Q   Why not?

18  A   Because I don't know the exact number.

19  Q   Has anyone ever spoken to you about the

20     level of certainty that's required for you

21     to commit someone?

22  A   No.

23  Q   You have complete discretion to decide?

24  A   We make a clinical decision.

25  Q   Do you have complete discretion in your mind

1        KANTILAL SHAH, M.D.

2            (Whereupon, the above-referred-to

3    Certificate of Examining Physician for

4    Ronald Bilyou was marked as Plaintiff's

5    Exhibit 1 for Identification, as of this

6    date, by the reporter.)

7

8    Q    Here you go, Doctor.  I'm going to ask you

9         to read that, please.  Is that your

10        signature?

11   A    Yes, this is my signature.

12   Q    Can I ask you what you wrote, please?

13   A    Say again.

14   Q    Can I ask you what you wrote?

15   A    Yeah.  It's a 40 years old white man.  He

16        was referred from the Dutchess County Jail.

17        He was arrested for harassment charges, said

18        that he was in HRPC two years ago and

19        currently he is psychotic and he denies

20        suicidal ideation, homicidal ideation and

21        needs hospitalization.  He -- one second.

22        He needs hospitalization.  He need

23        psychological testing for diagnosis and rule

24        out organicity.

25   Q    Now, Doctor, did you find that this patient,

KANTILAL SHAH, M.D.

1

2 but what happened by looking at history and

3 what we check, and on that ground we made

4 him involuntary at the time.

5 Q Well, do you believe that he posed a danger

6 to himself or others or both?

7 A By looking at his history he made the threat

8 to the neighbors and also he been to jail

9 before, he was on probation.  Also, he -- I

10 think he has a substance abuse problem, too.

11 Q What is the reason for this conclusion?

12 A Again, I didn't write anything here, but

13 before we make this conclusion we check

14 everything.

15 Q What, are you guessing now?

16 A No, I'm not guessing.

17 BY MR. PEEPLES:

18 Objection to form.

19 BY THE WITNESS:

20 A I'm not guessing.

21 BY MR. BROOKS:

22 Q Okay.  So, where does it say he has a

23 substance abuse problem?

24 A Okay.  Here the patient has a history of

25 poly substance abuse, mainly cocaine and

1                    KANTILAL SHAH, M.D.

2           alcohol.

3       BY MR. PEEPLES:

4                The witness is referring to exhibit 2,

5           page HR05095.  That's the Bates number.

6       BY MR. BROOKS:

7    Q     Now, if he had a substance abuse problem,

8           would that increase the risk of him causing

9           harm to himself or others?

10   A     Under the influence of drug or alcohol it's

11          possible.

12   Q     Is there any reason why you didn't note it

13          on the form here, on this certification

14          form?

15   A     I did not write that.

16   Q     I'm asking is there a reason why you didn't?

17   A     Usually we don't write on the paper like

18          that.  At that time we just -- we don't

19          write everything.

20   Q     But you write the important stuff, do you

21          not?

22   A     We wrote the paper the way he came from the

23          jail that we wrote that.

24   Q     What do you mean the way he came from the

25          jail?

138

                    KANTILAL SHAH, M.D.

1

2   A   Why he was in jail and what charges he was

3       there, and also I think we wrote that why he

4       was going to do the psychological testing to

5       rule out any organicity.

6   Q   Now, Doctor, does this certification say you

7       find based on the reasons set forth below

8       that this person is dangerous?

9       BY MR. PEEPLES:

10          Objection to form.

11      BY MR. BROOKS:

12  Q   I call your attention to number three and

13      number four.

14  A   But I did not document in this paper, but we

15      looked in the history before we come to this

16      conclusion.

17  Q   And my question to you is why didn't you

18      document it?

19  A   At that time -- I don't know.  That's the

20      way we always write that, because we check

21      history.  We don't document everything in

22      the chart -- in the paper.

23  Q   How do you decide what to document and not

24      to document?

25  A   There is not any criteria what to document

KANTILAL SHAH, M.D.

1

2   and what to not to document, but that's the

3   way we write that usually at that time.

4   Q   When you say that's the way, what is the

5   way?

6   A   That's the way I wrote in the paper.  I did

7   not document everything in the chart, in

8   this piece of paper, but we went through the

9   history, physical, whatever was reason for

10  admission, what happened in the past, and we

11  looked at everything, but I did not document

12  in this piece of paper.

13  Q   Now, Doctor, you would agree that if he

14  suffered from substance abuse, that would be

15  a very important factor in assessing his

16  dangerousness, correct?

17  A   At the time, right, yeah.

18  Q   And what were the other reasons why you

19  believed he was dangerous?

20  A   He was making threat to the neighbors and he

21  was on probation, too, and I'm not sure if

22  CPS was involved.

23  Q   Now, is there any reason why you did not

24  note on the certification that he was making

25  threats to others?

KANTILAL SHAH, M.D.

1

2   A   There's no real reason, but we don't -- I

3       didn't document it.  There's no specific

4       reason for that, but we consider everything

5       before we write this.

6   Q   I'll tell you what, Doctor, could it have

7       been that you were not aware that he was

8       threatening at the time you completed this

9       document?

10  A   No, I was aware that he was making threat.

11      We have to look everything what happened in

12      the past, and that's the only ground we use

13      that.

14  Q   Doctor, are you aware that Exhibit 2 was

15      completed the day after you completed

16      Exhibit 1?

17  A   Yes.

18  Q   So, you would agree, Doctor, that Exhibit 2

19      was not in the chart when you completed your

20      certification?

21      BY MR. PEEPLES:

22          Objection to the form.

23      BY THE WITNESS:

24  A   No, old discharge summary.  This is the

25      psych evaluation part 2, but the old

KANTILAL SHAH, M.D.

1
2    discharge summary was available.
3    BY MR. BROOKS:
4    Q    What did the old discharge summary say?
5    A    I don't have right now copy of the old
6         discharge summary here what they say.
7    Q    Then how do you know the old discharge
8         summary had the --- (interrupted).
9    A    Because he was at Hudson River in the past.
10   Q    Yes? Is it fair to say that the old
11        discharge summary indicated that he
12        threatened someone that resulted in him
13        being put in jail?
14   BY MR. PEEPLES:
15        Objection to form.
16   BY THE WITNESS:
17   A    I don't know.
18   BY MR. BROOKS:
19   Q    Now, Doctor, again, in what way did you
20        believe Mr. Bilyou posed a danger?
21   A    Again, what I just told you before, we check
22        his records --- (interrupted).
23   Q    No, not the reasons. In what way? Was he a
24        danger to others because of assaultive
25        behavior? Was he a danger to himself

KANTILAL SHAH, M.D.

2  because of suicide?  Could he not meet his

3  basic needs?  In what way did you conclude

4  he was dangerous?

5  BY MR. PEEPLES:

6      Objection; asked and answered.

7  BY THE WITNESS:

8  A  Because I mentioned before that what -- he

9  made the threat to the neighbor, neighbor

10  called the police, and that was one of the

11  threat.  Same day he was on probation and

12  also he has a substance abuse history.

13  BY MR. BROOKS:

14      Move to strike as not responsive.

15  Q  Doctor, we went through a number of

16  different ways a person may be dangerous.

17  A  Right.

18  Q  In what way -- and what of those different

19  categories of danger, such as danger to self

20  because of inability to meet needs or a

21  danger to others because of assaultive

22  behavior, was this person dangerous?

23  A  He was threatening to the neighbors.  That

24  was only thing I had.

25  Q  So you're concluding he was a danger to

KANTILAL SHAH, M.D.

 1
 2    document everything here.
 3    BY MR. BROOKS:
 4    Q    All right.  Where did you get the
 5         information that he threatened someone?
 6    A    This was in the chart.
 7    Q    I'm sorry?
 8    A    In the chart.  And also from -- it must be
 9         in the screening/admission note.  This is a
10         part two.  Screening/admission note is
11         different.  This is a part two.
12    BY MR. BROOKS:
13         Okay.  Let's go off the record.
14
15         (Whereupon, there was a brief recess
16    taken.)
17
18    BY MR. BROOKS:
19         Can I ask you to mark this.
20
21         (Whereupon, the above-referred-to
22    Certificate of Examining Physician for
23    Mercedes Fuso was marked as Plaintiff's
24    Exhibit 3 for Identification, as of this
25    date, by the reporter.)

KANTILAL SHAH, M.D.

Q    I'm going to ask you, is this your signature and handwriting, Doctor?

A    Yes.

Q    Please read.

A    86 years old, white female, widow, who was admitted here on August 10, 2005 on CPS 730.40, Final Order Observation with dismissal of the charges.  She was charged with criminal mischief in the second degree. She stated that my neighbors did -- I can't get that word before -- did get before.  She was reported by the neighbor that she was throwing feces on their door and on the car. She denies past psychiatric help and treatment.  She had few arrests before and she needs further inpatient care to rule out any dementia.

Q    Do you believe this person posed a danger to herself or to others?

A    Yes, but I have to -- I need the chart.  I don't remember what was reason for.  I'm not sure.  She was arrested in Dutchess County Jail for throwing the feces on the

1              KANTILAL SHAH, M.D.

2              Certificate of Examining Physician for

3              Debbie Harrington was marked as Plaintiff's

4              Exhibit 5 for Identification, as of this

5              date, by the reporter.)

6

7     Q        Is this your signature, Doctor?

8     A        Yes.

9     Q        Can you read what you wrote?

10    A        Yeah.  This is a 52 years old white female

11             referred from the Dutchess County Jail.  She

12             was arrested for possessing of the cocaine.

13             The patient has a long history of psych

14             illness.  Patient has history of overdose of

15             the pills.  Patient has a history of poor

16             compliance with medication and aftercare

17             follow-up.  The patient has no insight to

18             her illness and her judgment is poor and

19             needs further stabilization.

20    Q        Did you believe this patient posed a danger

21             to herself or others?

22    A        If you give me the summary, I can -- I don't

23             remember what was.  I don't have a copy of

24             that, of the information that I had.

25             BY MR. BROOKS:

MARY T. BABIARZ COURT REPORTING SERVICE, INC.
(845) 471-2511

165

KANTILAL SHAH, M.D.

1

2              Mark this please, Plaintiff's

3    Exhibit 6.

4

5              (Whereupon, the above-referred-to

6    Screening/Admission Note and Psychiatric

7    Evaluation for Debbie Harrington was marked

8    as Plaintiff's Exhibit 6 for Identification,

9    as of this date, by the reporter.)

10

11   Q   Does this help refresh your recollection,

12       Doctor?

13   A   Yeah.  Now, how we came to conclusion you

14       wanted to know about she's dangerous.

15   Q   No.  First I want to know in what way was

16       this person dangerous, if any?

17   A   Yeah.  Well, by looking at her history ---

18       (interrupted).

19   Q   No.  Doctor --- (interrupted).

20   A   Why --- (interrupted).

21   Q   In what way?  Not what did you rely upon

22       that lead you to believe she was dangerous.

23       In what way was she a danger to herself or a

24       danger to others?

25   A   Dangerous to herself, because she took many

KANTILAL SHAH, M.D.

2          overdose in the past and also present

3          admission she took overdose of the cocaine.

4    Q     So was she a danger to herself because of a

5          threat of suicide or because she was going

6          to take drugs and have disorganized

7          thinking?

8    A     By looking at her history she has long

9          history of taking overdose.  Also, whenever

10         she's in manic phase, she has history of not

11         taking the medication, and aftercare

12         follow-up, plus she has a substance abuse

13         history.  By looking all the factors at the

14         time and we make conclusion at the time.

15   Q     Doctor, a while ago you said there were

16         about five ways that a person is dangerous,

17         correct?

18   A     Yes.

19   Q     Which of these five ways was she dangerous?

20   A     In her case, like, she has a history of

21         overdose, she has noncompliance.

22   Q     Noncompliance is not a way someone is

23         dangerous.

24         BY MR. BROOKS:

25              Mike --- (interrupted).

KANTILAL SHAH, M.D.

1

2    A    She becomes manic and doesn't take and when

3         somebody's manic, their psychotic symptoms

4         reappear.

5    Q    That's not my question, Doctor.

6    A    Now, you're just telling me how I came to

7         conclusion.  I looked at --- (interrupted).

8    Q    No, that's not what I'm asking you.  I'll

9         get to that.

10   BY MR. BROOKS:

11            Can you help out, Mike?  You want to

12        try and help out or are you basically saying

13        you're on your own?

14   BY MR. PEEPLES:

15            You want me to ask the question?

16   BY MR. BROOKS:

17            I'd like you to explain, try and --

18        yes, explain that we spoke about the

19        different ways to be dangerous.  That's what

20        I'm looking for before we go any farther.

21   BY MR. PEEPLES:

22            Dr. Shah, I think Mr. Brooks is asking

23        you whether you recall or whether you found

24        that this individual is dangerous to herself

25        because she might injure herself or was she

168

KANTILAL SHAH, M.D.

1

2          dangerous because she might commit suicide

3          or was she dangerous to others or was she

4          dangerous for some other reason or for some

5          combination.

6          BY THE WITNESS:

7                  More or less dangerous to herself.

8          BY MR. BROOKS:

9     Q    Because of a threat of suicide or because of

10         an attempt to take drugs?

11    A    Both, suicide and drugs.

12    Q    Was she a danger to others?

13    A    Not at that time.

14    Q    Did she meet her essential needs of food,

15         clothing, and shelter?

16    A    That I don't recall right now, whether what

17         she did at the time, but when we check the

18         history and everything, she had ---

19         (interrupted).

20    Q    Okay.  Hang on.

21    A    Yeah.

22    Q    Did you find at the time you evaluated her

23         that she had a history of suicide attempts?

24    A    Yes.

25    Q    How come you didn't write it down?

KANTILAL SHAH, M.D.

1

2   A   I wrote there's a history of the overdose of

3       the pills.

4   Q   Okay.  Do you recall how many times she

5       attempted to overdose on pills?

6   A   I don't know the exact number.

7   Q   Did you ask her whether or not she intended

8       to overdose at the present time?

9   A   I did ask her at the time.  She denied, but

10      what, see, happens in the past she denies.

11  Q   What did she deny?

12  A   She's not going to do it.

13  Q   Okay.  So, did she deny that she did it in

14      the past?

15  A   No.

16  Q   She admitted it?

17  A   She admitted she did it in the past.

18  Q   Would you agree that the fact that she did

19      not intend to act on any suicide or --

20      question withdrawn.

21          Did the patient deny that she intended

22      to act on suicidal thoughts?

23  A   When I examined the patient, when asked

24      whether you are going to harm yourself or

25      take an overdose, patient denies.

170

KANTILAL SHAH, M.D.

1

2  Q   Does her denial lower the risk of her

3      causing harm to herself?

4  A   The patient denied, but by what -- patient

5      denies, but by looking her history and by

6      looking her other history of substance

7      abuse, poor compliance, psych illness, manic

8      disorder, bipolar; combining all the

9      factors, she became dangerous.

10 Q   Any other reasons why you believe she posed

11     a danger to herself?

12 A   I think I saw some family history.  I'm not

13     sure I saw someplace or not.  Only thing I

14     consider about that that she has no support

15     system at the time.  She was on the -- just

16     about homeless.

17 Q   Any reason why you didn't note the lack of

18     support system?

19 A   Again, I didn't write.  There's no other

20     reason, but I did not write.

21 Q   No reason being you weren't thinking about

22     it?

23 A   At the time we collect information, but I

24     did not write in this piece of paper.

25 Q   That much we know.  I'm trying to figure out

179

2              (Plaintiffs' Ex. 7 - CERTIFICATE OF

3              EXAMINING PHYSICIAN FOR SHARON DEYO

4              CARNEY marked for identification.)

5              KANTILAL SHAH, M.D.,

6    Having been first duly sworn by Karen M. Flemmig, a

7    Notary Public of the State of New York, was

8    examined and testified as follows:

9                    * * * * * *

10   EXAMINATION BY MR. BROOKS:

11        Q.   Doctor, have you read this?

12        A.   Yes.  As much as I can.  Only this line, I

13   don't know what is here, at the bottom.

14        Q.   I'm showing you the Certificate of Examining

15   Physician for a patient named Sharon Carney; correct?

16        A.   That's correct.

17        Q.   Is that your signature?

18        A.   That's my signature.

19        Q.   Could you please read what you wrote?

20        A.   "Thirty-eight year old black female discharged

21   from the Dutchess County Jail.  She has a history of

22   mental illness for a while.  She remains suspicious,

23   paranoid, and disorganized.  She has no insight into her

24   illness."  Then I don't know what the word is after

25   that.  This one at the bottom, I don't know what it is.

COURT REPORTING ASSOCIATES, INC.

KANTILAL SHAH, M.D.

2   It didn't come clear. "Unable to carry on logical

3   conversation with her. She needs further

4   stabilization."

5       Q.   Now, Doctor, did you examine Sharon Carney?

6       A.   Yes.

7       Q.   After examining Ms. Carney, did you conclude

8   that she posed a danger to herself or others?

9       A.   Yes. By looking, I don't have the records

10  with me at this time, but before we do that, we have to

11  have all the admissions screening and what information I

12  have from Dutchess County Jail back to psychiatrist.

13  The if patient was previously here, we get all discharge

14  summary. The patient was here before, then we need all

15  the records, the last discharge summary.

16      Q.   Now, can you recall whether or not you

17  concluded that she posed a danger to herself or to

18  others?

19      A.   I cannot recall. If you have psych assessment

20  or whatever. I cannot recall. I don't know until I

21  have the records.

22      Q.   Doctor, what is the clinical significance, if

23  any, that she was referred to the Dutchess County Jail?

24      A.   It was dangers she exposed in the community.

25      Q.   Excuse me?

COURT REPORTING ASSOCIATES, INC.

195

1                    KANTILAL SHAH, M.D.

2       Q.    How does the fact that she was paranoid

3  indicate what her suspicious thoughts were?

4       A.    If somebody was paranoid about particular

5  things, sometimes people do react to their delusions.

6       Q.    I'm sorry?

7       A.    Sometimes the patient reacts to the particular

8  delusion.

9       Q.    And sometimes a person does not act to a

10  particular delusion?

11      A.    That's correct.

12      Q.    Didn't you concede at the earlier portion of

13  this deposition a person who does not react on delusions

14  is far less of a threat than a person who does have an

15  intent to act on a delusion?

16             MR. PEEPLES:  Objection to form.

17      A.    I don't know.

18      Q.    You don't remember?

19      A.    No.

20      Q.    I'll try to ask it again.  Would you concede,

21  Doctor, that a person who intends to act on a delusion

22  is more dangerous than a person who does not intend to

23  act on a delusion?

24      A.    That's correct.

25      Q.    Would you agree further that a person who

COURT REPORTING ASSOCIATES, INC.

1                      KANTILAL SHAH, M.D.

2    intends to act on paranoia is more dangerous than a

3    person who does not intend to act on paranoia?

4         A.   Yes.

5         Q.   Would you agree further, Doctor, that not all

6    paranoid people are dangerous?

7         A.   Not all paranoid people, no.

8         Q.   I'm sorry?

9         A.   Not all paranoid people are dangerous, no.

10        Q.   So you agree with my statement?

11        A.   Yes.

12        Q.   So if not all paranoid people are dangerous,

13   how does the fact that you noted she was paranoid

14   indicate what she was thinking about when you noted she

15   was suspicious?

16        A.   Again, I don't remember at that time what was

17   in my conversation.

18        Q.   Would you concede, Doctor, that when assessing

19   someone for dangerousness, that because not all paranoid

20   people are dangerous, it is more important to know

21   whether or not a person intends to act on paranoia than

22   it is to know that the person is paranoid?

23             MR. PEEPLES:   Objection.  Asked and

24   answered.

25        A.   Can you just repeat it?

COURT REPORTING ASSOCIATES, INC.

KANTILAL SHAH, M.D.

1

2      Q.   Sure.  When assessing someone for

3  dangerousness, which is more important to know; one,

4  whether or not the person intends to act on paranoia,

5  or, two, that the person is paranoid in and of itself?

6              MR. PEEPLES:  Objection.  Asked and

7  answered.

8      A.   Usually who has a history of reacting to

9  paranoia in the past to delusions tend to more react

10  again.

11             MR. BROOKS:  I move to strike as not

12  responsive.

13      Q.   We're not talking about history of reacting.

14  I'll get to that.  When assessing someone for

15  dangerousness, which is a more important piece of

16  information to note; one, that the person is paranoid,

17  or, two, that the person has paranoia and intends to

18  acts on the paranoia?

19             MR. PEEPLES:  Objection to form.

20      A.   It's important.

21      Q.   Which is more important?

22             MR. PEEPLES:  Objection.

23      A.   Are you talking about both, suspicion and

24  paranoia?

25      Q.   No.

1                   KANTILAL SHAH, M.D.

2        A.   Paranoid toward what?

3        Q.   Let me try it again.  When assessing a patient

4    for dangerousness, which is a more important piece of

5    information from a clinical perspective; one, that the

6    person is paranoid, or, two, that the person is paranoid

7    and intends to act on the paranoia?

8                   MR. PEEPLES:  Objection.

9        A.   Intends to act on paranoia is more important.

10       Q.   Thank you.

11       A.   Would you agree further that if the person did

12   not intend to act on the paranoia, that would be more

13   probative of dangerousness than simply knowing the

14   person was paranoid?

15                  MR. PEEPLES:  Objection to form.

16       A.   I don't know what you mean.  If somebody

17   has --

18                  MR. PEEPLES:  Do you understand what

19   probative means?

20                  THE WITNESS:  No.

21       Q.   Doctor, you're trying to determine whether or

22   not someone is dangerous.  Okay?

23       A.   Yes.

24       Q.   Which is more important; the fact that the

25   person is paranoid, or that the person does not intend

KANTILAL SHAH, M.D.

1
2  to act on any paranoia that the person has?

3              MR. PEEPLES:  Objection.  Asked and

4  answered.

5              MR. BROOKS:  Not a chance.

6              MR. PEEPLES:  That's the same question.

7       Q.  You're on, Doctor.

8       A.  Any paranoid patient, usually, if they react

9  in the past, possibly they react again to their

10  delusion.

11      Q.  Doctor, I have to tell you, that's not even

12  close to answering my question.  My question involved an

13  intent to act, not a history of acting.  I know history

14  of acting is important.  I'll get to that.  But please

15  stick to my question.

16      A.  I don't know the answer.

17      Q.  I'm sorry?

18      A.  I don't know the answer.

19      Q.  When you're assessing someone for danger,

20  which is a more important piece of information; one,

21  that the person has paranoia, or, two, that the person

22  has paranoia but does not intend to act on any paranoia?

23      A.  They both are important.

24              MR. PEEPLES:  Objection.

25      Q.  Which is more important?

COURT REPORTING ASSOCIATES, INC.

1               KANTILAL SHAH, M.D.

2               MR. PEEPLES:  Objection to form.

3      Q.   Is that what you're saying?

4      A.   We did ask, but we did not write down here.

5  We did ask about this thing.

6               MR. BROOKS:  We'll move on.

7               MR. PEEPLES:  Might as well.  We spent an

8  hour and a half on that one.

9               MR. BROOKS:  Mark this, please.

10              (Plaintiffs' Ex. 8 - CERTIFICATE OF

11              EXAMINING PHYSICIAN FOR FABIAN GITTENS

12              marked for identification.)

13 BY MR. BROOKS:

14     Q.   Doctor, is this your signature on that page?

15     A.   Yes.

16     Q.   Please read what you wrote?

17     A.   "Twenty-nine year old white man transferred

18 from the Dutchess County Jail.  He was arrested for

19 sexual harassment.  He attempted to put his hands -- the

20 female in the store and attempted to take her into the

21 bathroom.  Patient is delusional and paranoid.  He was

22 in Hudson River Psych Center outpatient in 1997.

23 Patient has a long history of psychiatric illness with

24 poor compliance with medications and after care follow

25 up.  Patient needs further stabilization."

1              KANTILAL SHAH, M.D.

2    are stopping the deposition of Dr. Shaw because Dr. Shah

3    has stated that he has to go someplace.

4              THE WITNESS:  That was last time.

5              MR. BROOKS:  Can we continue?

6              MR. PEEPLES:  We'll keep going then.

7              MR. BROOKS:  We'll mark this as

8    Plaintiffs' 10.

9              (Plaintiffs' Ex. 10 - CERTIFICATE OF

10             EXAMINING PHYSICIAN FOR CHRIS DUSAULT

11             marked for identification.)

12        A.   I examined the patient on January 26, 2001.

13   "This is a forty-year-old white male.  He was referred

14   from Dutchess County Jail.  He was charged with stalking

15   with the fourth degree.  Patient has long history of

16   psych illness.  He was last discharged from Hudson River

17   Psych Center on August 25th, 2000, to Edgewood Community

18   Residence.  He was in the mall with his father and he

19   met one of his old girlfriends.  Then attempted to talk

20   to her.  She has an order of protection and she called

21   the police and was arrested.  Patient has long history

22   of psych illness, hospitalization.  He is suspicious and

23   some evidence of thought blocking.  Patient has no

24   insight into his illness and needs further care."

25        Q.   Doctor, this is your signature; right?

235

1                    KANTILAL SHAH, M.D.

2    thought blocking, he was suspicious, and was not taking

3    his medication served for your basis that he posed a

4    danger to others?

5                    MR. PEEPLES:  Objection to form.

6        A.    I'm not saying that.  I don't have the records

7    in front of me right now.  I don't remember why I came

8    to that conclusion.

9        Q.    All right.

10                   MR. BROOKS:  Mark this as Exhibit 11.

11                   (Plaintiffs' Ex. 11 - CERTIFICATE OF

12                   EXAMINING PHYSICIAN FOR ALLEN KURT marked

13                   for identification.)

14   BY MR. BROOKS:

15       Q.    Is this your signature, Doctor?

16       A.    Yes.

17       Q.    Please read what you wrote.

18       A.    Okay.  "Thirty-six year old white male.  He

19   was referred from Westchester County Jail.  He remains

20   disorganized, religiously preoccupied, and delusional.

21   His personal hygiene is poor.  He has been refusing his

22   medication.  Patient is uncooperative, unable to get any

23   information from him.  He needs further stabilization."

24       Q.    Doctor, do you believe that Mr. Allen posed a

25   danger to others?

COURT REPORTING ASSOCIATES, INC.

253

1

2          BY MR. BROUTMAN:

3                  Would you please mark this before we

4          begin.

5

6                  (Whereupon, the above-referred-to

7          Certificate of Examining Physician for

8          Michael Karkota was marked as Plaintiff's

9          Exhibit 12 for Identification, as of this

10         date, by the reporter.)

11

12

13   KANTILAL SHAH, M.D.,

14               produced on behalf of the Defendant herein,

15   having been previously sworn, upon being examined,

16   testified as follows:

17

18                         * * * * *

19

20   EXAMINATION BY MR. BROUTMAN:

21      Q      Dr. Shah, just take a look at what's been

22             marked Plaintiff's Exhibit 12 and did you

23             complete this commitment certificate,

24             Doctor?

25      A      Yes, it is my signature there.  Just one

                MARY T. BABIARZ COURT REPORTING SERVICE, INC.
                              (845) 471-2511

254

KANTILAL SHAH, M.D.

1

2    second.

3    Q    Sure.  If you can just read what you wrote

4         into the record.

5    A    Yeah.  This is a 48 years old white male.

6         He was admitted from Dutchess County Jail.

7         He reported that he was living in Hedgewood,

8         H-e-d-g-e-w-o-o-d, Home and he was arrested

9         for assault charges.

10             He was sent to the Central New York

11        Psych Center and then returned back to the

12        Dutchess County Jail.  He has been seeing

13        psychiatrist for many years.  Patient

14        reports that he goes to Montrose VA Hospital

15        for follow-up, is still somewhat suspicious

16        and paranoid and he needs further

17        stabilization.

18   Q    Doctor, did you find that Mr. Karkota

19        presented a danger to himself, a danger to

20        others, or both?

21   A    Right now I don't have the records, but

22        usually when we complete the certificate, we

23        check the informations, what we had from the

24        CPL 730.40 or from Dutchess County Jail, and

25        also we check all the records and

MARY T. BABIARZ COURT REPORTING SERVICE, INC.
(845) 471-2511

                    KANTILAL SHAH, M.D.

1

2    Q    Now, with regard to the assault that got

3         Mr. Karkota arrested, did you find out any

4         information about the circumstances

5         surrounding that assault?

6    A    At what happened at Hedgewood?

7    Q    Yes.

8    A    Exactly, I don't know the information.  Yes,

9         I see from the police report actually what

10        happened.

11   Q    And would you have had access to the police

12        report at the time that you completed the

13        commitment certificate?

14   A    Only we have the report of the two

15        psychiatrists who examine the patient at the

16        jail.  That report was available.

17   BY MR. BROUTMAN:

18             Would you mark this please,

19        Plaintiff's Exhibit 14.

20

21             (Whereupon, the above-referred-to

22        Certificate of Examining Physician for Mark

23        Taylor was marked as Plaintiff's Exhibit 14

24        for Identification, as of this date, by the

25        reporter.)

KANTILAL SHAH, M.D.

3  Q    Here you go, Dr. Shah.  Is this your
4       handwriting?
5  A    Yes, it's mine.
6  Q    On Plaintiff's Exhibit 14?
7  A    Yes.
8  Q    Can you read what you wrote into the record,
9       please?
10 A    One line -- I can try to as much I can.
11      This is a 24 years old white man.  He was
12      referred from the Ulster County Jail on
13      730.40 from the Final Order of Observation.
14      He was arrested from possession of the
15      weapon, 4th degree.  He has long history of
16      psychotic illness and hospitalization with
17      poor compliance with the medication.
18           He was interviewed today and he's
19      still hostiles and he denies any thought to
20      hurt others.  His behavior still is
21      unpredictable and he needs further
22      stabilization.
23 Q    Now, based solely on what you have written
24      in Plaintiff's Exhibit 14, can you tell me
25      if you concluded that Mr. Taylor was a

1          KANTILAL SHAH, M.D.

2          Certificate of Examining Physician for James

3          Winters was marked as Plaintiff's Exhibit 16

4          for Identification, as of this date, by the

5          reporter.)

6

7     Q    Here you go, Doctor.  Is this your

8          handwriting on Plaintiff's Exhibit 16?

9     A    Yes, this is my handwriting.

10    Q    And when you're done reading it, if you

11         could just read what you wrote into the

12         record.

13    A    Patient was transferred from the Dutchess

14         County Jail on June 9, 2003.  He has a long

15         history of substance abuse and emotional

16         problem with the poor compliance with the

17         medication and treatment recommendation.  He

18         has no insight into his illness, judgment is

19         poor, and he needs further stabilization.

20         Patient stated that he was hearing voices,

21         but now he takes the medication so he feels

22         good and does not hear voices.

23    Q    Now, based upon what you have written in

24         Plaintiff's Exhibit 16, can you tell me if

25         you concluded that Mr. Winters posed a