```
1                        PAUL                    33

2              mentally ill patients for dangerousness --

3              (interrupted)

4     A.       Basically, no.  Personally I don't go into

5              that.

6     Q.       Doctor, would you say a patient's history of

7              violence or otherwise dangerous behavior is

8              a relevant criteria in assessing

9              dangerousness?

10    A.       Yes.

11    Q.       How would one gather that kind of

12             information?

13    A.       From the patient.  After they receive the

14             patient and get the information, and also

15             from the records.  To the extent -- yeah,

16             the records.  Either the person used to come

17             to the facility many times or from

18             providers, therapists, psychiatrists,

19             whoever had dealt with the person in the

20             community.  Prior hospitalizations.

21    Q.       Okay.

22    A.       Family.

23    Q.       What about a person's criminal record, would

24             you consider that a relevant factor in

25             determining dangerousness?
```

PAUL                                    34

A.      Criminal record is -- first of all, we don't

        have access to criminal records just like

        that.  Also, I don't see -- I don't see the

        straight connection unless at some point if

        there was a criminal behavior and at the

        same time there was some mental illness

        involved.  I think it would be dangerous for

        the psychiatrist to go to the legal area and

        pull issues from the legal area to make a

        clinical judgment.

Q.      Would you agree, Doctor, if a patient had

        committed a violent criminal act in the past

        that that would be relevant in assessing

        that patient for future likelihood of

        dangerousness?

A.      If the person -- at the moment if the person

        is in the mental health setting and if it

        was investigated that at the moment when the

        crime was committed if there was a mental

        illness involved, but I am afraid to say

        that because the person has a criminal

        history and to make the leap straightforward

        with mental illness and make a clinical

        decision based on criminal record, I would

```
1                          PAUL                    35
2              not feel comfortable to do that.
3     Q.       When assessing a patient for involuntary
4              commitment, is the patient's criminal record
5              something that you could obtain access to if
6              you wanted to?
7     A.       Criminal record, I'm not aware we can get
8              the criminal record.  I'm aware of what we
9              call the rap sheet.  It's a kind of -- shows
10             the person's jail history.  It means the
11             person was in jail two times, three times
12             and so on, but I am not aware that we can
13             get access to the criminal record.  I'm not
14             aware of that.  Something we can get is a
15             kind of brief, it's not even a criminal
16             record.  When somebody comes to our facility
17             and after being evaluated in jail by two
18             forensic psychiatrists, if they determine
19             that the person should come to our facility
20             under the CPLR 730.40, the person can -- if
21             the person is sent to us from jail, they
22             don't even send you the criminal record,
23             they send just a kind of brief form where
24             the person -- where they mention the crime,
25             the crime and he was evaluated by the
```

```
 1                              PAUL                        36

 2              psychiatrist in the records, but in terms of

 3              the access to the real criminal record, no,

 4              I'm not aware of that.

 5       Q.     You said that you do have access to what you

 6              refer to as a rap sheet?

 7       A.     Yes.

 8       Q.     In that rap sheet does it contain

 9              information about any time the patient has

10              been arrested and the crime that they have

11              been arrested for?

12       A.     They mention it.  They give the term

13              misdemeanor or whatever legal term they use,

14              assault, something like that, but that's it.

15              There's no description of it.

16       Q.     Is that something that you, in your

17              practice, review prior to making the

18              determination that a patient should be

19              involuntarily admitted?

20       A.     No.  At that time, no.  At that time it's

21              not something we make a determination on.

22              Not all the cases have that.  Most of the

23              time we have the person come in from the

24              jail hospital in a pure clinical case.  In

25              some cases coming from the emergency room,
```

PAUL                                    37

2      so it means there is already enough clinical

3      symptoms for the hospital to make the

4      determination for the patient to come to us,

5      but we are not going to rely primarily or

6      essentially on the criminal record to make a

7      determination.  It is available to us, but I

8      think it would be peripheral.  That might

9      give us an idea about the person being

10     assertive or aggressive, but still is not

11     the core or essence in our determination.

12   Q.   Would you say that the patient's level of

13        anger is a relevant criteria in assessing

14        danger?

15   A.   Yes.

16   Q.   How would you obtain --

17        MR. BROUTMAN:

18             Strike that.

19   Q.   Earlier, Doctor, you mentioned another

20        factor that you considered, substance abuse.

21        In your mind, does it matter that the

22        patient is a present substance abuser as

23        opposed to a past substance abuser?

24   A.   That might play.

25   Q.   How might it play?

A.    It plays because some patients they might

present with a clinical condition due to

intoxication.  Some patients might present a

clinical condition due to withdrawal.  So

that's why I say depending if the person is

actively using and some symptoms might be

related to intoxication or the kind of acute

withdrawal.  If the person at some point

says my last drink or my last -- well, might

now be in the frame of protracted

withdrawal, it might not be due to the acute

effect of the substance, but rather on the

withdrawal from the substance.  In any case,

withdrawal or intoxication, it plays, but

will again with the presentation that we

have at the moment.  If the person is

agitated or aggressive due to the

intoxication or if person is agitated or

aggressive due to the withdrawal.  The

presentation for us is the same.

Q.    Let's say the person was an abuser of

substances years prior, but has not used

substances at all, let's say, in the past

two years up until the time that you are

```
 1                         PAUL                      39

 2            currently evaluating them for involuntary

 3            commitment.  Would the fact that they are a

 4            prior substance abuser impact your decision

 5            whether or not to involuntarily --

 6            (interrupted)

 7     A.     It is not enough.  We have to rely on the

 8            symptom at the moment.  The history held to

 9            the extent that it might explain the

10            symptoms of the moment, but if they are not

11            connected to the symptom, no.

12     Q.     Do you believe that an individual's family

13            history is a relevant factor in determining

14            whether or not an individual is appropriate

15            for commitment?

16     A.     Family history?  No, again, I'm going back

17            again and this is something that I will go

18            over and over.  If the symptoms at the

19            moment might have some connection with

20            family history, yes, but family history just

21            for family history, no.  Family history

22            means that the -- means that the symptoms

23            that the person has, the person is poor,

24            poor by some means, but it's not enough to

25            make the person seek to the point of
```

```
1                           PAUL                      40

2              becoming dangerous to self or others.  Some

3              other factors have to play.

4        Q.    Let's say we have two patients that present

5              identically.  Same symptomatology of mental

6              illness, all factors are the same except

7              that one patient has a family history of

8              suicide and the other patient does not.

9        A.    Okay.

10       Q.    Do you believe that the patient who has a

11             family history of suicide is in any way more

12             likely to cause harm to himself or others

13             than the patient who does not have that

14             family history?

15       A.    That would be, yes.

16       Q.    What about the existence of hallucinations

17             or delusions, is that a factor in making a

18             dangerous assessment?

19       A.    Yes, it is.

20       Q.    Do the kinds of hallucinations or delusions

21             matter in making a dangerous assessment?

22       A.    Yes.

23       Q.    How does it matter?

24       A.    If the person is having common

25             hallucinations, then him or her to kill self
```

PAUL                                    41

or to kill somebody.  If the person has the

delusion, acute delusion that the neighbor

or the interviewer or the staff in the --

they are there to kill him or kill her, this

is one thing, but if the person is having

hallucinations where I'm a bad guy, things

like that, so the nature of the

hallucination plays an important role, but

particularly common hallucinations is a very

risky one.

Q.   Would you agree that if someone were to tell

you a particular patient was delusional, but

not at all tell you anything else, just that

the patient was delusional, that that is not

at all helpful in determining whether or not

the person is dangerous?

A.   I have to assess that myself and try to

explore as much as possible the evaluation,

the nature of the delusion.  Even trying

with the patient to see how the person acted

when the person who was having the delusion

might try hard to have the person tell me --

tell me -- my direct evaluation I might have

a sense of what direction that person might

```
 1                        PAUL                      42
 2           go at the moment.  The history might help if
 3           the person has a history whenever he or she
 4           is delusional and she will have a particular
 5           behavior, a pattern.  If it is erratic, he
 6           or she goes to different behaviors, that
 7           will help.  I will try hard for my
 8           evaluation to see at the moment what the
 9           person might do.
10      Q.   So you would say in assessing dangerousness
11           it's relevant to determine if that person
12           has a history of acting on their delusions?
13      A.   Yes.
14      Q.   Would you also agree that it is relevant in
15           assessing dangerousness to know if the
16           patient has a present intent to act on their
17           delusion?
18      A.   That comes in the evaluation, yes.
19      Q.   Would you agree further that a person who
20           does have a present intent to act on their
21           delusions causes a great threat of harm than
22           a person who doesn't intend to act on their
23           delusions?
24      A.   Yes.
25      Q.   How do you go about assessing whether or not
```

```
1                        PAUL                    43
2          a patient has a present intent to act on
3          their delusions?
4     A.   This is the art of the interviewer.  Talking
5          with the patient.  First of all the patient
6          has to cooperate.  Sometimes there are
7          different ways to ask the question and you
8          have to understand.
9     Q.   For example?
10    A.   The person might not tell you and plan to
11         kill Mr. X, and the patient will not tell
12         you that as soon as I leave here he will
13         kill Mr. X.  For many years Mr. X has been
14         on my case, coming to my house, looking at
15         me, it has to stop, something might happen
16         to me.
17    Q.   What about the role of stressors, is that a
18         relevant factor in determining
19         dangerousness?
20    A.   It is, yes.
21    Q.   Family relationships, is that an important
22         factor?
23    A.   Yes.
24    Q.   Employment status?
25    A.   Yes.
```

```
1                              PAUL                    44

2        Q.     Financial stress?

3        A.     Yes.

4        Q.     What about a patient's compliance with

5               treatment?

6        A.     Very important.

7        Q.     Why is that very important?

8        A.     Because it's their ability to rely on

9               treatment.

10       Q.     Talking about -- let's talk about a person

11              being a danger to themselves because they

12              are unable to meet their basic needs.

13              Reaching a conclusion whether or not a

14              person is dangerous to themselves because

15              they are unable to meet their basic needs,

16              do you think it's important to know that a

17              person suffers from malnutrition or

18              dehydration?

19       A.     Yes, it is important.  It is important.  It

20              might not be an exact point, but yes, it is

21              important.  The imminence of the danger is

22              closer because obviously the person is -- if

23              the person or condition is prone to neglect

24              oneself, yes, there's a risk.

25       Q.     Would you say it's important to know whether
```

```
 1                              PAUL                    45

 2              or not the person suffers from physical

 3              infirmities that have gone untreated?

 4        A.    Physical what?

 5        Q.    Infirmities that have gone untreated.

 6        A.    Yes, it is.

 7        Q.    Would you say it's important to know whether

 8              or not the person has a willingness to

 9              accept treatment?

10        A.    Yes.

11        Q.    Would you say it's important to know whether

12              or not the person has family members that

13              are willing to support the patient?

14        A.    Yes.

15        Q.    Would you say it's important to know whether

16              or not the person is able to obtain and

17              properly store food?

18        A.    Yes.

19        Q.    Would you say it's important to know whether

20              or not the person is able to handle money in

21              such a way that they are able to complete

22              minimal transactions that would acquire them

23              food or clothing?

24        A.    Yes.

25        Q.    Would you say it's important to know whether
```

```
1                        PAUL                        46

2           or not the person is living in squalor?

3    A.     Squalor?  What is that?

4    Q.     Sort of dirty, unhealthy, unkemped living

5           condition, squalor.

6    A.     Yes.

7    Q.     Let's say over the past ten years, all these

8           different risk factors that we have been

9           talking about, were you aware of those risk

10          factors when you have been making

11          determinations to involuntarily commit

12          patients at the time that you were making

13          those decisions?

14   A.     Yes, I'm aware of them.  Specifically some

15          patients, not all, every patient will come

16          with full risk, but a particular patient

17          will come with some risk.

18   Q.     Were you aware of that list over the past

19          ten years?

20   A.     Yes.

21   Q.     Before you mentioned 730.40 patients.  Do

22          you agree with me those are patients that

23          have been found incompetent to stand trial

24          and are therefore brought to Hudson River?

25   A.     Yes.
```

second flag.  She is anxious, the person in
front of me.  She is anxious.  She is
hypertalkative, so it means what we call
pressured speech because she keeps talking
and talking and talking and talking.  The
perseverates, she repeats the same thing
over and over and over.  She has the
pressured speech and repeating the same
thing.  Sometimes you must ask a question,
it doesn't matter what you ask for, the
person comes with their own idea pushing it
all over, the same way.  She said several
times that she wants to go home, that she
wants to be with her mother.  The context
again, surely it is legitimate for her to be
with her mother, but in the context like
this I would not expect her going to jail,
coming here and to tell me I'm leaving the
hospital, I want to be with my mother.  I
expect her to want to present a case to me,
to justify what happened, how she is going
to meet with her mother.  She says she
doesn't like it here because she always
spends two hours in the shower every day and

1

2      she has to wash to get out of the shower.

3      Now, I have a problem there.  Doesn't make

4      sense.  If a person feels like taking two

5      hours in the shower, maybe, but I don't

6      expect somebody being evaluated by me

7      telling me okay, I have to spend two hours

8      in the shower, so because I can't do it in

9      your hospital I'm out of here.  The judgment

10     is out as far as I'm concerned.  Also, two

11     hours in the shower, already we start

12     thinking of obsessive compulsive disorder.

13     This is the thought that we were going to

14     watch for, for somebody to spend two hours

15     in the shower every day you can speculate

16     whatever you want, but immediately this is

17     the sign of obsessive compulsive disorder.

18     Associated with that, the context, if you

19     are in judgment to make a case to tell a

20     psychiatrist that you are not sick enough to

21     be in this hospital, during the evaluation

22     you expect again the person to make a case

23     to you, but not to tell them I'm going home

24     because your hospital doesn't have a shower

25     for me to spend two hours.  You have to look

```
 1                            PAUL                    115
 2             at it how you negotiate with the outside
 3             world, where the world is at your service
 4             with whatever exaggeration you are in.
 5             Essentially, if you are forced by the jail
 6             to be in a place like this, you make your
 7             case, you convey to the psychiatrist and to
 8             the interviewer that everything is flowing.
 9             I put denied homicide or suicide at the time
10             of my evaluation.  She shows anger and
11             anxiety about being here and some vague
12             delusion about being treated like a dog, the
13             anger, anxiety, pressured speech,
14             perseverates, anger, I come to that
15             conclusion.
16       Q.    When you conduct interviews in order to make
17             a determination of whether a person should
18             be involuntarily committed, do you inform
19             the patient as to the purpose of your
20             interview?
21       A.    Absolutely.  I present myself and the reason
22             I talk to the person and to a certain extent
23             I explain the conversion has to be made for
24             the jail status to your status in the
25             hospital, absolutely.
```

```
 1                     PAUL                          83

 2             DARYL ROBINSON WAS RECEIVED AND MARKED

 3             AS PLAINTIFF'S EXHIBIT 3 FOR

 4             IDENTIFICATION)

 5

 6      Q.     Doctor, I'd like to show you Plaintiff's

 7             Exhibit 3.

 8                     (Document submitted)

 9      A.     Okay.

10      Q.     Is this your handwriting?

11      A.     Yes.

12      Q.     Am I correct in saying that this is a

13             certificate that you completed to

14             involuntarily hospitalize this patient?

15      A.     Yes.

16      Q.     Can you read what it is that you wrote in

17             the narrative portion?

18      A.     Let me look it over first.

19      Q.     Sure.  I'll ask you to read it out loud for

20             the record.

21      A.     Absolutely.  This is a 41-year-old Caucasian

22             male who comes willingly to the interview

23             room.  He's cooperative, but not spontaneous

24             in providing information.  He answers

25             questions with one or two words.  He says
```

PAUL 84

1

2           that he was placed in jail after he lit a

3           fire in a driveway in Amenia next to the

4           firehouse.  He mentioned that he was cold

5           and he wanted to keep himself warm.  He also

6           said that he was at Mercy Hospital, but

7           unable to say why.  He doesn't know why he's

8           in this hospital either.  His speech is

9           slow, underproductive.  He appears to be

10           preoccupied with his inner world.  At times

11           he loses contact with the interviewer.  He

12           showed some thought blocking.  His

13           psychomotor activity is decreased.  His mood

14           is flat with blunted affect.  His hygiene is

15           fair.  His insight and judgment are

16           impaired.  The patient is unable to care for

17           himself indefinitely.  He is dangerous to

18           himself.  He needs inpatient care to

19           stabilize his condition.  My signature.

20    Q.    Am I correct in saying that you found this

21           person --

22           MR. BROUTMAN:

23               Strike that.

24    Q.    In what way did you find this person, Mr.

25           Robinson, dangerous?

PAUL                                         85

2    A.    The presentation, the person in front of me,

3          how he presents, is he malnourished or not,

4          well kept.  Second, he said that he was in

5          jail after he set a fire on the driveway of

6          the firehouse, to go to the driveway of the

7          firehouse to set the fire with the purpose

8          of keeping himself warm.  For me, it isn't

9          sound to me in somebody's behavior to set a

10         fire and to lay next to it in the driveway,

11         to me that's not quite okay.  Also, he

12         mentioned that he was at Mercy Hospital.

13         Mercy Hospital is a forensic unit.  People

14         who go to Mercy Hospital, when they are in

15         jail, if at some point they are in a mental

16         condition that requires treatment, they are

17         sent to Mercy to be studied and then

18         returned to jail.  So now we have a

19         combination of jail, we have a combination

20         of hospital.

21   Q.    Let me ask you this, Doctor.  Before we

22         talked about different ways which someone

23         can be dangerous.  You said a person can be

24         dangerous to others because they might cause

25         injurious behavior, danger to themselves,

```
1                              PAUL                        86

2              might not be able to meet their basic needs,

3              they could be dangerous to themselves or

4              others because their mental illness is so

5              acute that they are unable to navigate the

6              dangers of daily living.

7      A.      Right.

8      Q.      Outside of the ways that I just mentioned,

9              are there any other ways that a person can

10             be dangerous?

11             MR. PEEPLES:

12                  Objection.  Asked and answered.

13     A.      Let me think.  It might come to my mind.

14     MR. BROUTMAN:

15     Q.      All right.  Of those ways that we have

16             mentioned that a person can be dangerous,

17             which of those ways was Mr. Robinson

18             dangerous?

19     A.      Again, I said to go to a driveway to set a

20             fire and with his statement that he was

21             cold, he wanted to keep himself warm, what

22             does that mean?  He sets a fire, stays, lies

23             down next to it.  Do we agree?  He sets a

24             fire in the driveway, he sits next to it and

25             lies on the driveway to keep himself warm.
```

<pre>
 1                              PAUL                    87

 2                Is that a dangerous behavior?  I would say

 3                yes.

 4      Q.       Now, is that a dangerous behavior because

 5                you felt as though Mr. Robinson posed a

 6                danger to others?

 7      A.       To some extent, yes, but more immediately to

 8                himself.  Now, if the fire spread,

 9                definitely yes, that house would be on fire.

10                We are talking about the second step.

11                Immediately as far as he's concerned, he set

12                the fire and he lies next to it, we are

13                talking about immediate.  If we want to

14                speculate a little more, I'll come to that.

15                Didn't go so far and there's a possibility

16                there.

17      Q.       I'm not interested in speculating.  I'm

18                interested in what you determine at the time

19                that you completed the certificate.

20      A.       Okay.

21      Q.       So at the time that you completed the

22                certificate, did you determine that Mr.

23                Robinson posed a danger to others?

24      A.       To himself, yes.  This is my conclusion.  I

25                wrote in my conclusion -- (interrupted)
</pre>

```
1                          PAUL                    88

2    Q.    We will get to danger to others later.

3    A.    No, no.  At this point in time my conclusion

4          is clearly he's a danger to himself.  At

5          that time if I had any speculation about

6          others, maybe, but now, from what I wrote I

7          cannot extrapolate to come from what I

8          ordered that time.  I wrote he's dangerous

9          to himself, he needs inpatient care to

10         stabilize his condition.

11   Q.    Am I correct in saying you concluded Mr.

12         Robinson was a danger to himself and he may

13         have been a danger to others, but at this

14         point in time you were not sure that --

15         (interrupted)

16   A.    My conclusion from what I wrote, he was a

17         danger to himself.

18   Q.    Did you believe he was a danger to himself

19         because he was unable to meet his basic

20         needs?

21   A.    On a different level.  The presentation he

22         was not able to meet his basic needs for him

23         to -- to keep himself warm he chooses the

24         dangerous one, to set the fire in the area

25         on the driveway of a firehouse.  Also, his
```

1                          PAUL                        89

2          condition in terms of his judgment he was

3          guided by any means for whatever reason, he

4          didn't want to elaborate on that.  He was

5          like I don't want to answer.  It means

6          there's no way this person is going to

7          explain or rationalize his behavior.  At

8          least by questioning him he would have a

9          chance to give an explanation why he chose

10         to refuse.

11     Q.  Did you believe that Mr. Robinson posed a

12         danger to himself because he might commit

13         suicide or other injurious behavior?

14     A.  Suicide, I didn't mention suicide.  If I

15         don't mention it, I can't speculate about

16         it.

17     Q.  What about other self-injurious behavior?

18     A.  I can't speculate.  At this point in time, I

19         don't see it or I didn't write it, I don't

20         have any writing as an impression telling me

21         that he was going to cut himself or harm

22         himself.

23     Q.  Okay.

24     A.  I'd like to reinforce one thing, this is

25         somebody I saw at some point.  I don't

PAUL                                        90

1
2          remember the specifics.  When the case is

3          fresh, from the presentation and interview,

4          I might have said something in mind.  If I

5          come to the conclusion at the moment the

6          thing I wrote was the salient point for me

7          from the present condition.  Other areas,

8          the fire might spread to the house, fine,

9          but the salient point for me to make the

10         decision is, is he dangerous to himself.

11         Two or three years later I can't sit here

12         and tell you.  This was in February of '04.

13         This case is not really sharp in my mind

14         now, so to speculate I could not do that.  I

15         have to rely on what I wrote at the moment

16         and the presentation I got and put the

17         pieces together, I feel that he was a danger

18         to himself.

19    Q.   Now, although I know you've already

20         testified about this, my question is in what

21         way was he a danger to himself?

22    A.   I say the behavior to set the fire on the

23         driveway, sit next to it, lie next to it to

24         keep himself warm and his inability to

25         cooperate in a sense that he was responding

18

1

2      to inner stimuli.  The nature of it I don't

3      know.  Was it common hallucination?  I don't

4      know.  Clearly, it was a responding -- this

5      is a sign of psychosis.  He was having

6      problems.  This is a disorder.  Somebody who

7      is known to engage in the kind of

8      conversation, conversation flow either he

9      has to stop or he just says one way, unable

10     to give his perspective of the situation.

11     This is another thing.  Putting everything

12     together from the presentation, from the

13     behavior, from his history, he was at Mercy

14     Hospital knowing what Mercy Hospital is

15     about, clearly Mercy Hospital is a forensic

16     place for people who have medical and

17     psychiatric problems in jail.  So luckily if

18     he told me he was at Mercy Hospital that

19     means at some point he was in jail, but

20     because of sickness he has to be treated in

21     a hospital as a prisoner.  This is a summary

22     of my evaluation, what you see, talking to

23     himself, not answering questions, thought

24     blocking.  Inside his presentation,

25     everything put together, this is how I came

```
1                              PAUL                    92

2            to my conclusion.

3      Q.    Now, focusing on setting fire in the

4            driveway.  The fact that this person suffers

5            from a mental illness and sets a fire in the

6            driveway to keep himself warm, does that in

7            and of itself make him dangerous?

8      A.    That's part of the dangerousness.  This is a

9            dangerous behavior.

10     Q.    Does that action in and of itself make him

11           appropriate for commitment?

12     A.    I put other pieces in my assessment.

13     Q.    I understand that.

14     A.    It's important for me.  It's not just the

15           fire and I come to the conclusion.  I was

16           lucky enough at that time to write that

17           situation.  I give a description, thought

18           blocking, came from Mercy, his hygiene was

19           fair, he has poor insight, no judgment.

20           That's what we psychiatrists do.

21     Q.    That I understand.

22     A.    I can't follow you then.

23     Q.    Okay.

24     A.    I can't say that he was setting a fire on

25           the driveway of a firehouse and here he is
```

1                              PAUL                        93

2              in the hospital being committed.  That's not

3              me.

4    Q.   Would you agree with this, all people that

5              are mentally ill that set fires in driveways

6              to keep themselves warm are not dangerous?

7         MR. PEEPLES:

8                   Objection to the form.

9    A.   I can't say that.  I can't make a

10             speculation about it.

11   MR. BROUTMAN:

12   Q.   Again, if we gather all of the people that

13             are mentally ill in the world and all of

14             these mentally ill people set fires in

15             driveways to keep themselves warm, is there

16             any number of people within that population

17             that are not dangerous to the point that

18             they are appropriate for the point of

19             commitment?

20        MR. PEEPLES:

21                  Objection.

22   A.   I can't form an opinion on that.  I have to

23             evaluate them.

24   MR. BROUTMAN:

25   Q.   When evaluating Mr. Robinson, do you know if

2           he was suffering from hypothermia?

3   A.    I don't know.  I don't know if he was

4           suffering from hypothermia, but if it was

5           February, there's no place to stay -- I

6           think it was in February, if he doesn't have

7           a place to stay, I would say it's fair for

8           him to feel cold.  I would not go and put a

9           diagnosis of hypothermia while the

10          environment isn't a cold one.  Everybody

11          would like to be in a warm place.  It's not

12          him having hypothermia.  Rather, it was cold

13          weather and he had to be warm.

14   Q.    At the time that you completed this

15          evaluation of Mr. Robinson, would you have

16          been aware as to why he was in Mercy

17          Hospital?

18   A.    If he was cooperative with me, it would be a

19          possibility, yes.

20   Q.    That's not my question.  My question is --

21          my question is would you have been aware

22          from outside sources, not the patient

23          himself, as to why he was in Mercy Hospital?

24   A.    If there was a record at that time, it means

25          when he came to this hospital, if he came

```
1                              PAUL                        95

2              with the worker, that would mention that.

3              If at some point he was a former patient in

4              this hospital, it would have been the

5              possibility.  If at the time he was brought

6              to this hospital, he came directly from jail

7              from being arrested for being on that

8              driveway, there was no immediate

9              hospitalization established.  I would take

10             some time before getting any workup from

11             Mercy Hospital implying that.  He would have

12             to give us another consent or send the

13             consent to Mercy Hospital or any other

14             hospital to get this record.  So during the

15             time I did my evaluation, this process

16             necessarily could not be accomplished.

17        Q.   Can you describe what you mean by thought

18             blocking?

19        A.   Thought blocking is when the person has

20             difficulty expressing himself.  For example,

21             he would start the sentence, stop, take a

22             pause, and then start again.  Or if I ask a

23             question the person has difficulty to make a

24             sentence, will start with I was going --

25             stop -- take a pause -- and then start
```

```
 1                      PAUL                    96

 2           again.  Or the person is so limited that the

 3           answers are very short, but the person is

 4           unable to make a clear sentence to express

 5           his idea.  In some way this is somebody who

 6           needs pauses in expressing himself.

 7           Sometimes you get lost because in the pause,

 8           the person might not continue the sentence,

 9           there is no connection from the previous

10           part.

11      Q.   Am I correct in saying that thought blocking

12           is a symptom of mental illness?

13      A.   Yes.

14      Q.   Do all people that suffer from this symptom

15           of mental illness pose a danger to

16           themselves or others?

17      A.   It's not just that.  The thought blocking is

18           one symptom.  What we call symptoms, this is

19           part of a syndrome.  We admit on the basis

20           of syndrome, so the diagnosis -- the name is

21           the syndrome.  The syndrome is what this is,

22           the least of the symptoms.  Thought

23           blocking, this is just one symptom as part

24           of a syndrome.

25      Q.   Okay.
```

19

1                                    PAUL                        97

2        A.     We meet under the syndrome and the syndrome

3               makes the person -- (interrupted)

4        Q.     Doctor, my question is of all the people

5               that suffer the symptom of thought blocking,

6               are all of them dangerous?

7        A.     I can't answer that.  It would be hard for

8               me to take the symptoms and to talk about

9               the decision.

10       Q.     Is it possible that a person who manifests

11              the symptoms of thought blocking is not

12              dangerous?

13       A.     This is a possibility.

14       Q.     Can you tell me how Mr. Robinson's inability

15              to cooperate with your interview is relevant

16              to whether or not he poses a danger to

17              himself or others?

18       A.     The question is too specific.  It's part of

19              the whole presentation.  If at some point he

20              was exhibiting some dangerous behavior or if

21              he was not able to care for himself from the

22              presentation, but now himself in his

23              ability, this is part of the survival in

24              terms of being able to make his case, able

25              to explain, able to justify, so if he's

```
 1                         PAUL                    98

 2              unable to do that, either because of his

 3              difficulty to express himself, secondary to

 4              his illness or if now again he's unable to

 5              do that because he's too paranoid, he's too

 6              guarded to do that, so clearly there's a

 7              problem there.  He's able to demonstrate

 8              that he does not have the ability to

 9              negotiate with the outside world for his own

10              survival, he's a danger to himself then.

11      Q.      Doctor, are all people who are mentally ill

12              and homeless during the winter months in the

13              Poughkeepsie area of New York dangerous to

14              themselves or others?

15              MR. PEEPLES:

16                   Objection.

17      A.      I can't say that.

18      MR. BROUTMAN:

19      Q.      Is it possible that someone could be

20              mentally ill and homeless during the winter

21              months in the area of Poughkeepsie and not

22              be dangerous to themselves or others?

23              MR. PEEPLES:

24                   Objection.

25      A.      I can't answer that question.
```

```
1                       PAUL                      99

2        MR. BROUTMAN:

3        Q.      Why can't you answer the question?

4        A.      Because it's like taking fragments and other

5                fragments to make a decision.  I can't take

6                pieces inconveniently -- I put two pieces

7                together and here I am making a decision.

8        Q.      Can you envision any situation in which a

9                person suffers from a mental illness who is

10               homeless during the winter months in the

11               area of Poughkeepsie and that person is not

12               a threat to themselves or others to cause

13               danger?

14       A.      It's difficult for me to say it that way.

15       Q.      Why?

16       A.      It means in my office or in my general

17               thinking, if a person comes to me, if a

18               person presents in the hospital or if a

19               person has to be evaluated by me, now I'm

20               going to consider all the factors if the

21               person has to stay in the hospital or not.

22               But on the other end, I can't leave the

23               hospital and make speculation out there for

24               who are liable to come to the hospital, I

25               cannot.  People come in.  I evaluate them to
```

<pre>
 1                        PAUL                    100

 2            determine if they should remain in or not.

 3            Me, as a psychiatrist, I can't be there in

 4            Poughkeepsie assuming that some people

 5            should go in.  I'm keeping people I feel

 6            should be in and sending out people who I

 7            feel should be out.

 8     Q.     Let's say that the police officers in

 9            Poughkeepsie during the winter months round

10            up all of the people who are homeless and

11            living on the streets.  And you are

12            examining all of these patients to determine

13            if they should involuntarily be committed.

14            Of those people that are mentally ill, is

15            there -- is it possible that any percentage

16            of those people are not appropriate for

17            commitment?

18            MR. PEEPLES:

19                 Objection.

20     A.     I can't answer that.  Now you pull me in the

21            police business.  I can't answer that.  If

22            the police arrest them, then I can't answer

23            that.

24     MR. BROUTMAN:

25     Q.     My question has nothing to do with whether
</pre>

1                              PAUL                        101

2              or not they were appropriately arrested.  My

3              question has to do with your evaluation of

4              these group of people who have been

5              presented to you that are homeless in

6              Poughkeepsie during the winter months and

7              who are mentally ill.  I'm asking if there

8              is -- if it is possible that any portion of

9              that population of people are not

10             appropriate for commitment?

11             MR. PEEPLES:

12                  Objection to the form.

13     A.      If I evaluate some of them -- if I evaluate

14             them, if I feel that some of them don't pose

15             a danger to themselves or others, I don't

16             feel they need admission.

17     MR. BROUTMAN:

18     Q.      Generally speaking, not specifically to Mr.

19             Robinson, when you complete a certificate

20             for involuntary commitment, do you write

21             down all of the ways in which a person is

22             dangerous or just one way seeing how that is

23             sufficient to involuntarily admit the

24             person?

25             MR. PEEPLES:

```
 1                          PAUL                    102

 2                 Objection to the form.

 3       MR. BROUTMAN:

 4       Q.    Nonspecific to Mr. Robinson.

 5       A.    This is the way I do it (indicating).

 6       Q.    Let me ask you in terms of a hypothetical.

 7             Maybe that will make the question more

 8             clear.  If you are interviewing a patient to

 9             determine whether or not they should be

10             involuntarily committed and right off the

11             bat you come to the determination that the

12             person poses a threat of danger to others

13             because, let's say, that person says I'm

14             going to go home and get a gun and shoot so

15             and so.  Would you then make the

16             determination as to whether or not they pose

17             a danger in other ways that we have talked

18             about or would your psychiatric conclusion

19             cease at that point because you've

20             satisfactorily reached a condition as to

21             where it would be appropriate to commit that

22             person?

23       MR. PEEPLES:

24                 Objection to the form.

25       A.    I don't understand.
```

```
1                          PAUL                      103

2       MR. BROUTMAN:

3       Q.    I understand that was a long-winded

4             question.

5       A.    If the person told me I'm going to get a gun

6             and shoot myself -- (interrupted)

7       Q.    Let's say that happens.  Am I correct in

8             saying that you would reach the conclusion

9             that person poses a danger to themselves

10            because they might cause self-injurious

11            behavior?

12      A.    It might be part of it, but I would continue

13            my evaluation.  It's part of my red flag.

14            It's part of the whole thing.  I'm not going

15            to say this is it, you are committed, but

16            I'm going to continue my evaluation with

17            that element.

18      Q.    Let's say you continue your evaluation and

19            in addition that you conclude that the

20            person poses a danger to themselves because

21            of self-injurious behavior, you also pose an

22            opinion that the person will pose a danger

23            to others and unable to meet their basic

24            needs.  In completing the certificate, would

25            you indicate one of those reasons, all three
```

PAUL                           104

2            of those reasons or somewhere in between?

3  A.    I would not spell out specifically.  I would

4            examine, of course, indicate where I come

5            from.  As you can see in this certificate

6            here (indicating), this is mine, I give a

7            synopsis, and then I don't have to say the

8            person says he's going to take the matches,

9            he's going to get the gas, he's going to buy

10           the gas.

11           MR. PEEPLES:

12               Let the record reflect the witness is

13           referring to Exhibit 3.

14  A.    It means the details -- when you do the

15           interview you are lucky enough to get enough

16           element to do the examination.  But now in

17           terms of the details, it's more or less luck

18           if you have the patient cooperate with you

19           either because of the illness or because the

20           patient is unable to tell you or the art to

21           get the information, so you have a lot of

22           factors.  It means that you can't be fancy

23           in guessing on one as expected.  Yes, you

24           are going to set the fire, how did you plan

25           this?  Where did you get the gas?  You are

1                             PAUL                        105

2                  quick to get a cross picture of the person

3                  in terms of exactly the information I tried

4                  to get.  If I'm lucky, either of them how

5                  you wanted to set the fire and what happened

6                  when you went to Mercy Hospital, when you

7                  were arrested and in jail, how did you talk

8                  to the psychiatrist, all of those kind of

9                  things, they are just to put more flesh, so

10                 to speak, to different things.  I'm lucky I

11                 get this form here.  If you are somebody who

12                 has a third disorder, unable to express

13                 self, now to go into details and have the

14                 person give you details about one action you

15                 lose the person.

16     MR. BROUTMAN:

17     Q.    Doctor, I'm not concerned with the details.

18           My question is if another psychiatrist were

19           to read your certificates for involuntary

20           commitment, would that other psychiatrist be

21           able to conclude all of the ways in which

22           you believed that that person was dangerous?

23           When I say all the ways in which you believe

24           the person was dangerous, I'm talking about

25           the four different ways in which we talked

```
1                          PAUL                    106

2              about earlier?

3         MR. PEEPLES:

4              Objection.

5    A.   That part I can't, because this is the

6         evaluation of the psychiatrist at the

7         moment.  In some way I can't put myself in

8         the shoes of another psychiatrist.

9    MR. BROUTMAN:

10   Q.   My question is if another psychiatrist is

11        reading one of your certificates, would they

12        be able to understand Dr. Paul thought

13        patient X was a danger to himself because he

14        was going to cause self-injurious behavior,

15        and also Dr. Paul thought that patient X was

16        a danger to himself because he was unable to

17        meet his basic needs, would another

18        psychiatrist be able to understand those

19        conclusions based upon reading your

20        certificates?

21        MR. PEEPLES:

22             Objection to the form.

23   A.   Again, I can't answer for the psychiatrist.

24        To the best of my ability, I tried to convey

25        that because the patient is dangerous to
```

PAUL                                    107

himself, he has to be committed.  To the

best of my ability that's what I put here.

MR. BROUTMAN:

Q.    Let's focus on danger to himself.  We said

there are three different ways that a person

can be dangerous to oneself, self-injurious

behavior, unable to meet basic needs and

unable to navigate the tasks of daily

living.  In your certificates, do you write

them in such a way that another psychiatrist

would be able to understand which of those

three ways that a person was a danger to

himself if you did conclude that the person

was a danger to himself?

MR. PEEPLES:

        Objection to the form.

MR. BROUTMAN:

Q.    I'm speaking generally, not specifically to

Mr. Robinson.

A.    This is what I presented.  If I said you are

trying to set fire in the driveway, thought

blocking, he was not responding to stimuli,

his presentation was unkemp, disheveled, I

try to put in as much as I can.

PAUL                                    108

1

2    Q.    Am I correct in saying that you concluded

3          Mr. Robinson was a danger to himself?

4    A.    Yes.

5    Q.    Did you believe Mr. Robinson was a danger to

6          himself because he had the potential to

7          cause self-injurious behavior?

8    A.    I put unable to care for himself.

9    Q.    Sometimes this is just for clarity of the

10         record, but it's a yes or no kind of

11         question.  If you can't answer it --

12         (interrupted)

13   A.    Could you repeat it again?

14   Q.    Yes.  Did you conclude that Mr. Robinson was

15         a danger to himself because he was going to

16         cause self-injurious behavior?

17   A.    I can't answer that.  The self-injurious, I

18         can't answer it.  The way you ask

19         self-injurious I have it in my mind a

20         certain way.  I don't know if this is the

21         way you are asking me.

22   Q.    I want to make sure we are on the same page.

23   A.    Define self-injury.

24   Q.    By that, I mean the person will cause

25         physical harm to themselves, they will cut

```
 1                          PAUL                      109

 2            themselves, they will shoot themselves, they

 3            will do something that will cause physical

 4            harm to the body.

 5    A.      It directly -- the list you give, no.

 6            Secondarily, yes.  If he sets the fire and

 7            sits next to it or lies down next to it and

 8            falls asleep, he can get burned if he falls

 9            asleep.  I was not saying he was acutely

10            suicidal, where you would go straight, take

11            a knife, cut himself, stab himself, from

12            this writing that was not the impression.

13            Secondarily, either by his inability to

14            provide himself with basic necessities, yes,

15            he was a danger to himself.

16    Q.      Do you know if Mr. Robinson was

17            appropriately able to feed himself?

18    A.      At this point I don't know.  I don't

19            remember.

20    Q.      If you concluded that he was unable to

21            appropriately feed himself, was that

22            something that you would have included in

23            the certificate?

24    A.      I would either include it specifically or I

25            would keep it in the -- I would either put
```

```
1                              PAUL                    110

2            unable to provide himself with food, but

3            usually I don't specifically limit my

4            assessment just to the food.  I'm a little

5            bit more general than that.  I see larger

6            than just the food.  I see food, I see

7            shelter, I see clothing.  Navigating the

8            outside world in terms of survival.  Food is

9            part of it.

10      Q.   At the time that you evaluated Mr. Robinson,

11           were you aware of the size of the fire that

12           he set?

13      A.   No, I don't have a sense about that.

14      Q.   Were you aware if the fire that he set posed

15           a danger to any other structures in the

16           area?

17      A.   I'm not aware of that.

18           MR. BROUTMAN:

19                Mark that.

20

21                (CERTIFICATE OF EXAMINING PHYSICIAN,

22                HOLLY RIGGINS WAS RECEIVED AND MARKED

23                AS PLAINTIFF'S EXHIBIT 4 FOR

24                IDENTIFICATION)

25
```

```
1                              PAUL                      111

2      Q.    Doctor, is this your handwriting?

3            (Document submitted)

4      A.    Yes.

5      Q.    Can you read the certificate?

6      A.    Let me read it first.  The patient is

7            cooperative in accepting to be interviewed.

8            She said that she was sent to the hospital

9            from Ulster County Jail because she lied to

10           the doctors.  She said that she felt

11           suicidal, but she didn't have any plan to

12           hurt herself.  The patient is somewhat

13           anxious, hypertalkative and perseverates,

14           P-E-R-S-E-V-E-R-A-T-E-S.  She says several

15           times that she wants to go home, that she

16           wants to be with her mother.  She says that

17           she does not like it here because she always

18           spends two hours in the shower every day and

19           she has to wash to get out of the shower.

20           She did not have homicidal or suicidal

21           thoughts.  She shows anger being here and

22           some vague delusions about being treated

23           like a dog, insight and judgment poor.  She

24           needs inpatient care to stabilize her

25           condition.
```

PAUL                                    112

Q.    Doctor, what does the word perseverates mean
      again?

A.    It means doing the same thing again and
      again independent of any question -- saying
      the same sentence over and over.  I want to
      go home.  I want to go home.  I want to go
      home.  I want to go home.

Q.    With Miss Riggins, can you tell me in what
      way she posed either a danger to herself or
      danger to others?

A.    She said she lied to the doctor.  Lying, she
      means -- in some ways that statement for me,
      what it is she is telling me, is it true or
      not?  For being evaluated before, when she
      told me she lied to the other doctors, so
      what would put me in a position to believe
      what she is telling me is the truth.  Also,
      she says that she feels suicidal.  This is a
      red flag for me.  Somebody telling me she
      felt suicidal, but she didn't have any plan
      to hurt herself.  Yes, she is suicidal, but
      she doesn't have any plan.  Should I rely on
      that, you are suicidal, you don't have a
      plan, okay, let's go.  Now this is the

```
1                        PAUL                    139

2       A.    Others.

3       Q.    If Mr. William had been experiencing these

4             same delusions in the community and had not

5             caused any harm to others, would that then

6             relieve you of your belief that he did, in

7             fact, cause danger to others?

8       A.    Maybe I would not be in a position to

9             evaluate him.

10      Q.    Why do you say that?

11      A.    Circumstances for him to be picked up, to be

12            taken to another hospital and come to the

13            facility would not have been there.

14            MR. BROUTMAN:

15                  Mark that.

16

17                  (CERTIFICATE OF EXAMINING PHYSICIAN,

18                  MARK TAYLOR WAS RECEIVED AND MARKED

19                  AS PLAINTIFF'S EXHIBIT 6 FOR

20                  IDENTIFICATION)

21

22      Q.    Is this your handwriting?

23                  (Document submitted)

24      A.    Yes.

25      Q.    Could you please read this commitment
```

certificate?

A.   Sure.  Patient comes willingly to the room
for interview.  He mentions that he came
from Ulster County Jail and he was treated
with Risperdol while he was in jail because
of visual hallucinations.  He admits that
since 1998 he has been experiencing auditory
hallucinations.  He was hospitalized about
thirteen times since then.  But he often
stopped taking his medication because of
drugs.  He has used various drugs like LSD,
marijuana, cocaine.  He mentions that his
hallucinations started the same year he
began to use drugs.  He admits that he has
periods where he feels that people are
following him or are after him.  He admits
to having sleeping problems and his appetite
is good.  He mentions that he used to have
short temper in the past, but not anymore.
His insight and judgment are impaired and he
needs inpatient care to stabilize his
condition.

Q.   Is it your belief that Mr. Taylor posed a
danger to others?

```
1                          PAUL                    141

2       A.    Yes.

3       Q.    Is it your belief that Mr. Taylor posed a

4             danger to himself?

5       A.    Not directly, but indirectly.

6       Q.    How indirectly?

7       A.    Because of his behavior.  You know, the

8             substance abuse, stop taking the

9             medications.

10      Q.    Does that type of indirect harm to self

11            reach a level of dangerousness where it is

12            appropriate to commit a person?

13      A.    It's not in this case, this particular case,

14            is not the dangerousness to self, but rather

15            the dangerousness to others.

16      Q.    What is it that led you to believe that Mr.

17            Taylor was a danger to others?

18      A.    Number 1, substance abuse.  Also he has a

19            mental illness and that can be exacerbated

20            by two factors.  Substance abuse can make

21            the illness worse.  The noncompliance, the

22            cold turkey stopping of the medication, cold

23            turkey can also cause a sharp

24            decompensation.  Also, the other element,

25            short temper.  Naturally the insight in
```

```
1                         PAUL                    142

2              judgment.  So poor insight.  If at some

3              point he stopped taking medication, both

4              insight and judgment.  If he's using drugs,

5              speculation, but there's a possibility that

6              while he's taking psychiatric medication

7              he's also using drugs at the same time which

8              is a very dangerous combination of

9              behaviors.

10      Q.     Was there a particular person that you

11             thought Mr. Taylor was going to harm?

12      A.     For my evaluation, no, there is no specific

13             target.  Clearly because of the delusions

14             and hallucination and substance abuse, yes,

15             I believe -- (interrupted)

16      Q.     Do you know what kind of delusions Mr.

17             Taylor was suffering from?

18      A.     People are following me, people being after

19             him.

20      Q.     Did you make any effort to determine whether

21             or not people were actually following him?

22      A.     At this point in time, no.  Again, if it is

23             part of the delusion, so it means in the

24             context of my 2 PC, I would have to stop my

25             interview and again go to the extent
```

```
1                           PAUL                    143
2              possible, and I don't know if it is possible
3              where I am going to look, whom I'm going to
4              call, so it means for the purpose of the 2
5              PC, if it tells me that he feels that people
6              are following him, or are after him, you
7              know, at the moment just for the purpose of
8              this, I have to go by what he tells me.
9        Q.    Did you ask him who it was that was
10             following him?
11       A.    I don't recall asking him.
12       Q.    Is that something in your general course of
13             your interviews that you would ask?
14       A.    I would ask if I have enough time or if I
15             have the cooperation of the patient.  If I
16             can go in details, yes.
17       Q.    Do all mentally ill people who are presently
18             abusing substances pose a danger to others?
19             MR. PEEPLES:
20                   Objection to the form.
21       A.    I would not see it that way.
22       MR. BROUTMAN:
23       Q.    What way would you see it?
24       A.    Substance abuse is a high risk of a mentally
25             ill person.
```

```
 1                        PAUL                    144

 2    Q.    Does it matter what substances they are

 3          abusing?

 4    A.    Some drugs more than others, but overall

 5          substance abuse is a big risk in mentally

 6          ill patients.

 7    Q.    When you say "some drugs," what drugs?

 8    A.    Cocaine, LSD, alcohol.

 9    Q.    Those drugs pose the greatest risk?

10    A.    LSD is a hallucinogen.  Cocaine is a hard

11          drug.  It can go either way, suicide or

12          aggression.  So again, all of them -- there

13          are risks with all of them.  Depending on

14          the nature of the person, you have to

15          establish the priority.

16    Q.    You say here on the first page since 1998

17          he's been experiencing auditory

18          hallucinations?

19    A.    Yes.

20    Q.    Do you know what these were?

21    A.    From the purposes of this, I don't remember

22          if he told me.  If he told me, then I would

23          have put it down.

24    Q.    Would it be helpful to know what those

25          auditory hallucinations were in order to
```

| | PAUL | 154 |

2    gather information and you have a sense of

3    where the person comes from.  Again, the

4    physical examination, yes, to some extent

5    can be helpful, but on the reverse the

6    physical examination is not just a conduit

7    as soon as you feel that the person is

8    having a medical problem and you make a

9    straight connection whether the person cares

10   for himself.

11   MR. BROUTMAN:

12       Mark that.

13

14       (CERTIFICATE OF EXAMINING PHYSICIAN,

15       SIMON BENEPE WAS RECEIVED AND MARKED

16       AS PLAINTIFF'S EXHIBIT 8 FOR

17       IDENTIFICATION)

18

19   Q.   Doctor, is that your handwriting?

20       (Document submitted)

21   A.   Yes.

22   Q.   Can you read the certificate?

23   A.   Patient comes willingly to the room for the

24       interview.  Initially he appears suspicious

25       and guarded.  On two occasions he asks the

PAUL                                    155

2       writer for his title and work location.

3       When the patient feels a little bit more

4       comfortable, he begins to talk continuously.

5       His speech is pressured.  His thinking

6       process is circumstantial and illogical.  He

7       presents some looseness of association.

8       Thought content shows moderate delusion.

9       His insight and judgment are impaired.  He

10      mentioned that he was in this facility on

11      two or three occasions and his peers worked

12      it out for him to leave.  The patient was

13      presenting a danger to himself and others.

14      He needs inpatient care to stabilize his

15      condition.

16   Q.  Focusing on your conclusion that he posed a

17      danger to others, what led you to believe

18      that he posed a danger to others?

19   A.  He is delusional and he has thought disorder

20      and his speech is pressured and -- mostly

21      he's delusional and guardedness.

22   Q.  What type of delusions did he suffer from?

23   A.  I don't have a specific cite here.  I don't

24      describe the specifics.

25      MR. BROUTMAN:

PAUL                                                   164

1

2          likely cause harm in the future?

3     A.    Yes..

4     Q.    Am I correct in saying that if he had not

5          acted on his delusions in such a way to

6          cause harm to people in the past he would be

7          less likely to cause harm in the future than

8          if he had acted that way in the past?

9     A.    Yes, there's a possibility.

10         MR. BROUTMAN:

11              Mark that.

12

13              (CERTIFICATE OF EXAMINING PHYSICIAN,

14              RICHARD BACON WAS RECEIVED AND MARKED

15              AS PLAINTIFF'S EXHIBIT 10 FOR

16              IDENTIFICATION)

17

18    Q.    Doctor, Plaintiff's Exhibit 10, is this your

19         handwriting?

20              (Document submitted)

21    A.    Yes.

22    Q.    Read that in the record.

23    A.    This is a 59-year-old Caucasian male with a

24         history of alcohol abuse, admitted to this

25         facility by transfer from Ulster County Jail

PAUL                                    165

after the charges of criminal trespass,
harassment were dismissed due to his mental
condition.  The patient had said to come to
the interview room and is cooperating.
While he's answering all the questions, he
appears to be on the defensive saying
repeatedly that he does not steal and does
not panhandle.  He says several times that
somebody who looks like him and dresses
exactly like him used to go and panhandle,
steal and give his name.  He admits that the
situation has been going on for four years.
He does not give any answer when asked if he
was arrested before.  When asked about his
living situation, he says that he holds,
H-O-L-D-S, an antique shop, that he buys,
fixes and resells antiques.  He appears to
confabulate when asked specific questions
and he goes back to issues of somebody using
his name to steal and panhandle.  He's more
oriented to person, but partially oriented
to place and time.  He knows only month and
year.  He is casually dressed, fair hygiene,
not as depressed with blunted affect.  When

PAUL                                    166

1

2          asked about feelings of depression, he

3          pauses for a few seconds and says it's

4          better now.  He didn't want to elaborate on

5          his feelings before.  His insight and

6          judgment appear impaired and needs inpatient

7          treatment to stabilize his condition.

8     Q.   Was it your belief Mr. Bacon posed a danger

9          to others?

10    A.   To self.

11    Q.   Did Mr. Bacon pose a danger to himself

12         because of potentially self-injurious

13         behavior?

14    A.   He doesn't appear to be self-injurious, but

15         his inability to not care for himself in

16         part.  When I write this, I had the

17         impression that he was depressed.

18    Q.   Are all depressed people unable to care for

19         themselves?

20         MR. PEEPLES:

21              Objection to the form.

22    A.   I would not put it that way.

23    MR. BROUTMAN:

24    Q.   How would you put it?

25    A.   If when somebody is in the hospital and is

PAUL                                     167

1

2       evaluated for depression, the psychiatrist

3       will do other factors to determine if the

4       person was a danger to self.

5    Q.  What factors would a psychiatrist look at?

6    A.  Not only depression, but also the ability to

7       care for self.  It means all the factors

8       associated with the depression, no energy,

9       the act to go and navigate naturally because

10      the person can be so depressed, confined in

11      one corner and doesn't do anything.  Means

12      doesn't have the energy to go and deal with

13      the day by day life.  Naturally other

14      factors, self-esteem.

15   Q.  What about Mr. Bacon's depression led you to

16      believe that he was unable to care for

17      himself?

18   A.  Mr. Bacon's -- I think there is some element

19      of psychosis in Mr. Bacon.  Aside from my

20      feeling at that time that he was depressed,

21      as I said, not as depressed, but with

22      blunted affect.  Now if he was around

23      begging, asking people for whatever he was

24      asking for, and at some point there is

25      nothing wrong with that, so clearly there is

PAUL                                              168

something with the judgment that is not

quite there.  There is an impaired judgment

in terms of the self-care.  Also, as I

pointed out, the confabulation, it means I

asked him a question, he will create

something just to give me an answer.  He has

that shop that he holds, something like

that, he says he's -- obviously there is

nothing in his condition to confirm that by

any means.  At that point I could not really

establish that.

Q.  By that you are talking about whether or not

he actually owned this antique shop?

A.  Right.

Q.  Is that what you talking about?

A.  Right.  In fact, if -- I have to look again,

but I think he was arrested for going to an

antique shop.  I don't remember this, but he

was arrested for trespass.

MR. BROUTMAN:

Let's mark his psychiatric evaluation.

(PSYCHIATRIC EVALUATION, RICHARD BACON

WAS RECEIVED AND MARKED AS PLAINTIFF'S

1                              PAUL                      173

2              complete.

3     Q.       So then we should probably forget this

4              document and move onto the next one.

5     MR. BROUTMAN:

6              Mark this.

7

8              (CERTIFICATE OF EXAMINING PHYSICIAN,

9              ROBERT BURLEIGH WAS RECEIVED AND

10             MARKED AS PLAINTIFF'S EXHIBIT 13 FOR

11             IDENTIFICATION)

12

13    Q.       Doctor, is this your handwriting?

14             (Document submitted)

15    A.       Yes.

16    Q.       Can you identify this document?

17    A.       Yes.

18    Q.       What is that?

19    A.       Certificate of Examining Physician.

20    Q.       Before you start reading it, Doctor, let me

21             ask you a quick question.  When evaluating a

22             patient for a 2 PC commitment, how is it

23             that you come to be aware that this patient

24             needs to be evaluated?

25    A.       The ward clerk calls me.  There's a clerk

```
 1                            PAUL                      176

 2            that the person should not be admitted, it's

 3            now up to the ward physician and the team to

 4            make the next step for the person -- I might

 5            not know exactly what happened, so it means

 6            after I give the paper to the clerk it

 7            becomes part of the record, but now the

 8            final decision is the team, treatment team

 9            decision.  If they decide to discharge a

10            person, they call the crisis residence, they

11            call the families, whatever the disposition

12            is.

13       Q.   If you examine a patient for involuntarily

14            commitment and you determine that the person

15            is not appropriate for involuntary

16            commitment, do you still complete the

17            certificate?

18       A.   Yes.  I would have to complete this part of

19            the status of the patient.

20       Q.   So you complete the certificate regardless

21            if your conclusion is to involuntarily

22            commit or not involuntarily commit?

23       A.   Right.  This is part of the record.  When

24            the person comes from jail, the person has

25            to get his status in the hospital.  When the
```

```
 1                           PAUL                        177

 2            person -- the person cannot be somebody

 3            physically in this hospital with the 730.40

 4            status.  It's not a hospital status.

 5      Q.    Moving specific to Mr. Burleigh.

 6      A.    The patient comes willingly to the interview

 7            room.  He appears tired and he ambulates at

 8            a slow pace.  His hygiene was poor.  He was

 9            superficially cooperative at the beginning

10            of the interview, raising his shoulder for

11            some questions and saying I don't know for

12            some others.  He then cooperates.  There's a

13            missing part here.

14      Q.    All right.

15      A.    Goes along.  He admits to having received

16            psychiatric treatment before, but is not

17            aware of the treatment and the diagnosis.

18            He remembers that he received the medication

19            that started with P.  He said that the

20            police arrested him while he was walking

21            down the street to go visit his family.  He

22            mentioned that life has been difficult for

23            him for the last six years after he broke up

24            with his girlfriend and he has not been able

25            to find a steady job.  The place he was
```

PAUL                                    178

working at for ten years went out of

business.   His parents died and his siblings

are scattered all over the country.   For

eight months he has lived here and there

with friends up to two months.   They were

not able to help him any further.   Since

then he has been homeless.   He's alert,

oriented to place, person, but not to time.

He is disheveled with poor hygiene.   Sad,

depressed with blunted affect.   His thinking

process is underproductive, but goal

directed.   His thought content does not show

delusions.   He denied auditory

hallucinations.   He denied suicidal

thoughts.   His insight and judgment are

poor.   He expresses hopelessness and

helplessness.   He admits to sleeping

problems, but denies problems with his

appetite.   He needs admission to stabilize

his condition.

Q.   Did Mr. Burleigh pose a danger to himself

because of his ability to self-injurious

behavior?

A.   Inability to care for self.   In my writing I

PAUL                                    179

14

1
2      don't have -- I don't have it here that he's
3      suicidal, but because of his condition his
4      inability to care for himself is the reason.
5    Q.    I've noticed at the beginning of a lot of
6      these certificates you indicate that the
7      patient is willing -- the patient comes
8      willingly to the interview room.  Is there a
9      reason that you write that in the
10     certificate?
11   A.    This is my style, to give a flavor of the
12     patient in terms of cooperating.  It happens
13     that sometimes you go to a patient and they
14     say leave me alone, I don't want to talk to
15     you.  It might take some convincing
16     techniques, some talk, something to have the
17     patient cooperate a little bit for one.
18     Also, it happens in some cases the patient
19     might say no, I'm not going to talk to you,
20     so I have to sit exactly where the patient
21     is to try to get some information.  It means
22     that the person is not going to move from
23     point A to go into an interview and sit with
24     me quietly and talk.  This already gives the
25     writer who is in the clinical field a flavor

# CERTIFICATE OF EXAMINING PHYSICIAN

To Support an Application for
Involuntary Admission

Person's Name (Last, First, M.I.): Bacon Richard

Sex: Male      Date of Birth: 5/14/44

Address: HRPC      35

## CERTIFICATION

I, _____, hereby certify that:
*(Name of Examining Physician)*

1. I am a physician licensed to practice medicine in New York State.

2. I have with care and diligence personally examined the above named person
   on: | 0 | 4 | 21 | 06 |   at _Hudson River Psychiatric Center_
        | MO. | DAY | YEAR |
   *(place where examined)*

3. I find:
   a. this person is in need of involuntary care and treatment in a hospital providing inpatient services for the mentally ill *("in need of involuntary care and treatment" means that the person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he or she is unable to understand the need for such care and treatment)*; and
   b. as a result of his or her mental illness, this person poses a substantial threat of harm to self or others *("substantial threat of harm" may encompass (i) the person's refusal or inability to meet his or her essential need for food, shelter, clothing, or health care, or (ii) the person's history of dangerous conduct associated with non-compliance with mental health treatment programs)*.

4. I have formed my opinion on the basis of facts and information I have obtained (described below and on the reverse side) and my examination of this person.

5. I have considered alternative forms of care and treatment but believe that they are inadequate to provide for the needs of this person, or are not available.

6. If this person has to my knowledge received prior treatment, I have, insofar as possible, consulted with the physician or psychologist furnishing such prior treatment.

7. To the best of my knowledge and belief, the facts stated and information contained in this certificate are true.

PENGAD 800-631-6989

PLAINTIFF'S EXHIBIT
PO 6/29/06
10

| Signature _F Pauli MD_ | Print Name Signed _FRANCK PAUL_ | Title _PSYCHIATRIST_ | | | | | |
|---|---|---|---|---|---|---|---|
| Address _10 Ross Circle Poughk 12601_ | Phone Number _(845) 483-3192_ | Date |  |  | Time |  |  |
| | | Mo _04_ | Day _22_ | Yr _06_ | Hr _11_ | Min _00_ | AM PM |

_This is a 59 y.o. Caucasian male with a history of alcohol abuse admitted to this facility by transfer from Ulster County Jail after the charges of criminal trespass harassment + were dismissed due to his mental condition. The patient accepts_

HR 05 010

Form OMH 471A (2-94) page 2

Person's Name (Last, First, M.I.)

to come to the interview room and he is cooperative. While he is answering all the questions, he appears to be on the defensive, saying repeatedly that he does not steal and does not pedhandle. He says several times that somebody who looks like him and dresses exactly like him used to go and pedhandle, steal and gave his name. He admits that the situation has been going on for 4 years. He does not give any answer when asked if he was arrested before. When asked about his living situation, he says that he holds an antique shop, that he buys, fixes and resells antiques. He appears to confabulate when asked specific questions and he goes back to the issue of somebody using his name to steal and pedhandle. He is well oriented to person but partially oriented to place and time (He knows only month and year). He is casually dressed with fair hygiene. His mood is depressed with blunted affect. When asked about feelings of depression, he pauses for a few seconds and says: "It's better now." He does not want to elaborate on his feelings before. His insight and judgment appear impaired. He needs inpatient treatment to stabilize his condition.

F. Paul my

HR 05 011

JMH 471A (2-94)

State of New York
Office of Mental Health

# CERTIFICATE OF EXAMINING PHYSICIAN

To Support an Application for
Involuntary Admission

Person's Name (Last, First, M.I.)

BURLEIGH Robert

Sex M.   Date of Birth: 1/13/71

Address

# CERTIFICATION

I, __FRANCK PAUL__, hereby certify that:
(Name of Examining Physician)

1. I am a physician licensed to practice medicine in New York State.

2. I have with care and diligence personally examined the above named person
   on: | 1 | 1 | 2 | 3 | 0 | 4 |   at   Hudson River Psychiatric Center
       MO. DAY YEAR   (place where examined)

PENGAD 800-631-6989

PLAINTIFF'S EXHIBIT
13
PO 6/29/06

3. I find:
   a. this person is in need of involuntary care and treatment in a hospital providing inpatient services for the mentally ill ("*in need of involuntary care and treatment*" *means that the person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he or she is unable to understand the need for such care and treatment*); and

   b. as a result of his or her mental illness, this person poses a substantial threat of harm to self or others ("*substantial threat of harm*" *may encompass (i) the person's refusal or inability to meet his or her essential need for food, shelter, clothing, or health care, or (ii) the person's history of dangerous conduct associated with noncompliance with mental health treatment programs*).

4. I have formed my opinion on the basis of facts and information I have obtained (described below and on the reverse side) and my examination of this person.

5. I have considered alternative forms of care and treatment but believe that they are inadequate to provide for the needs of this person, or are not available.

6. If this person has to my knowledge received prior treatment, I have, insofar as possible, consulted with the physician or psychologist furnishing such prior treatment.

7. To the best of my knowledge and belief, the facts stated and information obtained in this certificate are true.

OMH PHI

HR 05 129

| Signature | Print Name Signed | Title |
|---|---|---|
| P. Paul MD | FRANCK PAUL | PSYCHIATRIST |
| Address | Phone Number | Date / Time |
| 10 Ross Circle, Poughkeepsie NY 12601 | (845) 483-3192 | 11 Mo. 23 Day 04 Yr. 11 Hr. 00 Min. AM PM |

The patient comes willingly to the interview room. He appears tired
as he ambulates at a slow pace - His hygiene is poor He was superficially
cooperative at the beginning of the interview, raising his shoulders for
some questions or saying "I don't know" for some others. He then cooperates
... He admits to have received psy

Form OMH 471A (2-94) page 2

| | Person's Name (Last, First, M.I.) |
|---|---|

chiatric treatment before but he is not aware of the treatment and the diagnosis. He remembers that he received a medication that starts with "p". He says that the police arrested him while he was walking down the street to go and visit his family. He mentions that life has been difficult for him for the last 6 years after he broke up with his girlfriend and he has not been able to find a steady job. The place he was working at for 10 years went out of business. His parents died and his siblings are scattered all over the country. For 8 months, he has lived here and there with friends up to 2 months when they were not able to help him any further, since then, he has been homeless. He is alert, oriented to place, person not to time. He is disheveled with poor hygiene. His mood is sad, depressed with blunted affect. His thinking process is underproductive but goal directed. His thought content does not show delusions. He denies auditory hallucinations. He denies homicidal or suicidal thoughts. His insight and judgment are poor. He expresses hopelessness and helplessness. He admits to sleeping problems but denies problems with his appetite. He presents a danger to himself. He needs inpatient care to stabilize his condition.

HR 05  130

Form OMH 471A (2-94)

State of New York
Office of Mental Health

# CERTIFICATE OF EXAMINING PHYSICIAN

To Support an Application for
Involuntary Admission

Person's Name (Last, First, M.I.)

*ROBINSON Daryl*

Sex *M*    Date of Birth *05/08/61*

Address

# CERTIFICATION

I, *FRANCK PAUL, MD* , hereby certify that:
(Name of Examining Physician)

1. I am a physician licensed to practice medicine in New York State.

2. I have with care and diligence personally examined the above named person
   on: *02 | 10 | 04*    at *Hudson River Psychiatric Center*
       MO. DAY YEAR         (place where examined)

3. I find:
   a. this person is in need of involuntary care and treatment in a hospital providing inpatient services for the mentally ill ("in need of involuntary care and treatment" means that the person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he or she is unable to understand the need for such care and treatment); and
   b. as a result of his or her mental illness, this person poses a substantial threat of harm to self or others ("substantial threat of harm" may encompass (i) the person's refusal or inability to meet his or her essential need for food, shelter, clothing, or health care, or (ii) the person's history of dangerous conduct associated with non-compliance with mental health treatment programs).

4. I have formed my opinion on the basis of facts and information I have obtained (described below and on the reverse side) and my examination of this person.

5. I have considered alternative forms of care and treatment but believe that they are inadequate to provide for the needs of this person, or are not available.

6. If this person has to my knowledge received prior treatment, I have, insofar as possible, consulted with the physician or psychologist furnishing such prior treatment.

7. To the best of my knowledge and belief, the facts stated and information contained in this certificate are true.

PLAINTIFF'S EXHIBIT 3
PD 6/25/16
[PENGAD 800-631-6989]

*HR 05 072*

| Signature | Print Name Signed | Title |
|---|---|---|
| *F Paul MD* | *FRANCK PAUL* | *PSYCHIATRIST* |

| Address | Phone Number | Date | | | Time | | |
|---|---|---|---|---|---|---|---|
| *10 Ross Circle Poughkeepsie NY 12601* | *(845) 483-3192* | *02* Mo. | *10* Day | *04* Yr. | *3* Hr. | *45* Min. | AM (PM) |

*This is a 41 year old Caucasian male who comes willingly to the interview room. He is cooperative but not spontaneous in providing information. He answers questions with one or two words. He says that he was placed in jail after he lit a fire on a driveway in America next to the fire house. He mentions that he was cold and he wanted to keep himself warm. He also*

Form OMH 471A (2-94) page 2

| | Person's Name (Last, First, M.I.) |
|---|---|

says that he was at Marcy Hospital but unable to say why. He does not know why he is in this hospital either. His speech is slow, unde productive. He appears to be preoccupied with his inner world. At times, he loses contact with the interviewer. He shows some thought blocking. His psychomotor activity is decreased. His mood is flat with blunted affect. His hygiene is fair. His insight and judgment are impaired. The patient is unable to care for himself independently. He is dangerous to himself. He needs inpatient care to stabilize his condition.                    F Pan I ung

HR 05 073

Form OMH 471A (2-94)

State of New York
Office of Mental Health

Person's Name (Last, First, M.I.)
*Berepe Seimon* 106 0a

# CERTIFICATE OF EXAMINING PHYSICIAN

To Support an Application for
Involuntary Admission

Sex: *M*   Date of Birth: *10/14/66*

Address

# CERTIFICATION

I, _____ *FRANCK PAUL* _____, hereby certify that:
(Name of Examining Physician)

1. I am a physician licensed to practice medicine in New York State.

2. I have with care and diligence personally examined the above named person
   on: *05-20-05* at *Hudson River Psychiatric Center*
   MO. DAY YEAR      (place where examined)

PLAINTIFF'S EXHIBIT 8   PP 6/29/06   PENGAD 800-631-6989

3. I find:
   a. this person is in need of involuntary care and treatment in a hospital providing
      inpatient services for the mentally ill *("in need of involuntary care and treatment"
      means that the person has a mental illness for which care and treatment as a
      patient in a hospital is essential to such person's welfare and whose judgment is so
      impaired that he or she is unable to understand the need for such care and treat-
      ment)*; and
   b. as a result of his or her mental illness, this person poses a substantial threat of
      harm to self or others *("substantial threat of harm" may encompass (if the person's
      refusal or inability to meet his or her essential need for food, shelter, clothing, or
      health care, or (ii) the person's history of dangerous conduct associated with non-
      compliance with mental health treatment programs).*

4. I have formed my opinion on the basis of facts and information I have obtained (described
   below and on the reverse side) and my examination of this person.

5. I have considered alternative forms of care and treatment but believe that they are inade-
   quate to provide for the needs of this person, or are not available.

6. If this person has to my knowledge received prior treatment, I have, insofar as possible,
   consulted with the physician or psychologist furnishing such prior treatment.

7. To the best of my knowledge and belief, the facts stated and information contained in
   this certificate are true.                                    *HR 05 206*

| Signature | Print Name Signed | Title |
|---|---|---|
| *F. Paul MD* | *FRANCK PAUL* | *PSYCHIATRIST* |

| Address | Phone Number | Date | | | Time | | |
|---|---|---|---|---|---|---|---|
| *10 Ross Circle Poughkeepsie 12601* | *483-3192* | *05* Mo | *20* Day | *05* Yr. | *12* Hr. | *30* Min | AM / PM |

*The patient comes willingly to the room for the interview. Initially he
appears suspicious and guarded. On 2 occasions, he asks the
writer for his title and work location. When the patient feels a
little bit more comfortable, he begins to talk continuously. His
speech is pressured. His thinking process is circumstantial and*

Form OMH 471A (2-94) page 2

| | Person's Name (Last, First, M.I.) |
|---|---|

illogical. He presents some looseness of associations. Thought content shows moderate delusions. His insight and judgment are impaired. He mentions that he was in this facility on 2 or 3 occasions and his peers worked it out for him to leave. The patient represents a danger to himself and others. He needs inpatient care to stabilize his condition.

HR 05 207

Form OMH 471A (2-94)

State of New York
Office of Mental Health

# CERTIFICATE OF EXAMINING PHYSICIAN

To Support an Application for
Involuntary Admission

Person's Name (Last, First, M.I.)

*Taylor Mark*   104 646

Sex   *M*   Date of Birth

*HKR*   *35*

Address

---

## CERTIFICATION

I, _FRANCK PAUL, MD_____ , hereby certify that:
(Name of Examining Physician)

1. I am a physician licensed to practice medicine in New York State.

2. I have with care and diligence personally examined the above named person

   on: | 0 4 | 2 5 | 0 8 |   at  _Hudson River Psychiatric Center_____
       | MO. | DAY | YEAR |              (place where examined)

3. I find:
   a. this person is in need of involuntary care and treatment in a hospital providing inpatient services for the mentally ill *("in need of involuntary care and treatment" means that the person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he or she is unable to understand the need for such care and treatment);* and
   b. as a result of his or her mental illness, this person poses a substantial threat of harm to self or others *("substantial threat of harm" may encompass (i) the person's refusal or inability to meet his or her essential need for food, shelter, clothing, or health care, or (ii) the person's history of dangerous conduct associated with non-compliance with mental health treatment programs).*

4. I have formed my opinion on the basis of facts and information I have obtained (described below and on the reverse side) and my examination of this person.

5. I have considered alternative forms of care and treatment but believe that they are inadequate to provide for the needs of this person, or are not available.

6. If this person has to my knowledge received prior treatment, I have, insofar as possible, consulted with the physician or psychologist furnishing such prior treatment.

7. To the best of my knowledge and belief, the facts stated and information contained in this certificate are true.

PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
6
PD 6/29/06

OMH PHI

*HR 05 192*

| Signature | Print Name Signed | Title |
|---|---|---|
| *F. Paul MD* | *FRANCK PAUL* | *PSYCHIATRIST* |
| Address | Phone Number | Date: Mo. *04* Day *25* Yr. *05*   Time: Hr. *1* Min. *30* AM/PM |
| *10 Ross Circle. Poughkeepsie 12601* | *(845) 483-3192* | |

*The patient comes willingly to the room for interview. He mentions that he came from Ulster county jail and he was treated with risperdal while he was in jail because of visual hallucinations. He admits that since 1998 he has been experiencing auditory hallucinations. He was hospitalized about 13 times since then. But he often stopped taking*

Form OMH 471A (2-94) page 2

| | Person's Name (Last, First, M.I.) |
|---|---|

his medications because of drugs. He has used various drugs like LSD, marijuana, cocaine. He mentions that his hallucinations started the same year he began to use drugs. He admits that he has periods where he feels that people are following him or are after him. He admits to having sleeping problems and his appetite is good. He mentions that he used to have short temper in the past but not any more. His insight and judgment are impaired. He needs inpatient care to stabilize his condition.

HR 05 193