```
1                          BARDEN, M.D.                    7

2     A.    Yes.

3     Q.    At what facilities have you certified

4           individuals for involuntary hospitalization?

5     A.    I have in the last four years done about 100

6           to 150 9.37 commitments to Saint Francis

7           Hospital with recommendation for

8           hospitalization, that requires a second

9           physician there at the hospital to admit,

10          but certainly with my commitments, the

11          police, whoever are committed to take the

12          person against their will to the hospital or

13          to the hospital for hospital treatment.

14          Before that I worked inpatient and

15          occasionally I got called to the admissions

16          unit to do a 2 PC, I believe when somebody

17          got ill.

18    Q.    While you were at Hudson River,

19          approximately how many 2 PC's, physician

20          certificate evaluations did you conduct?

21    A.    In the ten-year period that I was at Hudson

22          River from 1992 to 2002, I probably

23          conducted about twenty to thirty perhaps

24          would be my best estimate.

25    Q.    Let's go back a second to what you are doing
```

```
1                           BARDEN, M.D.                        8
2                 now with Saint Francis.  Are you considered
3                 a designee of the Director of Community
4                 Services?
5        A.       Yes, I am.
6        Q.       And have you been committing individuals
7                 pursuant to this position?
8        A.       Yes, I have.
9        Q.       What is your understanding of the criteria
10                for commitment pursuant to -- (interrupted)
11       A.       On the 9.37.
12       Q.       Pursuant to Section 9.37.
13                MR. PEEPLES:
14                    Do you understand the question?
15                THE WITNESS:
16                    Yes.  What is the criteria pursuant to
17                the 9.37 commitments.
18                MR. PEEPLES:
19                    You can answer.
20       MR. BROOKS:
21       Q.       You can answer.
22       A.       I would say the -- I would say when a person
23                has mental illness that deems them dangerous
24                imminently to themselves or others, those
25                would be my criteria.  Or inability to
```

BARDEN, M.D.                                    9

2    because of the mental illness get shelter,

3    food, proper medical care that was going to

4    be a substantial risk to their welfare.

5    That's the criteria.

6   Q.    To the best of your knowledge of the law,

7    are there any other requirements for

8    commitment under Section 9.37?

9   A.    Not offhand -- well, part of it, I guess,

10    would be that they don't voluntarily want

11    help also.

12   Q.    Is there anything else?

13   A.    Not that I recall.  Nothing that hit me.

14   Q.    To the best of your knowledge, what are the

15    requirements for commitment under Section

16    9.27?

17   A.    9.27?

18   Q.    Yes.  If I may add just for clarification

19    purposes, would you agree that Section 9.27

20    and 9.37 are the two Physicians' Certificate

21    Law?

22   A.    Yes.

23   Q.    So just to be clear, if I talk about 9.27 or

24    the 2 PC Law, we are talking about the same

25    thing?

```
 1                      BARDEN, M.D.                    10

 2      A.      Yes.

 3      Q.      Just for clarification purposes.

 4      A.      Thank you.

 5              MR. BROOKS:

 6                   Off the record

 7

 8              (OFF THE RECORD DISCUSSION)

 9

10      A.      The criteria for the 9.27 are basically

11              similar to the 9.37 with not quite as much

12              emphasis on imminent, if you will, that may

13              be not quite as imminent, but still a person

14              that is dangerous to himself or others or

15              has an inability to function in terms of

16              getting food, shelter, clothing, medical

17              care due to their mental illness and

18              otherwise doesn't want to get voluntary

19              care.  Also, that requires care and

20              treatment in the hospital and not less

21              restrictive alternative places.

22      Q.      To the best of your understanding, are there

23              any other requirements in the law?

24      A.      Not that I recall right now.

25      Q.      I'm going to read a number of statements and
```

```
1                          BARDEN, M.D.                    15

2              overwhelming?

3         MR. PEEPLES:

4                   Objection to the form of the question.

5              If you understand it, you can answer.

6    A.       When you say "involuntarily," you mean the 2

7              PC?

8    MR. BROOKS:

9    Q.       Yes.

10   A.       Can you repeat that?

11        MR. BROOKS:

12                  I'll rephrase the question.

13   Q.       Which of the following four degrees of risk

14             best categorizes what the law requires, as

15             is your understanding of the law, in order

16             to authorize involuntary hospitalization;

17             minimal, moderate, substantial or

18             overwhelming?

19        MR. PEEPLES:

20                  Objection to the form.

21        MR. BROOKS:

22                  What's the objection?

23        MR. PEEPLES:

24                  Vagueness.

25        MR. BROOKS:
```

BARDEN, M.D.                           31

1

2          MR. PEEPLES:

3               Objection to the form.  What are you

4          talking about?

5          MR. BROOKS:

6               A person's severe violent behavior.

7     A.   If it's in the hospital record, staff, from

8          family, from the patient, the hospitals have

9          something that is called a crim net that you

10         can refer to.

11    Q.   What is a crim net?

12    A.   It's a list of all the arrests that the

13         person has had.  The last one -- I was here

14         four years ago and it was in the records

15         then.  That's a way of getting information.

16         You can get information from different

17         sources.  As I said, the family, client,

18         record, clinics.

19    Q.   Approximately how many patients do you

20         examine pursuant to the 2 PC Law when you

21         were at Hudson River?

22    A.   Twenty to thirty, thirty to forty, something

23         like that.  Twenty to forty.

24    Q.   Okay.

25    A.   Two or three per year.

```
 1                          BARDEN, M.D.                    36
 2              crack for the next hour to prevent the world
 3              from exploding, if it was that delusion,
 4              then I would say they are probably not
 5              dangerous.
 6        Q.    Would you agree that when assessing danger a
 7              clinician should differentiate between risk
 8              enhancing delusions and those delusions that
 9              are not risk enhancing?
10        A.    Very much.
11        Q.    Would you agree when a clinician assesses
12              danger they should differentiate between
13              risk enhancing delusions and those
14              hallucinations that are not risk enhancing?
15        A.    Yes.  I definitely agree.
16        Q.    Are stressors a risk factor?
17        A.    I would say that they can be, yes.
18        Q.    When would they be and when would they not
19              be?
20        A.    When a person had a particular vulnerability
21              to react to a stress in a particular way
22              versus a person who would react to a stress,
23              but not in terms of hurting himself or
24              others, but just in terms of discomfort,
25              dysphoria.  It doesn't necessarily make them
```

```
 1                        BARDEN, M.D.                    42

 2            possibility -- (interrupted)

 3      A.    Command hallucinations.

 4      Q.    Hallucinations or delusions under some

 5            circumstances.

 6      A.    Okay.

 7      Q.    The role of stressors.

 8      A.    Yes, and maybe history of noncompliance with

 9            treatment might be a risk factor.  I don't

10            know if you mentioned that one.

11      Q.    Okay.

12      A.    Or even just a refusal to wanting to have

13            treatment could be a risk factor.

14            Motivation and history of treatment would

15            be -- that's all I can think of right now.

16      Q.    Now, Doctor, when assessing a person for

17            commitment under the 2 PC Law, was it your

18            practice to look at the person's history of

19            substance abuse prior to determining whether

20            or not the person is dangerous?

21      A.    I would look at their history of substance

22            abuse, yes, I would.

23      Q.    How would you gather that information?

24      A.    Often usually from the admission note.

25      Q.    And if not from there?
```

```
1                          BARDEN, M.D.                    44

2              they have a history of that, of hearing

3              command hallucinations ten years ago doesn't

4              mean they are a high risk factor now if they

5              are in treatment.

6       Q.     Would you agree that a person who doesn't

7              suffer from dangerous hallucinations or

8              delusions is less likely to cause harm than

9              a person who does?

10      A.     No, not necessarily.

11      Q.     All things being equal?

12      A.     All things being equal, I believe, yes, that

13             there's a higher risk of a personal problem,

14             probably all things being equal acting on a

15             command hallucination.  If a person doesn't

16             have a command hallucination they wouldn't

17             act on it, but doing an act that the voices

18             tell them, then the person not hearing the

19             voice does that act.

20      Q.     Was it your practice to look at the role of

21             stressors?

22      A.     Yes.

23      Q.     When determining whether or not a person met

24             the criteria for commitment under the 2 PC

25             Law?
```

BARDEN, M.D.                                          47

1

2          talked to him his thinking was tangential

3          and not direct.  He appeared to be confused.

4          Didn't have good judgment at the time from

5          what I can extrapolate on that of what my

6          insight and judgment findings were.

7     Q.   Are you saying that this person was suicidal

8          or he lacked the ability to meet his needs

9          for food, medical, clothing or shelter or

10         both?

11    A.   I don't believe he was suicidal, but I

12         believe that he was unable to care for

13         himself in terms of consuming the alcohol

14         and ending up making the accusations he did

15         and getting himself arrested.

16    Q.   Now, Doctor, let's look at -- I'm going to

17         ask you to tell me if you agree or disagree

18         with the following:  Whether or not a person

19         suffers from malnutrition or dehydration is

20         an important consideration when determining

21         whether or not a person is dangerous to

22         himself because of an inability to meet

23         basic needs?

24    A.   Yes, I agree.

25    Q.   Whether or not a person suffered from other

BARDEN, M.D.                                    48

1

2      physical infirmities that went untreated is

3      an important consideration when determining

4      whether or not a person poses a danger to

5      himself because of an inability to meet

6      basic needs?

7   A.  Yes.

8   Q.  Would you agree or disagree whether or not a

9      person has manifested a willingness to

10     accept treatment is an important

11     consideration when determining whether or

12     not a person causes a danger to himself

13     because of an inability to meet basic needs?

14  A.  Yes.

15  Q.  Would you agree that whether or not a person

16     has manifested a willingness of treatment on

17     an inpatient basis is an important

18     consideration when determining whether or

19     not a person poses a danger to himself

20     because of an inability to meet basic needs?

21  A.  Yes.

22  Q.  Would you agree that whether or not a person

23     has family members who are willing and able

24     to provide support and, if necessary, assist

25     in the treatment of the patient is an

BARDEN, M.D.                           49

1

2      important consideration when determining

3      whether or not a patient poses a danger to

4      himself because of an inability to meet

5      basic needs?

6   A.    Yes.

7   Q.    Instead of me going through the entire

8         question, I'm just going to give you other

9         criteria and ask you to tell me if you agree

10        or disagree that these are important

11        considerations when determining whether or

12        not a person poses a danger to himself.

13        One, whether the person has manifested an

14        ability to listen to those that have

15        attempted to intervene and provide

16        assistance?

17  A.    Yes.

18  Q.    Whether or not the person was in touch with

19        reality?

20  A.    To some degree.  Not as much.

21  Q.    Why not?

22  A.    If they were willing to agree to get care

23        and treatment, but their grip and other

24        faces of reality were not too good, it

25        wouldn't be that pertinent to meeting their

```
1                              BARDEN, M.D.                    50

2              essential needs.

3      Q.      Okay.

4      A.      So if they had delusions of hallucination

5              that didn't impact on their ability to get

6              food and treatment and so forth, then that

7              would not be a risk factor for them.

8      Q.      Whether or not a person was properly

9              questioned --

10             MR. BROOKS:

11                  Withdrawn.

12     Q.      Whether a person was able to obtain properly

13             and store and preserve food?

14     A.      Properly what?  Obtain and store food?

15     Q.      Yes.

16     A.      Yeah, that's important.

17     Q.      Whether a person was able to handle money in

18             a fashion satisfactory to complete minimal

19             self-maintenance transactions such as being

20             able to make correct change?

21     A.      Right.  That's important.

22     Q.      Whether or not a person was living in

23             squalor?

24     A.      That's important.

25     Q.      Why is that?
```

```
1                          BARDEN, M.D.                    51

2      A.    How neat they are is not that essential in

3            terms of them getting essential food and

4            care.

5      Q.    When you examined patients pursuant to your

6            two physician examination certificates of

7            Hudson River, were these all important

8            considerations at the time you evaluated

9            these people?

10     A.    Yes.

11     Q.    Now, Doctor, would you agree that some, if

12           not most, of the 2 PC evaluations you

13           conducted at Hudson River were done

14           involving patients that were transferred

15           from jail?

16     A.    I'd say some of them were.  Maybe out of

17           those thirty that I had mentioned, maybe

18           ten.

19     Q.    Let's talk about those that were transferred

20           from jail.  Would you agree that when

21           assessing whether or not a person suffered

22           from malnutrition you would want to

23           determine whether or not they were suffering

24           from malnutrition prior to their admittance

25           to jail?
```

```
 1                        BARDEN, M.D.                    52

 2     A.     Yes.

 3     Q.     Would you agree that a jail could meet a lot

 4            of basic necessities about what we just

 5            discussed?

 6     A.     Yes.

 7     Q.     Would you agree that with all these factors

 8            about which we have just spoke, you would

 9            want to assess the individual at the time

10            prior to admittance to jail?

11     A.     I'm not understanding the question.

12            MR. BROOKS:

13                 Question is withdrawn.

14     Q.     You said -- you acknowledged that whether or

15            not a person suffered from the physical

16            infirmities was an important consideration;

17            correct?

18     A.     Yes.

19     Q.     Would you not want to know whether or not

20            this person was suffering from other

21            physical infirmities at the time of his

22            admittance to jail?

23     A.     Yes.

24     Q.     To the best of your recollection, did Elmer

25            Cade manifest any symptoms or engage in any
```

BARDEN, M.D.                                    53

1

2        behaviors other than that noted here that

3        led you to conclude that he posed a danger

4        to himself or others?

5    A.  I don't recall, you know.  I don't recall.

6        I always review the record and talk to the

7        staff and so forth, but I don't recall what

8        the record and all the things that I read in

9        the record were.  To the best of my

10       knowledge, this is what I know now.  I don't

11       even recall seeing the gentleman or what he

12       would look like four or five years ago

13       unfortunately.

14   Q.  Now, Doctor, why is the fact --

15       MR. BROOKS:

16            Strike that.

17   Q.  Why did the fact that Elmer Cade made

18       allegations that he found dead bodies help

19       make him dangerous to himself?

20   A.  Well, it shows that he was psychotic,

21       delusional at the time and suffering from a

22       mental illness.  The fact that he was

23       dangerous I think was the fact that he ended

24       up getting himself arrested, doing enough

25       with those delusions getting himself

```
 1                              BARDEN, M.D.                    54
 2                arrested and incarcerated and also drinking
 3                heavily with no insight in judgment.   I
 4                don't know what his motivation was to stop.
 5                And also his current mental status where his
 6                thinking wasn't clear.
 7        Q.      You said earlier that not all delusional
 8                people are dangerous?
 9        A.      Correct.
10        Q.      What was it with this person's delusions
11                that heightened the risk of causing harm to
12                himself?
13        A.      As we said before, when you act on your
14                delusions to the extent of reporting it to
15                the police and being that concerned and all
16                of that, that is a dangerous thing.  The
17                inability for him to rationally understand
18                his situation led me to believe that he was
19                dangerous.
20        Q.      To himself?
21        A.      Yes.  To himself, yes.  He was dangerous to
22                himself.  And the fact that a person
23                drinking heavily in and of itself is not
24                dangerous, and the fact that a person
25                feeling there are dead bodies around isn't
```

| | | |
|---|---|---|
| 1 | | BARDEN, M.D.                                          55 |
| 2 | | dangerous, but coupled with the fact that he |
| 3 | | was arrested for it and when I examined him |
| 4 | | he was still confused and his speech was not |
| 5 | | goal directed and there was a hint of a |
| 6 | | thought disorder with tangential thinking, |
| 7 | | that all coupled with the fact that his |
| 8 | | insight wasn't very good, that all coupled |
| 9 | | together made him dangerous is what I |
| 10 | | assumed from my write-up here.  It has to be |
| 11 | | taken all together. |
| 12 | Q. | Would you agree that confusion in and of |
| 13 | | itself doesn't make a person dangerous? |
| 14 | A. | I would agree. |
| 15 | Q. | Would you agree that suffering from a |
| 16 | | thought disorder does not make a person |
| 17 | | dangerous in and of itself? |
| 18 | A. | Yes. |
| 19 | Q. | Would you agree that having impaired |
| 20 | | judgment and insight does not make a person |
| 21 | | dangerous in and of itself? |
| 22 | A. | Yes. |
| 23 | Q. | Did you attempt to determine -- |
| 24 | | MR. BROOKS: |
| 25 | | Strike that. |

```
1                          BARDEN, M.D.                    56

2    Q.    Would you agree that in concluding that Mr.

3          Cade posed a danger to himself because of an

4          inability to meet his basic needs you had to

5          conclude that his inability was so great

6          that he could not meet his essential needs

7          of food, clothing, shelter -- (interrupted)

8    A.    Yes.

9          MR. PEEPLES:

10              Let him finish the question.

11   MR. BROOKS:

12   Q.    Would you agree that a person who was

13         confused might still be able to meet his

14         essential needs of food, clothing, shelter?

15   A.    It might be, yes.

16   Q.    What was it about Mr. Cade's confusion that

17         led you to believe that such confusion would

18         impact on his ability to meet his basic

19         needs of food, clothing and shelter?

20   A.    I would say probably what -- I don't

21         remember exactly my thinking, but probably

22         the fact that he got arrested, that he made

23         these accusations and got himself arrested,

24         that if he was that confused that he

25         probably was not able to get his clothing
```

10

BARDEN, M.D.                              58

```
 1                          BARDEN, M.D.                58
 2                history.  It's vague in terms of what that
 3                would entail.
 4     Q.         What was it about his thought disorder that
 5                led you to conclude that it, meaning such
 6                thought disorder, would impact on Mr. Cade's
 7                ability to meet his essential needs of food,
 8                shelter and clothing?
 9     A.         That he couldn't answer my questions in a
10                goal directed way, that he was still
11                suffering from a thought disorder.
12     Q.         What do you mean, "a goal directed way"?
13     A.         That if I asked him something and he started
14                talking about some other things and then got
15                maybe back to what I was saying.  Confused,
16                I'm not sure what the confusion was.  Now I
17                don't remember, but he seemed like he was
18                confused about his situation, why he was
19                there in the hospital, what he had done or
20                what he could do to get himself well or so
21                forth in his confusion.
22     Q.         Would you agree that some people who are
23                tangential can still meet their basic needs
24                of food, shelter and clothing?
25     A.         Yes.
```

```
 1                      BARDEN, M.D.                    59

 2    Q.    Would you say that some people that are

 3          confused --

 4    MR. BROOKS:

 5               Strike that.

 6    Q.    Would you agree that some people who suffer

 7          from impaired insight and judgment can meet

 8          their essential needs of food, clothing and

 9          shelter?

10    A.    Yes.

11    Q.    What was it about Mr. Cade's impaired

12          insight and judgment that impacted adversely

13          on his ability to meet his essential needs

14          of food, shelter and clothing?

15    A.    I don't recall now.

16    Q.    What was it about his thought disorder that

17          led you to believe such thought disorder

18          impacted adversely on his ability to meet

19          his essential needs of food, clothing and

20          shelter?

21    A.    Other than the fact that he was so confused

22          that he was calling the police and getting

23          himself arrested, other than that I don't

24          recall.

25    MR. BROOKS:
```

BARDEN, M.D.                     63

```
 1
 2   A.    Yes.
 3   Q.    Would you agree that some people who are
 4         arrested and charged with a crime have not
 5         necessarily committed the act in question?
 6   A.    Yes.
 7   Q.    Now, what led you to believe that he, in
 8         fact, committed the act in question?
 9   A.    I don't recall.
10   Q.    Did you make any attempt to determine
11         whether or not he committed the act in
12         question?
13   A.    I'm sure I did, but I don't recall what it
14         was.
15   Q.    So you do not recall --
16         MR. BROOKS:
17              Withdrawn.
18   Q.    Is it fair to say you do not recall asking
19         Mr. Haynes whether or not he committed the
20         act in question here?
21   A.    I imagine that I asked him.  I don't recall
22         the interview at all from six years ago.  I
23         don't even remember seeing the gentleman, to
24         be honest, not at all.
25   Q.    Would you agree that depending on the facts
```

1                          BARDEN, M.D.                    64

2              of his arrest, the fact that he was arrested

3              may or may not have heightened the risk that

4              he would cause harm to himself or others?

5       A.     I think the fact that a person gets arrested

6              that is mentally ill usually raises your

7              concern about their potential harm for self

8              or others when they are in the midst of a

9              psychotic episode.

10      Q.     Would the fact that he was arrested increase

11             the risk that he would harm himself or

12             others even if he was only arrested?

13             MR. PEEPLES:

14                  Objection to the form.

15      A.     Depends on how he came to the attention of

16             the police and exactly what he did.

17             Certainly that would mitigate him being

18             dangerous if he was wrongly arrested,

19             whether it would be in his favor of not

20             being as dangerous, yes.

21      MR. BROOKS:

22      Q.     Would you agree with the fact that a person

23             who has pressured speech may or may not

24             heighten the risk of him causing harm to

25             himself or others?

BARDEN, M.D.                          69

1

2   Q.   Would you agree with the fact that a person

3        who has poor judgment may or may not

4        increase the risk of harm that the person

5        poses to himself or others?

6   A.   Yes.

7        MR. BROOKS:

8             Off the record.

9

10            (OFF THE RECORD DISCUSSION)

11

12  Q.   Now, Doctor, would you agree that what you

13       wrote about the patient being arrested and

14       having pressured speech, flight of ideas

15       would be you setting forth what you found to

16       be the patient's signs and symptoms of

17       mental illness?

18  A.   Yes.

19  Q.   Can you recall anything about any of the

20       signs and symptoms about which you noted

21       that heightened the risk of harm that this

22       person posed to himself or others?

23       MR. PEEPLES:

24            Read that back.

25

```
1                          BARDEN, M.D.                    70

2                   (QUESTION REPEATED BY REPORTER)

3

4      A.    I don't recall, sorry.

5      MR. BROOKS:

6      Q.    Let's go back to Barbara Dudas.  Would you

7            agree that the fact that she was extremely

8            paranoid would not in and of itself heighten

9            the risk of harm that she would cause to

10           herself or others?

11     A.    Yes.

12     Q.    Would you agree that you would want to know

13           whether or not Miss Dudas was --

14           MR. BROOKS:

15               Withdrawn.

16     Q.    Would you agree in determining whether or

17           not her paranoia would have heightened the

18           risk of harm that she posed, you would want

19           to know whether or not she intended to act

20           on such paranoia?

21     A.    Yes.

22     Q.    Would you further want to know whether or

23           not Miss Dudas had a history of acting upon

24           paranoia?

25     A.    Yes.
```

```
1                          BARDEN, M.D.                    71

2     Q.      Would you agree that if Miss Dudas had no

3             intention to act on her paranoia and did not

4             have a history of acting on paranoia she

5             would be far less dangerous than she would

6             be if she intended to act on the paranoia

7             and had a history of paranoia?

8     MR. PEEPLES:

9                 Objection to the form.

10    A.      Yes.

11    MR. BROOKS:

12    Q.      Would you agree with the fact that she was

13            delusional in and of itself did not

14            necessarily heighten the risk of harm that

15            she posed to herself or others?

16    A.      Yes.

17    Q.      Would you agree that if Miss Dudas did not

18            have an intent to act on her delusions she

19            would be less dangerous than she would be if

20            she had acted on her delusions?

21    MR. PEEPLES:

22                Objection to the form.

23    A.      Yes.

24    MR. BROOKS:

25    Q.      Would you agree if she had a further history
```

```
 1                        BARDEN, M.D.                    72
 2            of acting on delusions she would be more
 3            dangerous than she would have been had she
 4            no history of acting on delusions?
 5       MR. PEEPLES:
 6                 Objection to the form.
 7       A.    Yes.
 8  MR. BROOKS:
 9       Q.    Would you agree that the fact she was
10            psychotic in and of itself would not
11            heighten the risk that she posed to herself
12            or others?
13       A.    I guess, yes.  It's hard to say.
14       Q.    Okay.
15       A.    Each thing in and of itself, we established
16            that psychosis, delusions, paranoia, in and
17            of itself are not necessarily dangerous, it
18            just depends on the context.
19       Q.    Would you agree that the fact that she was
20            hypomanic in and of itself did not heighten
21            the risk of harm that she posed?
22       A.    Yes.
23       Q.    What word comes after hypomanic?
24       A.    Severe flight of ideas.
25       Q.    What are flight of ideas?
```

BARDEN, M.D.                          75

1

2          dangerous to herself or others if she wasn't

3          threatening?

4    A.    I think threatening makes you more

5          dangerous.

6    Q.    Even if you are threatening to sue?

7    A.    Well, that kind of threatening.  I meant

8          threatening to hurt someone, not threatening

9          a law action.

10   Q.    Do you recall how she was threatening?

11   A.    I don't recall that.

12   Q.    Would you agree that the fact she was easily

13         tearful would not in and of itself heighten

14         the risk of harm?

15   A.    I would agree.

16   Q.    Would you agree that the fact that a person

17         is confused, would not necessarily impact

18         on -- (interrupted)

19   A.    Yes.

20         MR. PEEPLES:

21              Wait for the question.

22   MR. BROOKS:

23   Q.    Namely the risk of harm?

24   A.    Yes.

25   Q.    Take into consideration of how she was --

```
1                        BARDEN, M.D.                    76

2            MR. BROOKS:

3                 Withdrawn.

4       Q.   Could you think of how Miss Dudas's extreme

5            confusion would have heightened the risk of

6            harm that she posed to herself or others?

7       A.   I don't recall.

8       Q.   Could you think of a situation, any

9            situation, how suffering from extreme

10           confusion would increase the risk of harm?

11      A.   Yeah, if one was not able to cross the

12           street correctly and negotiate getting their

13           food correctly and/or were going up to the

14           wrong types of people and misidentifying

15           them and getting themselves harmed in a big

16           city or something.

17      Q.   Would you agree that when looking at the

18           dangerousness of someone who suffers from

19           extreme confusion, it's far more important

20           to know whether or not the person was, in

21           fact, having difficulty crossing the

22           street -- (interrupted)

23      A.   What specifics, yes, would be helpful.

24      Q.   Then it would be to just know whether or not

25           the person suffered from confusion?
```

BARDEN, M.D.                                    78

1

2          would be a mitigating measure of the

3          Provachol?

4    A.    I guess, yes.

5    Q.    Would it be important to know whether or not

6          there were mitigating factors or mitigating

7          measures when assessing a person's

8          dangerousness?

9    A.    Yes.

10   Q.    If someone were reviewing a hospital

11         chart -- give me an example of --

12         MR. BROOKS:

13              Strike that.

14   Q.    Can you lay out all the mitigating measures

15         when assessing danger to others?

16   A.    All the what?

17   Q.    In connection with assessment of danger to

18         others?

19   A.    Well, if someone has a history of alcohol

20         and substance abuse, but yet they have

21         someone that's a good support system there

22         to help them and to notify and support them

23         and if they slip, to kind of set them

24         straight, that would be a mitigating force

25         for that mitigating circumstance for that

```
 1                           BARDEN, M.D.                    79

 2              risk factor of substance abuse.  Or if

 3              someone had a history of noncompliance with

 4              medication and they stopped the medication,

 5              but now they said look, I'll take the

 6              injection every three weeks so you don't

 7              have to worry about that, that's not going

 8              to be an issue anymore, then I guess that

 9              would be a mitigating factor against

10              noncompliance as a risk factor.  If someone

11              was not eating properly and not taking their

12              medication properly, but yet they were going

13              to a halfway house, that would be a

14              mitigating factor because they would have

15              supervision with that eating and medication,

16              so even if they didn't know on the one hand

17              to take it properly they wouldn't really be

18              dangerous if they were going to a halfway

19              house.

20      Q.      Okay.

21      A.      Those are some examples.

22      Q.      Are there any mitigating measures that

23              relate to history of violent behavior as a

24              risk factor?

25      A.      I suppose there are.  I can't think of any
```

1                          BARDEN, M.D.                    81

2              supervised more carefully.

3    Q.        Anything else?

4    A.        I can't think of any.

5    Q.        How about mitigating measures, if any,

6              stressors, anything else that you can think

7              of for the role of stresses?  In other

8              words, mitigating risk that may result from

9              stressors?

10   A.        I guess medication.

11   Q.        How about mitigating measurures that relate

12             to threat or harm from inability to meet

13             basic food needs?

14   A.        I would say a supervised setting would be a

15             good mitigating factor, family support and

16             involvement.

17   Q.        Any other mitigating measures that relate

18             to -- I guess as a whole a person's

19             inability to meet their needs for food,

20             clothing or shelter?

21   A.        Not that I can think of.  Medication, family

22             support and having the financial means to

23             support oneself.

24   Q.        How about support from other means such as

25             community assistance program?

14

```
1                        BARDEN, M.D.                    82

2    A.    Sure, and clinics and outpatient therapy.

3    Q.    Would you agree that you would want to look

4          at the person's willingness to participate

5          in such treatment?

6    A.    Yes.

7    Q.    Would you agree that's another way of asking

8          whether that person would be complying with

9          treatment?

10   A.    Whether they would be willing to, yes.

11   Q.    Participate in such activity?

12   A.    Yes.

13   Q.    Now, Doctor, earlier on you said you

14         assessed twenty to thirty people for

15         evaluation pursuant to the 2 PC Law?

16   A.    That was a guesstimate, yes.

17   Q.    In any of those situations or evaluations --

18   MR. BROOKS:

19              Strike that.

20   Q.    In any of those evaluations, can you recall

21         an instance when you reached the conclusion

22         that a person required inpatient

23         hospitalization, but was not dangerous?

24   A.    I don't recall that.

25   Q.    So would you agree you cannot recall a
```

BARDEN, M.D.                          83

```
 1                 situation where you say this person needs
 2                 hospitalization, but I have to let this
 3                 person go because -- (interrupted)
 4
 5    A.    No, I've discharged people on 730-40s in my
 6          life before the seventy-two hours.
 7    Q.    Can you think of a situation where a person
 8          needed inpatient care?
 9    A.    Yes.  And then let them go because they
10          weren't dangerous?
11    Q.    Yes.
12    A.    I don't recall that.  I might have.  If they
13          needed care and I felt that they wanted to
14          leave and they wouldn't be dangerous to
15          themselves or others, they would be able to
16          have enough support and mitigating factors
17          out there to help them, then I would
18          discharge them.
19    Q.    Can you recall a situation where you did
20          that?
21    A.    It's been so many years, sir, that I can't
22          recall that.  I've been doing these things
23          too at CDPC, between eighty and ninety.  I
24          saw many, many patients there too.  Many of
25          them went -- I don't see quite as many in
```

1                            BARDEN, M.D.                    84

2              this institution as in that one for some

3              reason, but I don't know why.  Different

4              cases.  I don't recall.  The mitigating

5              factors where they required further

6              treatment in the hospital, but were not

7              dangerous, I don't remember that.

8    Q.        Do you remember evaluating people who you

9              recall should be discharged prior to the

10             seventy-two hours?

11   A.        I'm not sure if it was this hospital or

12             another.  I do recall that happening, yes.

13   Q.        Just for the record, when we are talking

14             about discharging people within seventy-two

15             hours, are you referring to the Office of

16             Mental Health rule that says you need to

17             evaluate people remanded pursuant to CPL

18             730-40 and discharge within seventy-two

19             hours?

20   A.        Yes.

21             MR. BROOKS:

22                  Let's mark this.

23

24                  (CERTIFICATE OF EXAMINING PHYSICIAN,

25                  KEVIN WASHINGTON, WAS RECEIVED AND

```
 1                         BARDEN, M.D.                    90
 2            whether Mr. Haugh suffered from malnutrition
 3            prior to his being arrested?
 4     A.     That would be one factor and that would help
 5            assess it.
 6     Q.     Would it be useful to know whether he was
 7            suffering from any harm that may have
 8            resulted from his delusions?
 9     A.     Yes.  It would be useful to know if he had
10            ever attempted suicide or if he had ever
11            harmed himself or others.
12     Q.     Is there any indication from your note that
13            he did engage in these acts at any time?
14     A.     No.  There's no reference to the past use
15            harm towards others.
16     Q.     Would you agree that the fact that he was
17            extremely paranoid and suspicious in and of
18            itself would make him dangerous?
19     A.     In and of itself, but it's not a good sign
20            when he feels the food is being poisoned.
21            In and of itself, paranoia, suspiciousness
22            out of context are not necessarily dangerous
23            behaviors.
24     Q.     Would you want to know how this person acted
25            as a result of this paranoia and
```

```
1                        BARDEN, M.D.                    91
2            suspiciousness?
3      A.    Yes, I would.
4      Q.    Would you agree the fact that he had a
5            withdrawn affect would not in and of itself
6            heighten the risk of harm?
7      A.    I would agree.
8      Q.    Would you agree with the fact that he was
9            deprived would reduce the risk that he
10           posed?
11     A.    Yes.
12     Q.    Would agree that the fact he was
13           inappropriate would not heighten the risk of
14           harm?
15     A.    Yes.
16     Q.    Would you agree his being impaired would not
17           heighten the risk of harm?
18     A.    Yes.
19     Q.    Would you agree to want to know whether or
20           not any of these signs and symptoms increase
21           the risk of harm that he posed that you
22           would have to know about other additional
23           behavior in which he engaged in to assess
24           whether or not any of these symptoms
25           increased the risk of harm?
```

```
1                          BARDEN, M.D.                    92

2     A.    That would be helpful, but things taken in

3           and of themselves isolated, it's like taking

4           ten sticks and holding them together, it's a

5           lot stronger, so when I have several

6           different signs of mental illness,

7           depression, withdrawn, plotting, each one in

8           and of itself does not lead to

9           dangerousness.  All of them together

10          certainly raises the dangerousness because

11          of the more global dysfunctioning of the

12          person in terms of their psychosis, so even

13          though if a person is just paranoid that in

14          and of itself is not necessarily dangerous,

15          but if a person is paranoid, depressed,

16          flight of idea, recently been arrested and

17          confused, etcetera, sometimes the things

18          taken together one would abstract to a more

19          higher level of dangerousness because of the

20          number of different facets of dysfunction in

21          the behavior and thinking.

22    Q.    Let's take Mr. Haugh as an example.  Can we

23          agree that you believed he posed a danger to

24          himself only because of an inability to meet

25          his basic needs of food, clothing and
```

1                                    BARDEN, M.D.                        94

2                  against him, I'd have to review that to see

3                  if he threatened the staff, if he thought

4                  their actions were warranted to take

5                  revenge.  I don't know the specifics of

6                  exactly how he acted on those behaviors at

7                  the time without reading through the record

8                  and talking to the staff.

9          Q.      In terms of assessing whether or not he

10                 posed a danger to others, would it be more

11                 important to know that he was paranoid and

12                 suspicious or whether or not he acted on his

13                 paranoia and suspiciousness?

14         A.      It would be important -- both would be

15                 important.

16         Q.      Which would be more probative of an

17                 increased risk of harm?

18         A.      Probably a history of acting out on his

19                 paranoia and suspiciousness.

20         Q.      Would a manifestation of paranoia and

21                 suspiciousness be more probative of an

22                 increased risk of harm than an intention to

23                 act on such paranoia and suspiciousness or

24                 would the intention to act on any paranoia

25                 and suspiciousness be probative of increase

BARDEN, M.D.                                    95

```
 1                risk of harm than paranoia or
 2                suspisciousness alone?
 3
 4    A.          Paranoia and suspisciousness alone would not
 5                lead to intent to harm others.  That coupled
 6                with a history of hurting others would be
 7                more provocative.
 8    Q.          As would an intent?
 9    A.          Or an intent.
10    Q.          You just said, "provocative."  Did you mean
11                provocative or probative?
12    A.          What's the difference?
13    Q.          Provocative, provoking him all the time,
14                doesn't make him probative of danger.  In
15                other words, provocative means you are
16                provoking someone to engage in an act.
17                Probative means there's evidence of
18                something.
19    A.          What's the question?
20    Q.          When you used the word provocative -- I've
21                been using the word probative.
22    A.          I thought you meant provocative.
23    Q.          I mean probative.
24    A.          Okay.
25    Q.          In other words -- you've heard all my
```

```
1                      BARDEN, M.D.                 101

2              before, increase the risk of dangerousness

3              than one isolated symptom because of the

4              more global dysfunction in terms of more

5              symptomatology that a person has.

6       Q.     In talking about this global dysfunction --

7       MR. BROOKS:

8                   Withdrawn.

9       Q.     Earlier on in the deposition you said that a

10             person who suffers from mental illness is

11             not necessarily dangerous; correct?

12      A.     Yes.

13      Q.     Now, would you agree that a person who

14             suffers from mental illness generally

15             manifests more than one sign or symptom of

16             mental illness?

17      A.     Generally, yes.  More than one sign or

18             symptom.

19      Q.     So you would agree then that a person who

20             suffers from mental illness and manifests

21             several signs and symptoms still may not

22             pose a danger to herself notwithstanding the

23             existence of several signs and symptoms?

24      MR. PEEPLES:

25                  Objection.
```

```
1                          BARDEN, M.D.                    102

2     A.     Well, that's true sometimes, yes.

3     MR. BROOKS:

4     Q.     Sometimes?

5     A.     Yes.

6     Q.     Would you agree further that in order to

7            determine whether or not a person who

8            suffers from mental illness poses a danger

9            to herself or others as a result of the

10           manifestation of several signs and symptoms

11           you have to look at the existence of other

12           factors or other behaviors that go beyond

13           the particular signs and symptoms that the

14           person manifested?

15    A.     The ramifications of the symptoms, if you

16           will.

17    Q.     Right?

18    A.     Right.

19    Q.     Would an example of the ramification of the

20           symptoms being with Barbara Dudas that when

21           looking at her extreme confusion, whether or

22           not the confusion resulted in her getting

23           adequate food intake?

24    A.     Adequate food intake, hurting others or

25           herself, right.
```

BARDEN, M.D.                                      112

1

2    Q.    Same or similar.

3    A.    May differ, yes.

4    Q.    Please tell me if you agree or disagree with

5          the following statement:  Patients who

6          manifest the same symptoms of mental illness

7          may differ radically in their capacities to

8          care for themselves to meet their basic

9          needs?

10         MR. PEEPLES:

11             Objection to the form.

12   A.    If those symptoms of mental illness are

13         command hallucination to be violent, then

14         they wouldn't differ radically necessarily.

15         They probably would not differ radically.

16         Certain symptoms, in other words, are more

17         indicative of danger than others.  For

18         instance, a symptom of suicidal thoughts or

19         obsession.  If a person has that and a more

20         suicidal intent, symptoms of that are

21         certainly more significant than just

22         depression without any suicidal thoughts.

23   Q.    Would you agree that patients who manifest

24         the same or similar symptoms of mental

25         illness may differ radically in their

```
 1                          BARDEN, M.D.                    113

 2               capacities to care for themselves or others

 3               depending on the particular signs and

 4               symptoms that are at issue?

 5          MR. PEEPLES:

 6                    Objection to the form.

 7     A.    I suppose sometimes they may.

 8     MR. BROOKS:

 9     Q.    Would you say that's a yes?

10     A.    Yes.

11     Q.    Please tell me if you agree or disagree with

12               the following:  Because patients with the

13               same or similar diagnoses may differ

14               radically in their capacities to care for

15               themselves and meet their basic needs, in

16               order to accurately assess whether a patient

17               poses a danger to himself because of an

18               inability to meet his basic needs, a

19               clinician should prior to making a decision

20               about dangerousness attempt to gather as

21               much information as possible relating to the

22               risk assessment criteria about which we

23               spoke that relate to a patient's inability

24               to meet basic needs?

25          MR. PEEPLES:
```

```
 1                              BARDEN, M.D.                      114

 2                         Objection.

 3      A.      Yes, that would be a good idea.

 4      MR. BROOKS:

 5      Q.      And tell me if you agree or disagree.

 6              Because patients with the same or similar

 7              signs and symptoms of mental illness may

 8              differ radically in their capacities to care

 9              for themselves and meet their basic needs,

10              in order to accurately assess whether a

11              patient poses a danger to himself because of

12              an inability to meet basic needs, a

13              clinician should prior to making a decision

14              about dangerousness attempt to gather as

15              much information as possible relating to the

16              above criteria connected with a patient's

17              ability to meet basic needs?

18              MR. PEEPLES:

19                   Objection to the form.

20      A.      Yes.

21      MR. BROOKS:

22      Q.      Please tell me if you agree or disagree with

23              this statement:  A key source of information

24              about a patient's self-preservation and

25              survival skills would usually be third
```

| | | |
|---|---|---|
| 1 | | BARDEN, M.D.                                115 |
| 2 | | parties from the community who have observed |
| 3 | | and can describe the patient's |
| 4 | | self-preservation and survival skills. |
| 5 | A. | Whether I agree with that? |
| 6 | Q. | Yes. |
| 7 | A. | Yeah, it's usually another party, I agree. |
| 8 | Q. | In any of the patients that we spoke about |
| 9 | | today, can you recall speaking to a third |
| 10 | | party from the community who had observed |
| 11 | | the patient and could describe the patient's |
| 12 | | self-preservation and survival skills? |
| 13 | A. | Well, I'm sure I talked to the staff, so I |
| 14 | | would say that on each of those people I |
| 15 | | probably had some information in terms of |
| 16 | | how they were doing before they came in the |
| 17 | | hospital and how they were doing in terms of |
| 18 | | while they were in the hospital from the |
| 19 | | staff, but in the admission note, which I'm |
| 20 | | not privy to right now, there is information |
| 21 | | in terms of what they were doing prior to |
| 22 | | the hospitalization. |
| 23 | Q. | Okay. |
| 24 | A. | I can answer that question further if you |
| 25 | | can read it back? |

```
 1                          BARDEN, M.D.                    117

 2            opinion.

 3      Q.    Now, Doctor, when assessing a person's

 4            dangerousness you said a person's criminal

 5            history is important?

 6      A.    It's of somewhat importance, yes.

 7      Q.    Would you agree that the Office of Mental

 8            Health has access to a person's criminal

 9            history?

10      A.    Yes.

11      Q.    Would it be your practice to attempt to

12            gather a person's criminal history prior to

13            making a determination about whether a

14            person poses a danger to self or others when

15            assessing the person pursuant to 9.27?

16      A.    It would be helpful to have that.

17      Q.    Was it your practice to gather that

18            information?

19      A.    I don't believe to be honest that when I did

20            the 2 PC's that crim net was yet in the

21            record.  Although I would have liked that

22            information on these particular case that

23            you brought up today, I don't recall

24            reviewing the crim nets, but there might

25            have been reference to some of their
```

1                              BARDEN, M.D.                    121

2      A.     After reading the admission note and talking

3             to the staff, like I said I did on each

4             client, and then talking to the client, I

5             wouldn't get that information if it wasn't

6             there.  If the client didn't tell me about

7             it themselves either.  I wouldn't

8             necessarily call the therapist in the

9             community or the family to get further

10            information, so that if it wasn't in the

11            admission note and it wasn't noted by the

12            staff, dangerous previous behavior, and it

13            wasn't told to me by the client, I probably

14            wouldn't have it at the time of these

15            examinations.

16     Q.     What would be the best source of information

17            regarding a person's impulse control, good

18            or bad?

19     A.     Best source of information would be probably

20            the people that were living with this person

21            recently.

22     Q.     And was it your practice to attempt to speak

23            to others who were living with this person?

24     A.     Not to speak to them directly, but to gather

25            information in terms of how they were

```
1                            BARDEN, M.D.                    123
2            than not or less times than not?
3       A.   Less times than not.
4       Q.   Would you say you called people in the
5            community far less times than not?
6       MR. PEEPLES:
7                 Objection to the form.
8       A.   Yes.  I don't recall doing a 2 PC where the
9            information wasn't there.
10      MR. BROOKS:
11      Q.   How about substance abuse, what would be the
12           best source of that information?
13      A.   The admission note has a part of it that is
14           supposed to address that and the patients
15           themselves and staff again, anything that
16           staff knew.  And the outpatient department,
17           if they had been in outpatient therapy, they
18           would be contacted.
19      Q.   How about person's family history?
20      A.   Person's family history again is part of the
21           admission note, most definitely.
22      Q.   How about the role of stressors?
23      A.   Role of stressors?
24      Q.   Yes.
25      A.   I would say that's inferred by the admission
```

```
 1                         BARDEN, M.D.                    125
 2            taking care of the patient, a friend,
 3            someone that knows the person.  And the
 4            patient themselves.
 5     Q.     And motivational treatment?
 6     A.     I assess that through mainly the patient
 7            himself.
 8     Q.     How about whether or not a person suffers
 9            from malnutrition prior to incarceration?
10     A.     There's a physical exam that's done
11            certainly on admission that is done within
12            twenty-four hours and that would show
13            dehydration or malnutrition.
14     Q.     Would you agree that the person coming from
15            jail you would have to go back and see how
16            the person was in jail?
17     A.     Yes.  I would agree, yes.
18     Q.     What would be the best source of that
19            information?
20     A.     Who the person was living with, where the
21            person was prior to being there.
22     Q.     How about jail records?
23     A.     And my records.
24     Q.     I said jail records.
25     A.     Oh, jail records.  I don't know that much
```

```
1                        BARDEN, M.D.                126

2            about the jail records, what they do.

3    Q.     So it's fair to say you haven't seen many

4           jail records?

5           MR. PEEPLES:

6                 Objection to the form.

7    A.     No, I haven't.

8    MR. BROOKS:

9    Q.     How about whether or not a person has

10          support of the community, what is the best

11          source of information there?

12   A.     The community.

13   Q.     People in the community?

14   A.     Well, where they were staying prior to the

15          family.

16   Q.     Not family members.  With whom the person

17          was living?

18   A.     Well no, no.  Just family members in

19          general.  Family members in general and

20          outpatient therapists.

21   Q.     What's the best source of information about

22          whether or not a person had the ability to

23          listen to others who attempted to provide

24          assistance?

25   A.     I'd say their family and therapist.
```

```
1                         BARDEN, M.D.                    127

2      Q.     When you say "therapist," do you know

3             therapists in the community?

4      A.     Yes.

5      Q.     When you conducted 9.27 evaluations, did you

6             ever attempt to contact a therapist in the

7             community?

8      A.     Not on these cases, no.

9      Q.     On any cases involving involuntarily

10            hospitalization?

11     A.     Well, yes.  Many 9.37 cases, all the time,

12            every day.

13     Q.     In other words, what you are doing now?

14     A.     Yes.  Before I go out on a 9.37, I'm calling

15            the clinic, talking to the family, talking

16            to the patient.  It's a tremendous amount of

17            information I guess.

18     Q.     Is it useful information?

19     A.     Very useful information, yes.

20     Q.     You get this useful information from the

21            therapist?

22     A.     I get a referral to go out on the case and

23            the person who refers the case, of course,

24            who is concerned in the community whether

25            it's a friend or a therapist, often it's a
```

1                          BARDEN, M.D.                    134

2    Q.    I want you to assume that paranoid and

3          suspiciousness did not come on all of a

4          sudden and he was not found to suffer from

5          malnutrition and dehydration upon

6          incarceration.  Would that change your

7          opinion whether or not he was a danger to

8          himself?

9    A.    Yes.  It would reduce the danger to himself

10         if the symptoms were long-standing and he

11         had been eating all this time and not

12         malnourished, it would reduce the risk of

13         that particular symptom and that danger to

14         himself.

15   Q.    Would that reduce it to the point where you

16         would not have found him dangerous?

17   A.    That's hard to say without the admission

18         note.  If he was withdrawn and depressed and

19         had two previous suicides -- (interrupted)

20   Q.    I'm not talking about that.

21   A.    Are you talking about the basis --

22         (interrupted)

23   Q.    Meeting his needs.

24   A.    Yes, it would have changed them.

25   Q.    Let's talk about danger to self, suicide.

```
 1                        BARDEN, M.D.                135

 2    A.    Okay.

 3    Q.    If he was felt to have no history of suicide

 4          attempts, would that have changed your

 5          opinion?

 6    A.    Yes.

 7    Q.    Okay.

 8    A.    It would have been changed -- I don't know

 9          if it would have changed my opinion, but it

10          would have affected my opinion.

11    Q.    How would it have affected your opinion?

12    A.    If he had no history of suicide attempts or

13          self-injurious behavior, the withdrawing and

14          depressive feelings that he had with being

15          less dangerous may be just as painful for

16          him, but less dangerous in terms of him

17          needing hospitalization in an inpatient

18          setting.

19    Q.    Would it have changed your opinion enough so

20          that it would have resulted in you finding

21          him not dangerous?

22          MR. PEEPLES:

23               Objection to the form.

24    A.    It's hard to answer that.  Perhaps.

25    MR. BROOKS:
```

1                        BARDEN, M.D.                    147

2           over fences to get away.  It says he does

3           have some cannibus abuse and that makes him

4           paranoid.  Refusing to eat anything

5           prepared, I don't know if that is going to

6           increase and he will refuse to eat anything

7           in general.

8      MR. BROOKS:

9               Off the record.

10

11           (OFF THE RECORD DISCUSSION)

12

13     Q.     While you were at Hudson River, had you ever

14            seen that the facilities -- the facilities

15            for any reason use any risk assessment

16            forms, have you ever seen that?

17     A.     Yes.

18     Q.     What did the risk assessment form entail?

19     A.     On the 3/30/02 applications, I believe, sir,

20            to the court for recommitments, I believe

21            there's been a risk assessment section on

22            that application that I've had to complete.

23            That's the only one that I'm aware of.  I

24            haven't done it for awhile, but that's the

25            only one.