1               De Los Santos - July 14, 2006

2          A.    Yes.

3          Q.    About how often have you done

4     that?

5          A.    How often?

6          Q.    Yes.

7          A.    It's not that frequent, but I

8     cannot give a number.

9          Q.    More than once?

10         A.    More than once.

11         Q.    More than twice?

12         A.    More than twice.

13         Q.    More than three times?

14         A.    I think so.  As far as I can

15    remember, more than three times.

16         Q.    What is your understanding of the

17    requirements for involuntary hospitalization

18    under Mental Hygiene Law 9.39?

19         A.    You are saying hospitalization for

20    emergency status, right?

21         Q.    9.39, which I guess the law

22    characterizes as emergency status.

23         A.    As far as I can recall, the person

24    is suffering from a mental illness and at the

25    time of admission he poses a risk to the safety

De Los Santos - July 14, 2006

1

2    of himself or the safety of others.

3              It's also that he also may be

4    having impaired judgment, that he is unable to

5    care for himself, thus endangering himself.

6         Q.    Any other requirements, to the

7    best of your knowledge, for involuntary

8    hospitalization under 9.39?

9         A.    If there is a -- as far as I can

10   recall, with the 9.39 there might be -- let me.

11             You are asking if there is

12   another, as to the best of my knowledge?

13        Q.    If to the best of your knowledge

14   there are any other requirements for involuntary

15   hospitalization.

16        A.    There may be, but at this time I

17   cannot remember, and I have to kind of like

18   maybe have to review the paper.

19        Q.    Now, to the best of your

20   understanding what is the difference, if any,

21   between the legal criteria of 9.27 and the legal

22   criteria of 9.39?

23        A.    The similarities with both is

24   involuntary.

25        Q.    I'm sorry?

1                De Los Santos - July 14, 2006

2        A.      Well, the thing is, yes, because

3   the basis of facts and information where she was

4   hospitalized there by transfer history of

5   psychiatric, I got that from the records from

6   the transfer.

7        Q.      Okay.  So is what you wrote the

8   reasons why you believe the patient was

9   dangerous?

10        A.      She has -- she has a temper.  She

11   has to work on her temper; but awareness that

12   she doesn't know what causes the aggressivity,

13   that is -- that's the fact that when I saw her,

14   which she is on a one-to-one.  So that is a sign

15   that she is a danger, a risk.

16        Q.      I guess my question to you is,

17   are the reasons or the facts set forth in your

18   handwriting the reasons why you believed that

19   Ms. Carter was dangerous?

20        A.      Yes, based on the facts and

21   information I have obtained, yes.

22        Q.      Is your practice to always write

23   down the reasons why you believe a patient is

24   dangerous, on these two patient certificate

25   forms?

69

De Los Santos - July 14, 2006

1

2    A.    Yes.

3    Q.    If this paranoid patient thought

4  the way you said she thought, couldn't you say

5  that she was not going to or couldn't you say

6  she had an intent to act on paranoia if

7  challenged by others?

8              MR. PEEPLES:  Objection to

9        form.

10   A.    Intent to act.  If I talk to her,

11  and then she says I want to hurt her, then I

12  have to place her on a one-to-one because that

13  is a definite threat to safety of others.

14   Q.    Why don't you agree that a

15  paranoid person who poses -- sorry.

16              Wouldn't you agree that a paranoid

17  person who has an intent to act on paranoia

18  poses a far greater risk of causing harm than

19  she would have if she has no such intent to act?

20              MR. PEEPLES:  Objection to

21        form.

22   A.    The likelihood is greater, yes.

23   Q.    Would you agree further, Doctor,

24  that a paranoid person who has a history of

25  acting on paranoid thoughts in the past poses a

1                    De Los Santos - July 14, 2006

2    far greater risk of harm than she would if she

3    had no such history of acting on the paranoia?

4                    MR. PEEPLES:  Objection to

5         form.

6         A.      The history -- of course it

7    depends upon the situation, but based upon my

8    education and my assessment and my level of

9    training, the history of past behavior

10   influences the present.

11        Q.      So wouldn't you agree that if this

12   person had a history of acting on the paranoia

13   in the past then that person would pose a

14   greater risk than she would if she did not have

15   such a history?

16        A.      Yes.

17        Q.      When assessing danger, which is a

18   more important clinical fact to know, if a

19   person is paranoid or a person has a history of

20   acting on paranoia?

21        A.      Both, I would say.

22        Q.      Would you say that both are

23   equally important?

24        A.      Yes.

25        Q.      Why is that?

De Los Santos - July 14, 2006

1

2     A.     Because if a person is currently

3 paranoid but, for example, doesn't have, for

4 example, this was the first break and the

5 paranoid thoughts are so intense, the delusions

6 are so intense that the person has the risk of

7 acting up on it, that's dangerous.

8            Now, granting the fact that the

9 person has -- if the person has a history of it

10 also would substantiate more that because of

11 that history it would.

12     Q.     All right.  Well, let me ask you

13 this, Doctor, when assessing the dangers of a

14 paranoid person is it important to know the

15 nature of the paranoia?

16     A.     It is important to know the nature

17 and the content of the delusions.

18     Q.     Which is more important, knowing

19 that the person is paranoid or knowing the

20 content of the particular paranoid delusions?

21     A.     The content of paranoid delusions.

22     Q.     Would you agree, Doctor, that it's

23 more important to know the content because some

24 paranoid people are not dangerous and you really

25 have to know more than whether a person is

De Los Santos - July 14, 2006

1

2        A.      We are looking at the basic needs

3   of the person.  If the person was, let's say,

4   not eating, okay, but not just one day, but the

5   person comes in, you know, very thin --

6        Q.      So would you say the person

7   suffered from malnutrition?

8        A.      Well, yes.  Once the blood work is

9   done, which is usually done in the emergency

10  room, they show all the blood work that is very

11  abnormal, the glucose is very low, the

12  electrolytes are very low, then definitely the

13  person has some medical problems that should be

14  addressed; and then the person still doesn't

15  want to be treated for that, unable to care for

16  themselves.

17              And because of that, if it's not

18  treated or his needs are not addressed, then the

19  person will get more sick and be a danger to

20  themselves.

21       Q.      Would you agree, Doctor, that when

22  you say cannot care for themselves that's a

23  conclusion, correct?

24       A.      Conclusion, yes.

25       Q.      Wouldn't you agree further,

De Los Santos - July 14, 2006

1  Doctor, you have to look at certain information

2  that will allow you to reach that conclusion?

3       A.    Yes.

4       Q.    I'm concerned about the

5  information you look at.

6       A.    Okay.

7       Q.    Is whether or not a person was

8  dehydrated something you would look at?

9       A.    Yes.

10      Q.    How about if the person had other

11  physical illnesses that went untreated?

12      A.    Yes.

13      Q.    How about whether a person had a

14  willingness to accept treatment?

15      A.    Yes.

16      Q.    How about a willingness, a

17  willingness to accept treatment on an outpatient

18  basis?

19      A.    Unwillingness to accept treatment

20  on an inpatient basis?

21      Q.    Or a willingness.  Either one,

22  willingness or unwillingness.  All right.

23      A.    Let's see.  Where the person --

24  the person has good judgment, not impaired

1                  De Los Santos - July 14, 2006

2    judgment, because the willingness of a person to

3    undergo treatment depends upon the person's

4    judgment, and then if the judgment is present

5    and he undergoes treatment, then it would be

6    helpful that outpatient would be appropriate.

7          Q.    Let me ask you this, Doctor,

8    would you agree that a person might have poor

9    judgment and not want treatment and yet have the

10   ability to meet his food need?

11              MR. PEEPLES:  Objection to

12        form.

13        A.    That's difficult to answer because

14   if a person has poor judgment how will he know

15   what he will need?

16              I mean if he thinks that eating

17   from the garbage is his good judgment, that's

18   poor judgment to us.  It's not within the norm

19   of society or within the normal standard.

20        Q.    I guess my question to you,

21   Doctor, is, from a psychiatric and clinical

22   perspective can a person manifest poor judgment

23   in some ways and yet have it enough together to

24   know that he's got to eat food that is not

25   unsanitary?

94

1              De Los Santos - July 14, 2006

2         A.      Some judgment in some ways,

3    possibly, yes.

4         Q.      So you would agree, Doctor, that

5    simply because a person has impaired judgment

6    that doesn't render the person unable to meet

7    his food needs, correct?

8         A.      Repeat that, please.

9         Q.      You would agree, Doctor, that

10   simply because a person has poor judgment in

11   some ways does not mean the person lacks the

12   ability to meet his food needs?

13              MR. PEEPLES:  Objection to

14         form.

15         A.      Yes.

16         Q.      So would you agree that when

17   making an assessment of danger because of an

18   inability to meet needs, if you had a person

19   with poor judgment you would want to know to

20   what degree this judgment interfered with the

21   person's ability to meet his essential needs of

22   food?

23         A.      Yes, among other things, yes.

24         Q.      Is it important to know whether or

25   not such a person had family members who were

95

1              De Los Santos - July 14, 2006

2    willing and able to provide support in the

3    community?

4          A.      Yes, it's important.

5          Q.      Would it be important to know

6    whether or not this person is able to handle

7    money in a way to help make minimal

8    self-maintenance transactions?

9          A.      Yes.

10         Q.      Would it be important to know

11   whether or not the person was living in squalor?

12         A.      Yes.

13         Q.      Now, Doctor, let's say you were

14   evaluating a 730.40 patient, correct?

15         A.      Yes.

16         Q.      That patient would be coming from

17   jail, correct?

18         A.      Some of them, yes, straight from

19   Riker's.

20         Q.      Where else would they be coming

21   from?

22         A.      From Kings County, Bellevue.

23         Q.      So they would be coming from some

24   sort of institutional setting, not the street?

25         A.      Yes.

STENO-KATH REPORTING SERVICES, LTD.

1                    De Los Santos - July 14, 2006
2         Q.      Would you agree, Doctor, that when
3    a person comes from the street it is highly
4    unlikely --
5                    MR. BROOKS:  Withdrawn.
6         Q.      Would you agree, Doctor, that when
7    a person is coming from some sort of
8    institutional setting and not the street the
9    person will not suffer from malnutrition,
10   dehydration, or have medical needs unmet,
11   correct?
12                   MR. PEEPLES:  Objection to
13        form.
14        A.      Yes, because then he would have
15   been given the proper treatment there, if he --
16   this is working under the assumption that he
17   agrees, is working with the doctor over there in
18   the hospital.
19        Q.      So wouldn't you have to know,
20   Doctor, how the patient was doing prior to being
21   arrested and being taken to jail?
22        A.      Yes.  It's important to know that,
23   yes.  Because in the forensic information they
24   would describe the age, where the person was
25   picked up, when he became a homeless person,

129

1                De Los Santos - July 14, 2006

2     hospital was not forcing the clinicians to look

3     at certain risk criteria?

4                     MR. PEEPLES:   Objection to

5          form.

6          A.     More accurate you say?

7          Q.     Yes.

8          A.     Personally, I think that the risk

9     assessment is a way of safeguarding the

10    person's -- I mean the safety of the public and

11    also kind of like a way of seeing if the person

12    is still safe and not a danger to himself also.

13         Q.     Would you agree, Doctor, that this

14    form requires clinicians to look at certain

15    factors relating to danger?  Correct?

16         A.     Yes.

17         Q.     Do you believe it's useful for

18    clinicians to be forced to look at certain

19    criteria relating to danger?

20                     MR. PEEPLES:   Objection to

21          form.

22         A.     Forced?  We are not forced.  It's

23    part of our work training to look at this.

24         Q.     Well, would you say it's useful to

25    have a process that directs clinicians to focus

STENO-KATH REPORTING SERVICES, LTD.

130

1                De Los Santos - July 14, 2006

2    on certain criteria?

3          A.     Yes.

4          Q.     Would you agree that it's useful

5    because it results in clinicians examining

6    certain data when they might otherwise not do

7    so?

8                MR. PEEPLES:  Objection to

9          form.

10         A.     Yes, it helps.

11         Q.     Would you say it enhances the

12   accuracy of any risk assessment process?

13               MR. PEEPLES:  Objection to

14         form.

15         A.     Yes, it helps.

16         Q.     Would you say it enhances the

17   accuracy of the process?

18               MR. PEEPLES:  Objection to

19         form.

20         A.     It then enhances the accuracy of

21   the process relating to the risk, yes.

22         Q.     Why is that?

23         A.     Because when a person is more

24   stable, more focused, they are able to kind of

25   like discuss.  Sometimes the history is not