UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

GREGORY MONACO, on behalf of himself and
other similarly situated individuals, et al.,

                Plaintiffs,

    -against-

MICHAEL HOGAN, Ph.D., in his official
capacity as Commissioner of the New York State
Office of Mental Health, et al.,

                Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**98-CV-3386 (NGG) (RML)**

NICHOLAS G. GARAUFIS, United States District Judge.

       Before the court are the State Defendants' motions to decertify the Plaintiff classes, to

exclude Plaintiffs' experts, and for summary judgment (Not. of Mot. (Dkt. 598)); Defendant

William Packard, M.D.'s ("Packard") motion for summary judgment (Not. of Mot. (Dkt. 613));

and Plaintiffs' (the named Plaintiffs are the Law Clinic and Gregory Monaco) partial motion for

summary judgment (Not. of Mot. (Dkt. 640)). For the reasons explained below, the court

GRANTS the State Defendants' motion to decertify the Plaintiff classes. The court accordingly

does not reach the State Defendants' motion to exclude Plaintiffs' experts, the State Defendants'

motion for summary judgment, or Plaintiffs' motion for partial summary judgment on the claims

against the State Defendants. The court further GRANTS Defendant Packard's motion for

summary judgment and DENIES Plaintiffs' motion for partial summary judgment on the claim

against Packard.[1]

---

[1] The court assumes familiarity with the underlying procedural history and the allegations brought in this suit.
Where necessary, the court explains important background information below.

# I.   CLASS CERTIFICATION

## A.   Background

On March 12, 1999, this court certified a Plaintiff class and a Plaintiff subclass. See Monaco v. Stone, 187 F.R.D. 50, 63-64 (E.D.N.Y. 1999). On December 20, 2002, the court certified four additional subclasses. Monaco v. Stone ("Monaco II"), No. 98-CV-3386, 2002 WL 32984617 (E.D.N.Y. Dec. 20, 2002). Importantly here, the court certified the Civil Commitment Subclass, which consisted of "all individuals in the counties of Kings, Queens, Richmond, Nassau, and Suffolk who are subject to civil commitment evaluations pursuant to Mental Hygiene Law article 9 at facilities operated by the Office of Mental Health or other state entities, local governments, and private entities." Monaco II, 2002 WL 32984617, at *43. Likewise, the court certified the Incompetency Subclass, which consisted of "all individuals who have been or will be: (1) charged with a minor felony or misdemeanor; (2) evaluated to determine whether or not they are competent to stand trial; (3) found by court appointed psychiatrists to lack the capacity to stand trial, and awaiting a determination of the competency issue by the local criminal court; and (4) if remanded pursuant to CPL § 730.40, subject to a civil commitment evaluation pursuant to Article 9 of the MHL." Id. at *36.

All remaining claims are asserted on behalf of either the Civil Commitment Subclass, the Incompetency Subclass, or both. Defendants now move to decertify both subclasses.

## B.   Legal Standard

### 1.   Continuing Obligation to Assess Class Action

"Generally, a district judge has broad discretion to certify, modify, and de-certify classes 'whenever warranted.'" Cassese v. Washington Mut., Inc., 711 F. Supp. 2d 261, 267 (E.D.N.Y. 2010) (quoting Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262

2

F.3d 134, 139 (2d Cir. 2001)). Indeed, district courts "are 'required to reassess class rulings as the case develops.'" <u>Wu v. Pearson Educ. Inc.</u>, No. 09-CV-6557 (KBF), 2012 WL 6681701, at *4 (S.D.N.Y. Dec. 21, 2012) (quoting <u>Boucher v. Syracuse Univ.</u>, 164 F.3d 113, 118 (2d Cir. 1999)).

"In considering the appropriateness of decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met." <u>J.S. v. Attica Cent. Sch.</u>, No. 00-CV-513, 2011 WL 4498369, at *4 (W.D.N.Y. Sept. 27, 2011) (internal quotation marks and citations omitted).

2.    <u>Class Certification</u>

"Before certifying a class, a district court must determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation." <u>Marisol A. v. Giuliani</u>, 126 F.3d 372, 375 (2d Cir. 1997).

Only two of the requirements are relevant here: typicality and adequacy. "To establish typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. Adequacy entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." <u>In re Flag Telecom Holdings, Ltd. Sec. Litig.</u>, 574 F.3d 29, 35 (2d Cir. 2009).

3

## C.    Discussion

### 1.    Civil Commitment Subclass

The Law Clinic alone represents the Civil Commitment Subclass.  See Monaco II, 2002 WL 32984617, at *46.  On February 25, 2016, the parties filed a joint stipulation stating that the Law Clinic "lacks standing to be a plaintiff in this action" (Feb. 25, 2016, Stip. (Dkt. 666) ¶ 3), and that "Gregory Monaco, an individual, is now the only plaintiff in this action," (id. ¶ 5).

Accordingly, there is no longer a representative for the Civil Commitment Subclass.

### 2.    Incompetency Subclass

Monaco represents the Incompetency Subclass.  See Monaco II, 2002 WL 32984617, at *37.  Defendants now argue that "Mr. Monaco cannot serve as class representative because he is collaterally estopped from challenging his involuntary commitment." (State Defs.' Mem. in Supp. of Mot. for Summ. J. ("State Defs.' Mem.") (Dkt. 599) at 32.)  Defendants reason that the court "already has held that Mr. Monaco is collaterally estopped from re-litigating the issue of whether he posed a danger at the time of his involuntary commitment." (Id. (citing Monaco II, 2002 WL 32984617, at *31).)  Thus, State Defendants argue that Mr. Monaco cannot litigate any of the remaining claims because "the issue of dangerousness is at the heart of all of those claims." (Id.)  Plaintiffs respond that the court should not apply the law of the case doctrine to follow the prior collateral estoppel determination because that decision was clearly erroneous for two reasons (1) "a finding that Mr. Monaco was dangerous is not synonymous" with a finding that his due process rights were not violated (Pls.' Omnibus Mem. in Opp'n to State Defs.' and Packard's Mots. for Summ. J. ("Pls.' Opp'n") (Dkt. 630) at 29)[2] and (2) Mr.

_____

[2] The court notes that the same document was also filed as docket number 621.

Monaco did not have a full and fair opportunity to litigate the state court finding that he was dangerous (id. at 30).

       i.      Judge Sifton's Ruling

In 2002, Judge Sifton—then the district judge assigned to this case—considered whether an earlier state court determination that Monaco's confinement was lawful "precludes plaintiff Monaco from asserting that he was improperly certified as dangerous." Monaco II, 2002 WL 32984617, at *30. Judge Sifton answered in the affirmative. He reasoned:

> Under New York law, there are but two necessary requirements for the invocation of the doctrine of collateral estoppel. First, there must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling.
>
> The burden of showing that the issues are identical and were necessarily decided in the prior action rests with defendants, those seeking to apply issue preclusion. In contrast, the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with plaintiff Monaco, the party opposing the application of issue preclusion.
>
> Defendants contend, and plaintiff Monaco does not deny, that the first element is satisfied here. In the habeas corpus proceeding, Judge Oshrin considered whether plaintiff's confinement was wrongful because he was not mentally ill or in need of involuntary care and treatment as required by § 9.27 of the MHL. The testimony of Kanji and Weidenbacher confirms that evidence on these issues was presented. In denying the writ, the court necessarily found that plaintiff Monaco met these statutory conditions. As the case law makes clear, a person is in need of involuntary care and treatment under § 9.27 only if he poses a substantial risk of harm to himself or others. Thus, Judge Oshrin necessarily made the additional finding that plaintiff Monaco was dangerous. Because plaintiff Monaco's claims in this case hinge on his allegation that he was not dangerous, they involve the same question that was posed and answered in the state court proceeding.
>
> Issue preclusion would not bar plaintiff Monaco from relitigating this question if he could show that he did not have a full and fair

opportunity to litigate it in the prior proceeding. He has failed, however, to carry his burden. . . . Plaintiff Monaco sought nothing short of his release from the facility at which he was being held against his will. In cross-examining witnesses and in testifying himself, he vigorously pursued this end. Represented by the same seasoned and diligent attorney who represents him and an entire class of plaintiffs in the present action, he sought relief from New York's trial court of general jurisdiction. He enjoyed the benefit of additional evidence at the court's insistence. The record cannot be read to support a finding that Judge Oshrin's determination was compromised or that the evidence or law has changed appreciably. As plaintiff Monaco had already commenced the present action, he can hardly contend that it was unforeseeable.

Plaintiff Monaco argues only that he was deprived of a full and fair opportunity to litigate in the first instance because his motion for leave to appeal was denied for mootness. He presents no authority, however, to buttress his argument. Nor can this Court discern a principled basis on which to rest the rule of law that he proposes. While the Second Circuit often vacates lower court judgments to avoid the harsh result of allowing preclusive effect to attach to a judgment from which any appeal would be moot, it does so only where the circumstances lie beyond an appellant's control. Plaintiff Monaco chose to forego his option of filing a petition for a rehearing and review of Judge Oshrin's order within thirty days. Instead, he waited ten months from the time of the order and five months from the time of his release to file a notice of appeal. Having balanced the factors suggested by the New York Court of Appeals, I find that the habeas corpus proceeding, coupled with the available avenues for review, represented a full and fair opportunity for plaintiff Monaco to challenge his dangerousness.

Id. at *31-32. Judge Sifton further found that because Monaco was collaterally estopped from litigating his dangerousness he could not serve as a class representative of the Civil Commitment Subclass. He explained:

Plaintiff Monaco's dangerousness appears to be central to the success of his claims. The record, moreover, contains no evidence upon which to conclude that issue preclusion will be raised as a defense against the claims of many members of the class. Plaintiff Monaco has thus failed to meet his burden of demonstrating typicality.

Id. at *42.

Defendants now argue that the law of the case doctrine should be applied to two of Judge Sifton's rulings: (1) his finding that Monaco cannot relitigate the issue of his dangerousness and (2) that Monaco cannot serve as a class representative for a class asserting claims that center on a finding of non-dangerousness.

### ii.     Law of the Case Doctrine

The law of the case doctrine provides "that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983). Although the law of the case doctrine is discretionary, see Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 8 (2d Cir. 1996), generally, a court should adhere to its prior holdings absent "cogent" or "compelling" reasons militating in favor of reversal. Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009) (quoting United State v. Quintieri, 306 F.3d 1217, 1229 (2d Cir. 2002)). The major grounds justifying reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (citation and internal quotation marks omitted); see also United States v. Carr, 557 F.3d 93, 102 (2d Cir. 2009) ("A court's reconsideration of its own earlier decision in a case may, however, be justified in compelling circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice.").

Plaintiffs contend that the law of the case doctrine should not be applied here because Judge Sifton's ruling was clearly erroneous. For the reasons discussed below, the court disagrees.

### iii.     Collateral Estoppel

"[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984). "In New York, collateral estoppel has two essential elements. 'First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination.'" Jenkins v. City of New York, 478 F.3d 76, 85 (2d Cir. 2007) (quoting Juan C. v. Cortines, 89 N.Y.2d 659, 667 (N.Y. 1997)). "The fundamental notion of the doctrine of collateral estoppel, or issue preclusion, is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the parties or their privies." Constantine v. Teachers Coll., 448 F. App'x 92, 93 (2d Cir. 2011) (summary order) (quoting Ali v. Mikasey, 529 F. 3d 478, 489 (2d Cir. 2008)).

Plaintiffs raise two challenges to Judge Sifton's prior ruling. First, they argue that the state court's finding that Monaco was dangerous is not a finding that Monaco's due process rights were not violated (as the class alleges). (Pls.' Opp'n at 29.) Second, they claim that Monaco did not have a full and fair opportunity to litigate the issue of his dangerousness in state court. (Id.) The court addresses each claim in turn.

### a.     Identical Issues

Plaintiffs make two arguments on identicality. First, they argue that although New York law required a finding a dangerousness, the state court made no such finding. (Id. at 29.) This argument merits little discussion. As Judge Sifton explained fourteen years ago, "In denying the

8

writ, the [State] court necessarily found that plaintiff Monaco met these statutory conditions. As the case law makes clear, a person is 'in need of involuntary care and treatment' under § 9.27 only if he poses a substantial risk of harm to himself or others. Thus, Judge Oshrin necessarily made the additional finding that plaintiff Monaco was dangerous." Monaco II, 2002 WL 32984617, at *31. All record evidence supports this conclusion; indeed, the issue of Monaco's dangerousness was heavily litigated. (See, e.g., Tr. of State Habeas Proceeding (Decl. of Michael Peeples in Supp. of State Defs.' Mot. for Summ. J. ("Peeples Decl.") (Dkt. 624), Ex. B (Dkt. 624-2) at 39:18-41:20, 41:25-49:21, 54:19-55:23, 64:12-15, 66:22-67:3, 67:20-22.) Indeed, Plaintiffs' Rule 56.1 statement admits that "[t]he issue of dangerousness, that is, of whether Mr. Monaco posed a substantial risk of harm, was litigated at the May 22, 1998 hearing." (See Defs.' 56.1 (Dkt. 600) ¶ 18; Pls.' 56.1 (Dkt. 631) ¶ 18.) And, to make matters easier, Plaintiffs admit that "[i]n authorizing Mr. Monaco's retention at Pilgrim, the Supreme Court necessarily found that that Mr. Monaco was dangerous to himself or others." (See Defs.' 56.1 ¶ 21; Pls.' 56.1 ¶ 21 (admitting to ¶ 21 of Defendants' Rule 56 statement).) Thus, the court finds that the issue of Monaco's dangerousness was fully litigated in Monaco's state habeas proceeding.

Plaintiffs next argue that the issues decided in Monaco's state habeas proceeding differ from the remaining claims in this case. (Pl.'s Opp'n at 29.) Specifically, they claim that a commitment finding that that Mr. Monaco was dangerous and therefore permissibly committed is not synonymous with a due process finding that the evaluations by the physicians who initially committed Monaco promised some degree of accuracy. (Id.) As an example of this potential distinction, Plaintiffs propose the following hypothetical:

> A patient can be extremely dangerous, suffering from command hallucinations in which voices tell him to kill. However, a doctor

9

> certifying a patient for commitment may not be aware of this symptom as the doctor conducts only a one-minute evaluation because the doctor wants to leave for the golf course. At the civil commitment hearing, a different doctor testifies about the command hallucinations, which serve as a basis for the court's determination of dangerousness. Any determination by the court will not address the whether the evaluation by the certifying doctor promised some degree of accuracy.

(Id. at 29 n.5.) Plaintiffs thus reason that Judge Sifton committed clear error when he held that Monaco's procedural claims were collaterally estopped.

Plaintiffs' argument obfuscates the issue. Judge Sifton made two key findings. First, he found that Monaco was estopped from litigating his substantive dangerousness. Monaco II, 2002 WL 32984617, at *42. This is the issue to which Defendants seek to have collateral estoppel applied. As explained above, this exact issue was plainly presented and decided in the state habeas preceding.

Second Judge Sifton found that because Monaco could not relitigate his dangerousness, his claims were not typical of the class's claims. Strictly speaking, this is not a collateral estoppel finding at all, but rather a typicality finding. Judge Sifton found that "Plaintiff Monaco's dangerousness appears to be central to the success of his claims. The record, moreover, contains no evidence upon which to conclude that issue preclusion will be raised as a defense against the claims of many members of the class. Plaintiff Monaco has thus failed to meet his burden of demonstrating typicality." Id. at *42.

On this latter point, Judge Sifton is undoubtedly correct; a brief review of the facts surrounding Monaco's detention reveals that his claim is far from typical. Monaco was examined by three psychiatrists before he was committed in conformity with the procedure mandated by New York Mental Health Law. Id. at *9. From there, Monaco's procedural history diverged from a typical commitment. On May 19, 1998, Monaco requested that he receive a

10

judicial hearing to determine whether he was in need of hospitalization. Id. The next day, Monaco filed a writ of habeas corpus. Id. The following day, in the presence of his counsel and two of the psychiatrists who made the initial commitment decisions, Monaco was examined by a fourth psychiatrist, Juliana Kanji. Id. Monaco alleges that Kanji's examination was just as cursory as his earlier examinations. Id. However, when Kanji testified at Monaco's habeas proceeding, Judge Oshrin did not find that the examination was overly cursory or unreliable. Instead, he found that Monaco should remain in treatment as more evidence was gathered. Id. at *9-10. Judge Oshrin then appointed Richard Weidenbacher to conduct a fifth examination of Monaco. Id. at *10. Mr. Weidenchacher concluded that Monaco required additional in-patient care. Id. Thereafter, Judge Oshrin approved Monaco's detention. Id. Accordingly, at the time Monaco was committed, five psychiatrists and a judge found that he was dangerous. Moreover, Judge Oshrin determined that Kanji's examination—an examination that Monaco alleged was just as cursory as his commitment examinations—was at least reliable enough to justify commitment pending additional investigation. (See Habeas Tr. (Exs. to 2002 Mot. for Summ. J. at 128[3]) at 125:9-21.)

More important here, upon reviewing this record, Judge Sifton did not find that Monaco could not possibly raise a claim related to his dangerousness (nor did he need to make such a finding). That is, Judge Sifton never found that Monaco was collaterally estopped from asserting any possible procedural claim. Instead, he found that because Monaco was precluded from asserting that he was not dangerous as a substantive matter and because substantive dangerousness was central to the class's claims, Monaco's claims were not typical. Plaintiffs have put forward no reason why that holding should be abandoned.

---

[3] The moving papers associated with the 2002 motion are on file with the court.

In any event, Plaintiffs' argument that Monaco has unaddressed procedural claims fails

for an independent reason; namely, the class no longer asserts any claims that are independent of

an assessment of substantive dangerousness.[4] The only remaining claims asserted by the

Incompetency Subclass are the sixth, seventh, and thirteenth causes of action in the Sixth

Amended Complaint. Each cause of action hinges on a finding that state psychiatrists are finding

individuals with mental health issues to be dangerous when they are, in fact, not. The sixth cause

of action alleges that state psychiatrists evaluate individuals "as dangerous because the

physicians believe that such individuals' clinical condition warrants in-patient care and

treatment, [and because of such practice] defendants . . . are responsible for the confinement of

nondangerous individuals." (Sixth Am. Compl. (Dkt. 592) ¶ 215 (emphasis added).) Likewise,

the seventh cause of action alleges that "[b]y failing to examine and employ significant criteria

related to the likelihood of causing harm when examining allegedly mentally ill individuals for

civil commitment purposes, physicians . . . make clinical determinations that do not promise

some degree of accuracy and such decisions result in the confinement of nondangerous

individuals." (Id. ¶ 218 (emphasis added).) Thus, both of the due process causes of action that

Monaco seeks to assert on behalf of the class are inextricably tied to a finding that nondangerous

people are committed. Monaco, however, has already been determined to be dangerous. The

same logic applies to the remaining Americans with Disabilities Act claim. The thirteenth cause

of action alleges that "[b]y failing to determine whether individuals remanded pursuant to

_____

[4] The court notes that Plaintiffs have abandoned their eighth through twelfth causes of action. (Brooks Decl. in Opp'n to Defs.' Mot. for Summ. J. (Dkt. 636) ¶ 15.) Thus, the only remaining claims asserted on a class wide basis are the sixth, seventh, and thirteenth causes of action. (See State Defs.' Mem. at 99; Sixth Am. Compl. (Dkt. 592).) The sixth and seventh causes of action are asserted by both the Civil Commitment and Incompetency Subclasses, each claim alleges a substantive due process violation based on the allegation that state psychiatrists commit nondangerous individuals. (See State Defs.' Mem. at 99; Sixth Am. Compl.) The thirteenth cause of action is asserted by only the Incompetency Subclass. (See State Defs.' Mem. at 99; Sixth Am. Compl.) It alleges that committed individuals should be placed in the community under the Americans with Disabilities Act. (See State Defs.' Mem. at 99; Sixth Am. Compl.)

Criminal Procedure Law § 730.40 can live nondangerously in the community because physicians erroneously believe that if individuals who have been brought to a psychiatric emergency room have been deemed to require hospitalization, they are in a psychiatric crisis and only inpatient treatment is warranted to treat someone who requires compulsory care and treatment, physicians at OMH facilities violate the most integrated setting of Title II of the Americans with Disabilities Act." (Id. ¶ 234.) However, Judge Oshrin found that Monaco in fact required in-patient treatment. Therefore, even if Monaco was not collaterally estopped from asserting a procedural claim, and even if Monaco could be a typical class representative, he is not asserting such a claim. With regard to the claims that the class actually asserts, Monaco's claims are not typical.

### b. Full and Fair Opportunity to Litigate

Plaintiffs next argue that the state habeas decision should not preclude re-litigation of Monaco's dangerousness beacause in that case "Monaco filed a notice of appeal. However, the Appellate Division dismissed the appeal as moot." (Pls.' Opp'n at 30 (internal citations omitted).) Thus, Plaintiffs reason that Monaco did not have a full and fair opportunity to litigate his dangerousness at the state habeas proceeding, which under New York law would bar the application of collateral estoppel. See Johnson v. Watkins, 101 F.3d 792, 793 (2d Cir. 1996).

This exact argument was made fourteen years ago in front of Judge Sifton. He rejected it, stating:

> Nor can this Court discern a principled basis on which to rest the rule of law that [Monaco] proposes. While the Second Circuit often vacates lower court judgments to avoid the harsh result of allowing preclusive effect to attach to a judgment from which any appeal would be moot, it does so only where the circumstances lie beyond an appellant's control. Plaintiff Monaco chose to forego his option of filing a petition for a rehearing and review of Judge Oshrin's order within thirty days. Instead, he waited ten months from the time of the order and five months from the time of his release to file a notice of appeal. Having balanced the factors suggested by the

> New York Court of Appeals, I find that the habeas corpus proceeding, coupled with the available avenues for review, represented a full and fair opportunity for plaintiff Monaco to challenge his dangerousness

Monaco II, 2002 WL 32984617, at *32.

Plaintiffs now argue that Judge Sifton's decision was clear error because Monaco had good reason to choose not to seek review. Plaintiffs aver that "[a] number of reasons exist why Mr. Monaco did not pursue a rehearing and review." (Brooks Decl. in Opp'n to Defs.' Mot. for Summ. J. (Dkt. 636) ¶ 19.) Namely, Plaintiffs argue that: (1) Monaco did not appeal because he thought he would be discharged before any review could have concluded (id. ¶ 20); (2) Monaco's attorney thought that review would only be successful if an expert was obtained and no expert could be obtained in time (id. ¶ 21); (3) Monaco did not believe that there was time to seek in forma pauperis status and resolve the appeal before he would be released (id. ¶ 22); and (4) Monaco's attorney is overworked (id. ¶ 23).

Accordingly, Plaintiffs ask the court to decide whether, under New York law, collateral estoppel applies to a Plaintiff who chooses not to pursue an appeal until it is too late to do so. The court finds—just as Judge Sifton found—that a Plaintiff who makes a strategic decision to forego an appeal still had a full and fair opportunity to litigate.

New York courts are clear that in the context of collateral estoppel, the inquiry is not whether a party pursued the first action through the final possible appeal, but is instead whether there was an opportunity to appeal. See In re Harley, 746 N.Y.S.2d 137, 139 (App. Div. 2001). Thus, for example, "[d]iscretionary denial by the New York Court of Appeals of a party's motion for leave to appeal . . . is not equivalent to the absence of an opportunity to appeal, and does not prevent the underlying decision of the Appellate Division from having collateral estoppel effect." Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 110-11 (2d Cir. 2002).

14

Indeed, New York courts appear to regularly apply collateral estoppel where a party to the first proceeding could have, but neglected, to appeal the judgment. See, e.g., Clute v. State, 664 N.Y.S.2d 637, 639 (App. Div. 1997). Thus, the court concludes that where a party has a chance to appeal, but does not, collateral estoppel may still be applied.

That is precisely what occurred here. Judge Sifton found that "Plaintiff Monaco chose to forego his option of filing a petition for a rehearing and review of Judge Oshrin's order within thirty days. Instead, he waited ten months from the time of the order and five months from the time of his release to file a notice of appeal." Monaco II, 2002 WL 32984617, at *32. The court finds no error in Judge Sifton's determination that given such circumstances, Monaco had a full and fair opportunity to litigate his dangerousness in the state habeas proceeding.

Accordingly, the court finds (as Judge Sifton did) that Monaco cannot serve as a class representative if the class's claims center on nondangerousness. This, of course, means that Monaco can no longer serve as a class representative of the Incompetency Subclass because each of the Incompetency Subclass's claims revolves around nondangeroussnes.

### 3. A Class without a Representative

Having concluded that neither the Civil Commitment Subclass nor the Incompetency Subclass has a class representative, the only remaining question is whether the lack of a representative is fatal to their continued certification. It is.

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation. Regardless of whether the issue is framed in terms of the typicality of the representative's claims or the adequacy of its representation, there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce,

Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990) (internal citations omitted). Here, as explained above, each class representative has a unique, likely dispositive, defense applicable to their claims. Although the court recognizes that "decertification of a class is a "drastic step," Jermyn v. Best Buy Stores, L.P., 276 F.R.D. 167, 168-69 & n.1 (S.D.N.Y. 2011), the court sees no other solution for three reasons.

First, courts routinely decertify classes where, before trial, it becomes apparent that there is no class representative. See, e.g., Briggs v. Anderson, 796 F.2d 1009, 1019 (8th Cir. 1986); Wu v. Pearson Educ. Inc., No. 09-CV-6557 (KBF), 2012 WL 6681701, at *8 (S.D.N.Y. Dec. 21, 2012); Key v. Gillette Co., 104 F.R.D. 139, 141 (D. Mass. 1985), aff'd, 782 F.2d 5 (1st Cir. 1986). These cases are unsurprising given the general rule that "[a] district court may— and should—decertify a class when the standards of Rule 23 have not been met." Wu, 2012 WL 6681701, at *5. Indeed, the Second Circuit has suggested that decertifying a class is appropriate when the class representative is disqualified. See Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 104 n.9 (2d Cir. 2007) ("[I]f the district court certifies the class after a determination that either or both of the plaintiffs are adequate class representatives, it can always alter, or indeed revoke, class certification at any time before final judgment is entered should a change in circumstances render the plaintiffs inadequate class representatives.").

Second, "'where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation,' certification for the class is improper because he or she can no longer act in the best interest of the class." Rocco v. Nam Tai Elecs., Inc., 245 F.R.D. 131, 135 (S.D.N.Y. 2007) (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000)). Here, both the Law Clinic (standing) and Monaco

(collateral estoppel) are subject to unique defenses, such that if they were allowed to continue representing the class, the class may be harmed.

Finally, delaying the case while Plaintiffs seek to find a new representative would risk prejudicing Defendants. Plaintiffs have been aware of the potential problems with their class representatives for years. During that time, Plaintiffs did not attempt to augment the class with a new representative. Instead, they waited. The court fears that allowing Plaintiffs additional time to find a new representative will considerably delay adjudication of Defendants' potential liabilities. A new representative would likely require additional discovery and further summary judgment briefing. This case has already been litigated for nearly 20 years, additional delay is not warranted. Indeed, courts in this circuit recognize that significant delays risk serious prejudice. See, e.g., Dodson v. Runyon, 957 F. Supp. 465, 470 (S.D.N.Y. 1997) ("As the Second Circuit has found, a delay of [more than eleven years] makes likely the chance that memories have faded and that witnesses who might once have been available may well not be found."), aff'd, 152 F.3d 917 (2d Cir. 1998).

Accordingly, the court finds that decertification of the Civil Commitment Subclass and the Incompetency Subclass is proper.

### D.    Conclusion

For the reasons stated above, the court decertifies both remaining Plaintiff classes because neither class has a proper representative.[5] Accordingly, the court neither reaches the

---

[5] The court notes East Texas Motor Freight Systems Inc. v. Rodriguez, 431 U.S. 395 (1977) and its progeny do not compel an opposite conclusion. There, the Supreme Court noted that:

> [A] different case would be presented if the District Court had certified a class and only later had it appeared that the named plaintiffs were not class members or were otherwise inappropriate class representatives. In such a case, the class claims would have already been tried, and, provided the initial certification was proper and decertification not appropriate, the claims of the class members would

State Defendant's motion for summary judgment on the classes' claims, nor does it reach the classes' motion for partial summary judgment against the State Defendants.

## II.   MONACO'S INDIVIDUAL CLAIM AGAINST PACKARD

Before the court are Packard's and Monaco's cross-motions for summary judgment. Briefly, Monaco argues that Packard was deliberately indifferent to his medical needs when Packard failed to prescribe Monaco Lithium. For the reasons stated below, the court GRANTS Packard's motion for summary judgment and DENIES Monaco's motion for summary judgment.

### A.   Background[6]

Monaco was first incarcerated at the Suffolk County Correctional Facility on March 24, 1998. (Packard's 56.1 (Dkt. 613-1) ¶ 1.) The admission note states that Monaco was diagnosed by Dr. Fortuna with bipolar disorder and that Monaco was taking Lithium. (Id. ¶ 2.) Packard saw Monaco on April 9, 1998. (Id. ¶ 6.) Packard observed that Monaco was extremely psychotic. (Id.) On that same day, Packard learned from Mr. Scharfenberg, Monaco's lawyer, that Monaco had, in the past, been taking Lithium and Prolixin. (Id.) Accordingly, Packard prescribed Prolixin, to be taken with the Lithium that Monaco was already taking. (Id.)

On April 10, 1998, Monaco was bailed out of jail and sent to the Eastern Long Island Hospital ("ELIH") for psychological treatment. (Id. ¶ 7.) While at ELIH, Monaco was not given Lithium, but was instead given Prolixin and Klonopin. (Id. ¶ 8.) On April 16, 1998, Monaco

---

not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims.

Id. at 406 n.12. East Texas and its progeny concern cases where a class action proceeds to trial and based on proof at trial, the named plaintiffs are shown to not have valid claims. In such a case, the court would have the benefit of trial to assess whether representation was proper. Indeed, the East Texas concern really only arises where the named plaintiff loses at trial, but at least some of the remaining class wins. That is, if the whole class loses, typicality will generally not be implicated. However, if the class as a whole prevails, the court can likely infer adequacy from the trial victory. See Sirota v. Solitron Devices, Inc., 673 F.2d 566, 572 (2d Cir. 1982).

[6] Except as specifically noted, the court finds that the following facts are not genuinely disputed.

reportedly threw a chair and because of this reported violence he was sent back to the Suffolk County Correctional Facility. (Id.) Nonetheless, Dr. Eitan, an ELIH doctor, told Packard that Monaco had been free from thought disorders for three days while at ELIH. (Id.)

On April 17, 1998, Packard saw Monaco after he had returned to jail. (Id. ¶ 9.) Monaco appeared to speak logically at the time, although he did ramble occasionally. (Id.) At the meeting, Monaco agreed to continue taking his Prolixin. (Id.) Packard saw Monaco again on April 20, 1998, and on May 1, 1998. (Id.) During both meetings, Monaco appeared coherent although would occasionally say irrelevant things or ramble. (Id.) On May 8, 1998, Monaco was discharged from the Suffolk County Correctional Facility. (Id. ¶ 11.) Monaco was not prescribed Lithium during his second stint at the Suffolk County Correctional Facility. (Id. ¶ 9.)

Monaco's allegations relate to this second stint in Packard's care at the Suffolk County Correctional Facility, after he returned from ELIH. Monaco alleges that Packard was deliberately indifferent to his serious medical needs when Packard failed to prescribe him Lithium. (See Pls.' Mem. in Supp. of Mot. for Partial Summ. J. (Dkt. 646) at 62.)

**B.    Legal Standard**

To establish a Fourteenth Amendment claim arising from inadequate medical care, a pretrial detainee must show 'deliberate indifference to a serious medical condition.'" Covington v. Westchester Cnty. Dep't of Corr., No. 06-CV-5369 (WHP), 2010 WL 572125, at *5 (S.D.N.Y. Jan. 25, 2010) (quoting Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009)).[7] "The standard includes objective and subjective criteria: plaintiff must show that (1) 'he had a serious medical condition' and (2) 'it was met with deliberate indifference.'" Id. (alteration removed) (quoting Caiozzo, 581 F.3d at 72).

---

[7] The court notes that the standard is the same regardless of whether the claim is brought under the Eighth or Fourteenth Amendment. See Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009).

With regard to the objective prong, the alleged deprivation must be "sufficiently serious." Hathaway v. Couglin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). "A condition is objectively serious if it poses an unreasonable risk of serious damage to a prisoner's future health." Young v. Choinski, 15 F. Supp. 3d 194, 198-99 (D. Conn. 2014) (alterations removed) (quoting Guilbert v. Sennet, 235 F. App'x 823, 826 (2d Cir. 2007) (summary order)).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care. This means that the charged official must act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Officials need only be aware of the risk of harm, not intend harm. And awareness may be proven from the very fact that the risk was obvious." Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks, citations, and alterations omitted).

## C. Discussion

Packard argues that he is entitled to summary judgment because "there is no record evidence that Dr. Packard actually drew the inference that not prescribing Lithium would result in a substantial risk of harm." (Packard's Mem. in Supp. of Mot. for Summ. J. (Dkt. 616) at 21.)[8] Specifically, Packard claims that he was unsure about Monaco's diagnosis and, therefore, never inferred that there was harm in not prescribing Lithium.[9] Monaco responds that "[a] reasonable jury could easily conclude that if Mr. Monaco was still manifesting symptoms of

[8] The parties also contest whether Monaco's condition constituted a serious health risk. The court does not reach this question.

[9] Packard also claims that he did not prescribe Lithium because Monaco often refused to take Lithium. The parties sharply contest what specifically Monaco said regarding his views on Lithium. According to Packard, Monaco had a history of not taking his Lithium, had refused to take Lithium, and never requested Lithium.
(Packard 56.1 ¶¶ 4, 14.) According to Monaco, Monaco repeatedly requested to be prescribed Lithium.
(Packard 56.1 ¶ 20.) The court need not (and indeed, at the summary judgment stage, cannot) resolve this dispute.

mental illness, but had been free of a thought disorder, the only logical conclusion that Dr. Packard could have drawn was the Mr. Monaco was suffering from mania." (Pls.' Opp'n at 77.) Monaco's argument misses the mark.

The parties agree that it is often extremely difficult to differentiate between bipolar disorder and schizophrenia at the acute state. (Packard 56.1 ¶ 12.) When Packard first saw Monaco, he initially believed that Monaco suffered from bipolar disorder and was suffering from an acute manic episode. (Packard Dep. (Decl. of William Brooks in Supp. of Pls.' Mot. for Partial Summ. J. (Dkt. 642), Ex. CC (Dkt. 643-18)) at 70:5-8.) However, when Packard examined Monaco again on April 17 and April 20, 1998, receptively, Packard was less certain that Monaco was suffering from an acute manic episode; instead, Packard suspected that Monaco was suffering from an acute schizophrenic episode. (Id. at 81:2-14.) Packard believed the best medicine to treat an acute schizophrenic episode was Prolixin. (Id. at 89:6-12.) Accordingly, Packard thought that prescribing Lithium might have been less effective. (Id. at 82:6-11.)

Monaco does not contest three key facts: (1) that at the acute phase it is difficult to determine whether an individual is suffering from bipolar disorder or schizophrenia; (2) that Prolixin is a an appropriate treatment for schizophrenia; and (3) that Packard drew the conclusion that Monaco was more likely suffering from acute schizophrenia.[10]

---

[10] In his 56.1 statement, Monaco denies Packard's paragraph 13, which states, in part, that Packard was less certain that Monaco was suffering from bipolar disorder after he returned from ELIH. (Pls.' 56.1 ¶ 13.) Monaco's basis for denying the statement is not clear. Rather than responding to each factual claim, Monaco instead objects to a paragraph of factual allegations by saying that he (1) denies that it was good medical practice to continue to give Lithium under the circumstances (the court assumes Monaco meant to say Prolixin) and (2) denies that Monaco was better when he returned. (Id.) Thus, it is unclear from Monaco's 56.1 statement whether Monaco denies that Packard reevaluated his original diagnosis upon Monaco's return. From a review of the entire record, it appears that Monaco does not contest this fact. (See Pls.' Opp'n at 77 (stating that Packard's conclusion that Monaco was not suffering from bipolar disorder was against the weight of the evidence but not contesting the Packard came to believe that Monaco was schizophrenic).) In any event, Monaco has put forward no evidence to create a genuine issue of material fact as to whether Packard actually reevaluated his diagnosis.

All of the evidence on which Monaco relies only supports the argument that Packard should have become aware that Monaco actually suffered from bipolar disorder[11] and, therefore, should have become aware of the risks of not prescribing Lithium.[12] That argument is foreclosed by Second Circuit precedent. In <u>Caiozzo v. Koreman</u>, 581 F. 3d 63 (2d Cir. 2009), Caizzo's estate argued that the defendant, Cummins, was deliberately indifferent to Caiozzo's alcohol withdrawal. <u>Id.</u> The Second Circuit disagreed, it reasoned that:

> Most of the evidence offered by the plaintiff was in support of the argument that Cummins should have been aware that Caiozzo was in immediate danger of alcohol withdrawal. A reasonable juror might have concluded that this was the case. There is virtually no evidence, however, to support a conclusion by a reasonable juror that Cummins was actually aware of that immediate danger. The evidence is clear that she thought, wrongly it turned out, that Caiozzo was intoxicated and therefore not in danger of an imminent severe alcohol withdrawal reaction.

<u>Id.</u> at 72. At most, Monaco's evidence shows that Packard should have discerned that Monaco suffered from bipolar disorder and, accordingly, prescribed Lithium. However, Monaco does not, and cannot on this record, suggest that Packard actually surmised that Monaco was suffering from bipolar disorder. Instead, the record is clear that Packard concluded that Monaco was suffering from schizophrenia and acted accordingly. Just like in <u>Caiozzo</u>, the fact that Packard

---

[11] Monaco's argument that Packard actually diagnosed him with bipolar disorder has no support in the record. Instead, the record makes clear that Packard initially thought that Monaco had bipolar disorder but questioned that judgment when Monaco returned to Suffolk County Correctional Facility. (Packard Dep. at 70:5-8, 81:2-14). The portion of Packard's deposition that Plaintiffs cite only relates to Packard's initial impression, not his final diagnosis. Indeed, in their motion for partial summary judgment, Monaco describes Packard's bipolar diagnosis as "tentative." (Mem. in Supp. of Pls.' Mot. for Partial Summary J. (Dkt. 646) at 60.) Thus, the court finds that Packard ultimately came to believe that Monaco suffered from schizophrenia.

In any event, even if Monaco was correct that Packard initially diagnosed Monaco with bipolar disorder, Monaco received Lithium during his first stint at Suffolk County Correctional Facility. It is Monaco's second stint at Suffolk County Correctional Facility that is at issue. By that time, the record is clear that Packard believed Monaco was schizophrenic.

[12] For example, Dr. Lubit's declaration argues that Packard should have drawn a different conclusion from the evidence before him. And therefore, should have concluded that there was danger in not prescribing Lithium. (<u>See</u> Decl. of Roy Lubit in Opp'n to Defs.' Mot. for Summ. J. (Dkt. 620).)

may have been wrong does not give rise to a deliberate indifference claim. Indeed, it is a bedrock principle that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

More important, the record demonstrates that Packard had good reasons to suspect that Monaco did not suffer from bipolar disorder.[13] First and foremost, the parties agree that Packard faced a difficult diagnostic decision because bipolar disorder and schizophrenia present similarly at the acute phase. (Packard 56.1 ¶ 12.) Second, some evidence indicates that Monaco's condition improved during his time at ELIH where he was taken off of Lithium and placed on Prolixin and Klonopin. (Packard Dep. at 69:3-8, 84:21-85:10.) It is true, as Monaco argues, Monaco did exhibit violent tendencies when he threw a chair at ELIH and he was still symptomatic when he returned to the Suffolk County Correctional Facility. (See, e.g., Pls.' Opp'n at 77.) Nonetheless, when Packard reexamined Monaco after he returned from ELIH, Packard came to the conclusion that Monaco's condition had improved. (Packard 56.1 ¶ 9.) This observation could have rationally led Packard to conclude that Monaco's treatment at ELIH, which did not include Lithium, should have been continued. (See Packard Dep. at 71:22-25.)

Accordingly, the court finds no genuine issue of material fact with regard to whether Packard actually perceived that there was a risk of not prescribing Lithium and thus, GRANTS Packard's motion for summary judgment and DENIES Plaintiff's motion for summary judgment.

## III. CONCLUSION

For the reasons stated above, the court DECERTIFIES the Civil Commitment Subclass and the Incompetency Subclass. Within thirty (30) days of the issuance of this Memorandum

---

[13] These facts also separate this case from those where a medical professional ignores obvious signs of a serious medical need. Packard did not ignore Monaco's symptoms at all; instead, he attempted to treat them in a manner that Monaco now disagrees with.

and Order, the parties are DIRECTED to file a status report with the court outlining whether, and if so what, issues remain active in this case. The court further GRANTS Defendant Packard's motion for summary judgment and DENIES Monaco's motion for partial summary judgment against Packard.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
  March 31, 2016

NICHOLAS G. GARAUFIS
United States District Judge